

**EXHIBIT 10**



**PohlmanUSA®**

## Court Reporting and Litigation Services

Robert Huelskamp

October 18, 2023

Connie Essmyer
vs.
Huelskamp Law, LLC

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

Connie Essmyer,            )
                           )
    Plaintiff,             )
v.                         ) Case No. 1:22-cv-00140
                           )
Huelskamp Law, LLC,        )
                           )
    Defendant.             )

DEPOSITION OF ROBERT HUELSKAMP
Taken on behalf of the Plaintiff
October 18, 2023

Julie Ann Whiting, CCR 830, RPR

INDEX

Examination by Mr. Christian                    Page 5

PLAINTIFF'S EXHIBIT INDEX

Exhibit 1                                        Page 49
     (Defendant's Answers to Plaintiff's First
     Set of Interrogatories Directed to
     Defendant Huelskamp Law, LLC)

Exhibit 2                                        Page 52
     (Letter dated 9/21/15)

Exhibit 3                                        Page 55
     (Garnishment Application and Order)

Exhibit 4                                        Page 60
     (V.A.M.S. 408.040)

Exhibit 5                                        Page 65
     (Huelskamp Law Firm, LLC Deposit Detail)

Exhibit 6                                        Page 101
     (15 U.S.C.A. 1692e)

Exhibit 7                                        Page 76
     (Defendant's Answers to Plaintiff's First
     Requests for Production Directed to
     Defendant Huelskamp Law, LLC)

Exhibit 8                                        Page 90
     (Document entitled Essmyer Payments)

Exhibit 9                                        Page 95
     (Document entitled Essmyer Payments)

     (Whereupon, the exhibits are attached
electronically to the original and copies.)

```
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MISSOURI

Connie Essmyer,          )
                         )
   Plaintiff,            )
v.                       ) Case No. 1:22-cv-00140
                         )
Huelskamp Law, LLC,      )
                         )
   Defendant.            )
```

DEPOSITION OF ROBERT HUELSKAMP, produced, sworn, and examined on the 18th day of October, 2023, at the offices of Voytas Law, 7321 South Lindbergh Boulevard, Suite 400B, St. Louis, Missouri, between the hours of 11:32 a.m. to 2:07 p.m., before Julie Ann Whiting, a Certified Court Reporter within and for the State of Missouri and Registered Professional Reporter, in a cause now pending In the United States District Court, Eastern District of Missouri, wherein CONNIE ESSMYER is the PLAINTIFF and HUELSKAMP LAW, LLC is the DEFENDANT.

A P P E A R A N C E S

APPEARING ON BEHALF OF THE PLAINTIFF:

Voytas Law, LLC
Caleb Christian, Esq.
Jacob Mohrmann, Esq.
7321 South Lindbergh Boulevard, Suite 400B
St. Louis, Missouri  63125
(314)380-3166
caleb@voytaslaw.com
jacob@voytaslaw.com


APPEARING ON BEHALF OF THE DEFENDANT:

Watters Wolf Bub & Hansmann, LLC
Daniel P. Hunkins, Esq.
600 Dellwood Parkway, Suite 120
St. Louis, Missouri  63017
(636)798-0570
dhunkins@wwbhlaw.com

COURT REPORTER:

Julie Ann Whiting, CCR 830(MO), RPR
PohlmanUSA
10 South Broadway, Suite 1400
St. Louis, Missouri  63102
(314)421-0099

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the Plaintiff and Counsel for the Defendant, that the Deposition of ROBERT HUELSKAMP may be taken in shorthand by Julie Ann Whiting, a Certified Court Reporter, and afterwards transcribed into typewriting, and the signature of the witness is expressly not waived.

* * * * *

(Deposition start time:  11:32 a.m.)

ROBERT HUELSKAMP, of lawful age, being produced, sworn, and examined on behalf of the Plaintiff, deposes and says:

EXAMINATION

QUESTIONS BY MR. CHRISTIAN:

Q   Good morning, sir.  Would you mind stating your name for the record?

**A   Robert D. Huelskamp.**

Q   And what is your occupation?

**A   I'm an attorney.**

Q   And how long have you been an attorney?

**A   1984.**

Q   How long -- kind of walk me through since 1984.  Solo firm?  What have you been doing since 1984?

**A   Do you want chronology of my employment?**

Q    You can ballpark it for me.

A    My first job out of law school was with Kortenhof & Ely, a law firm in downtown St. Louis. I then went to Hullverson Law Firm, which is also in downtown St. Louis. Kortenhof & Ely is an insurance defense firm, Hullverson is a personal injury firm. From there, I went to a firm named Fox Goldblatt & Singer. I could dredge up the specific years, but each was about four years.

And then at that point we moved to Ste. Genevieve, Missouri, where I entered into a practice with a partner who has since retired. But we were partners for about 20 years. Now I am a solo practitioner with an office in Ste. Genevieve, Missouri.

Q    And is -- are you currently the principal of Huelskamp Law, LLC?

A    I'm the only member.

Q    And is the firm's name previously Law Office of Rottler & Huelskamp?

A    When I had my partner, it was Terry Rottler and myself, yes.

Q    And when did Mr. Rottler or Ms. Rottler -- excuse me -- when did they -- when did they retire and leave the practice?

A    Terry retired in late 2018, I believe.

Q    And since late 2018, you've been running it as a solo practice?

A    Yes.

Q    And in advance of today's deposition, what all did you do to prepare?  Did you take a look at the Complaint filed in Case Number 1:22-CV-00140?

A    I've looked at the Complaint, yes.

Q    Did you have a chance to review any documents you may have regarding the underlying -- the underlying debt collection case of 19PR-AC00283?

A    I have looked at numerous documents.  I don't know exactly what you might be referring to.  I can talk about specifics if you'd present them to me.  But my attorney and myself went through issues that are attorney/client privilege.

Q    Did you have a chance to review -- review documents regarding to a judgment and then the subsequent garnishments that were brought on behalf of Perry County Memorial Hospital versus Joseph F. Essmyer and Connie Essmyer?

A    I'm very sorry, but during the first part of your question there was a loud vehicle going by so I didn't quite catch it all.

Q    We are at a crossroads, so, unfortunately,

that happens more than I would really like.  And I'll be honest with you, at about this time we might start hearing some screaming from some people at that crossroads as well, so I apologize in advance.

Did you have a chance to review a consent judgment, a judgment, and subsequent garnishments that were filed on behalf of Perry County Memorial Hospital versus Joseph S. Essmyer and Connie Essmyer?

**A     I reviewed those documents.**

Q    Okay.  So in the -- has the -- has the firm that you're currently running as a solo practice, how would you -- has -- I guess my first question would be to you, is has the work that you performed changed since your partner left the firm, or has it pretty much stayed consistent in that 25 years that you've been working in Ste. Gen?

**A     I am a general practitioner in a small town.  I do a lot of different types of legal work.**

Q    Can you give me some examples of what -- if I wanted to come and hire Huelskamp, what could I hire them to do for me?

**A     Whatever we agree that -- mutually for me to represent.  But I do estate planning.  I do bankruptcy.  I do a lot of domestic**

relations-related work.  I do some criminal work.
Thankfully, there's not a big call for that in our
little town.  Been doing a lot of real estate work.
And I do some collection work.

Q    And when you say collection work, is that
debt collection for clients of yours that are
creditors?

A    As opposed to myself, or --

Q    Correct.

A    Yeah.  I -- I do work for various
companies and entities that have debt owed to them.

Q    How long would you say that you've been
doing debt collection?

A    Mr. Rottler was doing it when I joined
with him in 1996, and I probably immediately started
helping him with those type of things.  So I -- I
did not do much of it before that date, if any.

Q    But since 1996 you've been practicing in
the debt collection field, I'm sure learning more
every year as you go along.

A    I've been filing cases in that regard and
otherwise attempting to collect debts probably
since, yeah -- or my firm did for sure and -- yes.

Q    All right.  Does your firm offer -- I
guess in my opinion -- correct me if I'm wrong -- I

kind of view debt collection as some firms are able to file a case and get it to a judgment, and then they might pass it off.  And then other firms will maybe accept a judgment and then try to collect on that.

Does Huelskamp Law, and previously Rottler and Huelskamp, were they able to perform both of those tasks?  One of those tasks?  What does -- what's your usual -- the usual way of collecting on the debts?

**A     We don't sell judgments and debts.  We do it ourselves to the extent possible.**

Q    So a typical debt collection case for you would be you file it, you get a judgment.  And then depending on the relationship you have with your client, you're set up to then collect on that judgment?

**A     We will do that work to collect on the judgment, yes.**

Q    Obviously I'm not prying into the actual, you know, what was in the meeting when you got this client or anything, but how -- how usually do -- are you able to get in your debt collection clients?  Is it just word of mouth?  You're -- you're the go-to people in Ste. Gen?  Is that -- you've just built up

this practice?  Or is it in any other way?  Do you -- do you advertise?  Do you -- do you put anything in papers?  How do you usually get in your debt collection clients?

A    **I don't advertise.  Exactly how they come to me I don't always know.**

Q    It could be a great reputation.

A    **I like to think so.  Word of mouth is very -- in a small town, a very big thing.**

Q    Mr. Huelskamp, you said that you have been maybe -- beginning -- you began doing debt collection in 1996.  And would you say that you've been in some ways, to varying degrees, handling that until the present day?  Does that seem fair?

A    **I'm still handling collection matters, yes.**

Q    Have -- either when you had a partner or during your solo practice, has there ever been a formalized document that has set out your policies and procedures of how you handle debt collection at your firm?

A    **I'm not sure I know what you mean by a formalized document.**

Q    Is there a document that could be printed out, or is there some other kind of bound document

that lists a policy or procedure for debt collection at your firm?

**A      That was created by my firm, or otherwise available on the Internet?  I'm not --**

Q    If -- in any way?  Is there a policy or procedure that your firm has implemented as its debt collection process and procedure?

**A      Well, we follow the statutes, if that's what you mean.**

Q    So what statutes are we referring to?  Any Missouri statutes that may apply and federal statutes, including the FDCPA?  Does that seem fair?

**A      We follow the law.**

Q    Okay.  But as far as there being a separate document outside of statutes that can be looked up, there is no separate document for Huelskamp Law, LLC that is -- that you have created or otherwise brought together and said this is our policy and procedure for debt collection.  Is that right?

**A      There is nothing that I have typed up and put together.  But there are a lot of other step-by-step type documents available on the Internet that I have looked at over the years.**

Q    So step-by-step documents, what is -- what

do those typically look like?

A   Step 1.  Step 2.  I'm not sure, again, what you mean.

Q   Is it kind of like a checklist?  Is it something that --

A   I don't know.

Q   You don't know.

So this is not a form that you are frequently engaged with, you've just seen checklists before that have walked you through the process?

A   Over the years I reviewed a lot of various articles on debt collection.  I can't point you to any specific.

Q   So I'll -- for -- for the sake of today I'll limit our questions -- because I'm sure this number fluctuates all the time -- but I'll limit it to -- we'll start in 2020 when kind of the issues around this case began bubbling up.

How -- how many people are at Huelskamp Law, LLC?  How many employees are there?

A   In 2020?

Q   In 2020.

A   Myself and two administrative assistants. I'm trying to recall if in 2020 -- I have an internship program at the local high school, I guess

**you'd call them an employee. They're there part time during the school day. I -- I -- I don't remember if it was in place in 2020. But two administrative assistants and myself.**

Q And since 2020 to today, what would -- what changes have gone from there being kind of two admins, an intern, and you at your office?

**A I have two administrative assistants and myself. I'm no longer involved in the internship program. So three of us.**

Q For the actual debt collection that Huelskamp Law, LLC conducts, is that something that is performed by you? Performed by your admins? Performed by the interns? Who -- who is that -- their job to handle the debt collection aspects of the case?

**A I guess we're all involved in it. That's why I hire administrative assistants.**

Q You spoke about reviewing throughout the years -- I'm assuming probably since 1996 -- sporadically looking at articles, other documents, helpful checklists that would explain the debt collection process.

Have you ever done any training with your two admins regarding that information that you've

gleaned?

A    **Are you talking about formalized trainings, sending them to seminars?  Are you talking about just me sitting down with them and going over the --**

Q    We'll start with the first.

Have you ever -- have you or your two admins -- or I should -- I guess I'll ask first.

Are the two admins from 2020 until today, are those the same two admins, or have they changed?

A    **No, they are not.**

Q    They are not the same two admins?

A    **They are not.**

Q    Okay.  How many different admins are we talking about since 2020?

A    **Probably the two that I have now, I believe took the place of the two that were there in 2020.**

Q    Can I get all four of their names?

A    **In 2020, it would have been Olivia McKenzie and Hailey Schweiss.  Currently it's Stephanie Soltys, S-O-L-T-Y-S, and Olivia Anderson.**

Q    Two Olivias?

A    **Two Olivias.**

Q    And I think I'm going to maybe help our

stenographer a little bit and ask what Hailey's last

name was, if you could spell that for us?

A    S-C-H-W-E-I-S-S.

Q    Thank you.

A    Schweiss.

Q    Jumping ahead just a little bit and

because we're talking about them right now, the

garnishment kind of at issue today began in -- I

believe the first one was filed in January of 2021.

Who were the two admins at that time, if

you can remember?

A    I actually think it was July of 2020.

MR. HUNKINS:  Yeah.  I'm going to object.

It misstates the evidence.

Q    (By Mr. Christian) I apologize.  It's

July 30th, 2021, I believe.  I apologize.

A    It would have been Olivia McKenzie and

Hailey Schweiss.

Q    And can -- I apologize, this is going to

be a little bit, maybe, long-winded.

But when did Olivia and Hailey leave, and

when did Stephanie and Olivia 2 enter into the firm?

A    Both Olivia Anderson and Stephanie Soltys

have been with me since late 2022.  So shortly

before that time is when Olivia McKenzie and Hailey

would have left.

Q    And this might solve a lot of our problems.

Do you remember if Olivia McKenzie and Hailey Schweiss, if they left the firm before the Complaint that brought us here today was filed by my clients?

A    I don't remember specifically.

Q    Sometime in late 2022, though, would seem right?

A    Yeah.  I don't have it -- the records to show when -- Hailey was the second one to leave.  I don't know.

Q    Okay.  So now that I've forced you to go through that, going back to what you said regarding training.

Have you or any of your four admins since 2020, have they -- have you or them ever gone to a formal training regarding debt collection?  FDCPA practices?  Any other sort of training like that?

A    No.

Q    And you also mentioned that there might be some more informal meetings that would have -- be had regarding FDCPA practices, collection practices based off of statutes.

Is that something that you would have meetings with your admins about?

A    I don't know if you call them meetings, but we'd have sit-downs to discuss the procedures, and what would happen when accounts come in, and that sort of thing.

Q    How frequently do you think those meetings occur?  And we'll just -- I'm sure it was more just like you're in the office together.  So how often would those discussions occur, if you're fine with me calling them that?

A    I couldn't tell you.

Q    It wasn't -- it wasn't something where you were doing it on a monthly, a quarterly, a biannually, it was just as something happens you might have a discussion with them?

A    It was not on a scheduled basis, normally. It was when issues needed -- or were there, especially when they were newer.

Q    You mentioned that in one case it would be if they were a newer admin, you would have the discussions with them.  Right?

A    Yes.

Q    You also mentioned that if there were issues, that might be a situation where you would

have a discussion with the admin about policies and procedures.

Does that seem right?

**A      They bring me questions all day long.**

Q      Can you give us a sample of what issues you can remember being brought to you and you discussing?

**A      In relation to what?**

Q      To debt collection in general.

**A      Debt collection issues.  Just what happens when we get an account, what needs to be done at that point.  What happens when we don't get a response, what needs to be done at that point.  What happens when we need to file a Petition, what needs to be done at that point.  I mean, so on and so forth until we get the judgment even.  Then there's stuff to be done then.**

**Now, I can't say I remember that we did that -- the whole thing all the way through on every -- when it came time to -- for debt collection matters.**

Q      But if they ever had a question, they would come to you and ask you a question about what was going on?

**A      They're very good about that.**

Q   You've mentioned that there are certain steps that you go through.  And for our process, I am, maybe artificially, going to break this into pre-judgment and post-judgment.

So in 2020 -- or I apologize -- maybe I should ask this first.

When did you actually receive the Essmyer's file from Perry County Health System to begin the litigation process against them?

**A   I didn't bring that file with me, so I don't recall a specific date.  So I don't know.**

Q   Was it in 2019?  Was it in 2020?  Do you have any recollection of when that date might be?

**A   Well, since the judgment is dated October of 2019, it would have been before then.**

Q   Okay.  So in 2019, when a file came in the door from your client for the purpose of filing litigation for debt collection, what would be the steps at that time that you would expect your firm and your admins to go through to get them to judgment?

**A   I can give you a general outline of that. The first thing we do is send out a letter to the alleged debtor, standard form letter, stating the hospital believes you owe them such and such.  Tell**

them the amount.  Tell them the account numbers.  I believe it sets forth the date of the admission that gave rise to the account.  And says please contact us within 30 days, you certainly have a right to dispute it.  If so, we'll send you whatever documentation you request.  That's the first step.

Q    And after that if no -- but let's -- let's just say that no agreement is reached, what would be the next step at that point?

A    If we do not hear from them, then at that point we would start preparing Petitions.  But it's rarely, if ever, day 31.  It's usually more like day -- two months, rather, by the time you get around to these things.

Q    And then I would assume you would file that Petition.  And then how would you typically get --

A    No.

Q    Excuse me.

A    The Petition gets prepared and sent to the hospital so they can double-check the numbers and sign it and send it back to us for filing.

Q    So your policy is every Petition gets verified?

A    Every one is verified.

Q   So after the verification occurs with your client, then it comes back to you.

Then does it get filed?

**A   Then we -- once we get them back from the hospital we do file them at that point.**

Q   And I'm -- I'm not trying to go through a civil procedure right here, I'm just trying to get us quickly to the judgment.

But service occurs.  People show up to court or they don't.  And let's say in -- because we're talking about a consent judgment here, we won't even talk about the case where people don't show up.  If people show up on the day that they were supposed to be there in court, what is your policy and procedure for talking to them and possibly remedying this issue?

**A   The judge calls the docket.  If they announce they are there -- keeping in mind, I don't know what these people look like -- I look over my shoulder, they raise their hand.  I'll say, Judge, can you put that on recall?  He says sure.  When the docket is over I meet with them.  At Perry County, there's a little conference room in the hallway outside the courtroom, and I meet with them and discuss the issues with them.**

Q    If you come to an agreement with them as to -- let's just say they come in, they say I owe -- I owe this money, I'm trying to do right here, do you have a procedure for entering into an agreed judgment, a consent judgment, whatever you may call it with them?

**A    I bring a form with me that has been prepared.  And we do discuss, if they agree they owe it and the amount, the terms that they would like to enter into.  I'm very flexible on that, generally. And they agree, we fill out the form with the number, as in this case, and they sign.**

**We go back into the courtroom and let the court know what the announcement is, and the judge signs the judgment and the consent gets filed along with that.  The judge may tell them, hey, look, you've signed this, you know you have to live up to this, that sort of thing.**

Q    So in the case that you are able to come to an agreement, you agree to -- I'm assuming is it a -- usually a monthly payment?  Or is it going to be weekly?  Monthly?  What?

**A    Almost always a monthly.**

Q    Let's say you agree to a monthly payment plan with the debtor.  What -- once you have brought

that judgment in, I'm sure that you tell your client that you've got the judgment, and I'm not really worried about that part.  But once you have had judgment in and you have the consent judgment, and let's say that your client has also asked for you to perform debt collection on that judgment, what is your process at that point if you have a consent judgment with a payment plan in it?  How is that ran in your firm?

**A    Well, we wait to see if they're going to make the payments they agreed to make on the debt that they said they owed on a consent judgment.  If they do not, then it's highly likely we'll commence garnishment action or some other form of execution, although we rarely do anything other than garnishment.  We also do abstract of judgment in whatever county they might have real estate in.**

Q    In the event that the debtor does not make a monthly payment, is there a default system that your -- that your firm uses that might give them a warning, or is it a you knew you were on notice about this, we're moving forward?  How does your firm handle that?

**A    I'm talking in general here, because I don't know specifics regarding this particular**

debtor.  But we will send out a letter on occasion that says, hey, look, you've agreed to do this, but you're not, so we're going to commence this after such and such, a date.  But on occasion we just go straight to the garnishment.

Q    Who at the firm tracks payments that come in to the firm?

A    Well, it's not me.  It's one of my administrative assistants.

Q    And is -- how -- do you know how they track those payments as they come in?

A    We use QuickBooks.  I don't know if -- if that's what you mean.

Q    So I'll kind of show my hand.  I -- I, many years ago, did debt collection, and I know that we had a system where it was like every file had like a number, or, you know, some kind of alphanumeric number that we would file stuff away with.

So does your firm have any system to say this goes with file number 453, or is it just this goes with the Essmyer file whenever a payment comes in?

A    Well, when we're garnishing, the check from the Court lists who the money is from on that

particular check.  You might have seen redacted areas on the checks that we provided.  Those are other parties who also have been garnished, which are not subject to being disclosed in this instance. So we have that to know where the money is coming from.

Q    What if someone brings money into the firm?  How does that get handled by your policy and procedure?

A    I make the deposits, and I -- literally I'm the one that makes the copies of all these.  And I give them to Hailey or Olivia to enter into QuickBooks.  And they will see that a cash payment was made by such and such, they will see it's for Perry County Hospital, and they will enter it accordingly.  If they do come in with cash, they also will get a receipt from us.

Q    If they bring in cash or a check -- or I don't even know if you take checks -- but if they bring in something that's not from a garnishment, do they give that money to you -- which I doubt -- or do they give it to one of your admins?

A    It could be either.  Depends on who's up at the front desk at the time.

Q    And is it the policy and procedure of the

firm that that person who accepts the payment would be the one to provide a receipt on that cash or money order payment?

**A    Yes.  I mean, whoever's there writes the -- I've written many receipts myself, personally.**

Q    What do the receipts look like?  Like, how -- what form do the receipts take?

**A    It's standard.  I don't know, they're about 2 by 3 inches, four or five on a page.  You peel them out and --**

Q    Is it the kind that has like a carbon copy to it?

**A    It makes a yellow carbon copy, right.  The top's white, you peel that off, give it to them, and we have the copy.**

Q    And do you know how far back you have records of your receipt books currently in your firm?

**A    I don't know how far, no.**

Q    Would you be able to produce receipt books from 2020?

**A    Yes.  I did.  Right there (indicating).**

Q    I believe you were holding up the document that was previously marked as Defendant's Exhibit D.

Is that correct?

A    I was holding up my list of receipts.  But **you might specifically be referring to a receipt book, rather than this.  I don't know if I have those available or not.  I'm pretty sure I do, but --**

Q    So as far as the carbon copy that is left from when a payment is received in your office, you're not for sure that you would have those carbon copies still to this day?

A    **I'm not sure.  It wouldn't surprise me that we do still have them.**

Q    Is there --

A    **More likely than not.**

Q    Is there a policy and procedure in place for culling these old receipt books, or is it just once a pile gets high enough we start tossing them?

A    **Not a policy.  I've got a lot of stuff back in my storage room.**

Q    Whenever you get to the post-judgment aspects of representing your clients and you're performing debt collection, are you doing that on a contingency basis?

MR. HUNKINS:  I'll object to the form. How he gets paid is irrelevant to this lawsuit.

And -- and you're getting into his financials, and I'm going to instruct him not to answer. You're not entitled to that information. Also seeks attorney/client privilege.

Q   (By Mr. Christian) You don't do debt collection pro bono for your clients. Correct?

**A   Not all of them. Some I do.**

Q   Do you perform pro bono debt collection for Perry County Memorial Hospital?

**A   No.**

Q   Now I'm going to move to beyond the we're getting along and we're bringing in payments phase and ask about garnishments.

So who is the person in the office who is tasked with dealing with all of the admin regarding the garnishment process?

**A   Well, I'd say all three of us in a sense, but one of the administrative assistants would prepare the actual form. I don't do it physically, is what I'm saying.**

Q   So for the amounts that go into the form, is there a way that your admins are able to pull that information from your records, or, you know, how do they tabulate those numbers?

**A   From the records that we have.**

Q   And is that the QuickBooks that you were referring to earlier?

**A   It would have to be.**

Q   Do you maintain any kind of account summaries or case notes system that would say, for an example, now, I spoke to the debtor, they said they're going to be a day late?  Something like that?  Are there notes about the individual files that are housed in a computer system?

**A   That happens quite frequently, and we do put a note into their file.  And we're very benevolent in that regard.**

Q   Is it a note in a physical file?  In a digital file?  Where is that housed?

**A   Generally into a physical file.  I -- if they call me, I'll write a note and put it on my secretary's desk.**

Q   Do you maintain any digital files for the debtors that you have in your roster?

**A   In terms of the pleadings and --**

Q   Well, start with that.

So how do you in your computer system -- number one, what computer system do you use to keep track of your cases?

**A   I'm not sure what you mean.**

Q   Is it you just have a documents folder that, then, is set out by the name of the debtor? Do you have a separate third-party system that you utilize to keep things together?  How do you keep everything moving?

**A   Well, I guess you might say we're kind of old school.  Hard copies are involved.  Obviously, we have to scan in the pleadings for electronic filing and all.**

Q   When you scan in a pleading, where is that scan saved?

**A   I'm no IT guy.  You know, it's in a folder that I can access whenever I want to.**

Q   If you wanted to access, let's just say a scan of a garnishment, what would you click through on your computer to get to that scan?

**A   I guess there's a folder that is titled -- named PCMH, Perry County Memorial Hospital, and then alphabetical.**

Q   So if I'm extrapolating a little bit -- correct me if I'm wrong -- it would be -- kind of the top level would be your client, and then once -- the next -- subfolders would be the debtor name.  Is that how things are typically saved?

**A   By alphabetical.  They might be under,**

like, A to H and I to Q -- and, you know, just to save -- make it more convenient. It's the same for all my civil cases.

Q   Is there an intranet in your office, meaning that if -- does everyone in the office have access to these documents, or are they only housed in a computer that you can access?

A   We are networked, so I guess they have access to it.

Q   So anyone who was working for you at the time would have access to all of these client documents.

Is that fair to say?

A   To the pleadings that have been filed, yes.

Q   So walk -- if you could, walk me through, let's say, a payment -- and we'll even make it for -- relevant to this case -- a cash payment of $250 comes in the door. So far what I understand is whoever might be at the front is tasked with providing -- taking the actual payment and providing a receipt to the debtor. Is that correct?

A   Yes.

Q   And it sounded like that might get, like, probably piled up for the day. And then it sounded

like you said that you were the one who actually went through and looked at the payments and provided a list for your admins to, then, input into the system.  Is that correct?

**A     I personally do all of the deposits, so -- so I guess that would be correct.  I copy each one. I prepare the deposit slip.  I drive it to the bank. And I put the copied documents on the secretary's desk, who, ultimately, inputs them into QuickBooks.**

Q     And so if you could, take me through the QuickBooks screen.  Is --

**A     QuickBooks what?**

Q     How -- QuickBooks screen.

**A     Screen.**

Q     How -- are you -- I mean, are you familiar with the way that the payments are input into the system?

**A     I've seen it done.  I've been through the process.  But I can't say -- I could do it if I had to, but I can't claim to be fully knowledgeable of the exact process.  If you talk about specific icons, I won't know.  I could say, oh, yeah, it's that one.  But I don't know what they're called, necessarily, unless I do look at the screen.**

Q     Is there a point where maybe on a weekly,

bi-weekly, monthly, quarterly basis that the -- any credits that were put on someone's file, that those are gone through and verified as this was input correctly, that this has actually occurred, there's been no user error in the entry of the payment application?

**A    I really don't know what you're discussing or meaning.**

Q    Do you ever go back through and make sure that the numbers that were input by your admins was done correctly?

**A    Ever?  I have.  But I don't have a scheduled time for doing that, and I certainly don't go through every one.  That's why I have administrative assistants.**

Q    You said that you, of course, have done it in the past.  What would be an example of when you said, oh, now I've got to go and really check up on the payment input?

**A    I don't know.**

Q    So it's definitely not something that's routine, by any means?

**A    It's not routine.**

Q    Now going to garnishments again, and I apologize for backtracking.

You said that the admin was the one who pulled the numbers out of the system and then created the form that is used to actually file a garnishment.  Is that correct?

A    Yes.

Q    Who makes the decision that a garnishment is going to be filed?

A    **I guess it's just an understanding of policy, in general.  I mean, there might be specific ones that they bring to me and ask whether we should move forward or not.  But, again, if we get no response from a party, we assume they're ignoring it, and we file a garnishment.**

Q    So there's no hard-and-fast policy and procedure for when a garnishment gets filed.  It's more of a case-by-case basis that, then, you would pull the trigger on filing a garnishment in a case.  Is that correct?

A    **I think, in general, it's understood a garnishment's going to be filed if we're not getting payment as agreed to by the debtor, or if we've obtained a judgment by default or whatever.  They do, on occasion, bring me an issue relating to garnishment or collection, and I'll make the decision to move forward or not.**

Q    Is there any policy or procedure at your firm reduced to a document, a written document, that would describe how you expect your admins to actually pull information and put it into the garnishment form?

**A    No.**

Q    Is there any internal checklist or other -- other way of tracking information that is used to make sure that the same process is occurring every time that a garnishment is being created?

**A    Let me backtrack a little bit.**

**Because I know that my administrative assistants have put together step-by-step.  So I guess to say that we don't have any is not entirely -- I can't state for sure.  I can say that I didn't prepare any, but I've seen step-by-steps that they have prepared.  They're very efficient in that regard.**

Q    Do you remember the last time you've seen one of these step-by-step guides?

**A    I don't remember the last time.  And I can't say, as I sit here, that I know there's one specific for what you're asking about.  But I've seen them on a lot of issues.  Because, again, I'm a general practitioner, and we do a lot of different**

**areas of law.**

Q    So just for clarity on the record.

You can't say for certain that there is one dealing with debt collection or garnishment, but if you were to find one, you wouldn't be surprised because you've seen other ones dealing with other topics?

A    **That's a fair statement.**

Q    Do you remember, specifically, ever seeing one regarding a step-by-step guide put together by anyone at your office regarding debt collection?

A    **I do not recall that.**

Q    Do you recall ever seeing a step-by-step guide put together by anyone at your firm regarding garnishment procedures?

A    **I do not recall that.**

Q    After the admin prepares the form, what is the procedure at that point for the garnishment actually being filed?

A    **They put it in an area where my documents to be reviewed and signed are.  And I review, and then sign if it appears appropriate.  And then it gets filed.**

Q    When you say you review the garnishment form, what is your review process?

**A** I look at it. I'm not sure what you mean.

**Q** Do you look at the numbers? Do you look at the heading? What do you actually interrogate as to the document before you when you review it?

**A** I look at the form as it has been prepared.

**Q** Do you ever verify any numbers on that form?

**A** Ever?

**Q** Is it part of your typical day to review the numbers on that form?

**A** To go back and check all the numbers would defeat the purpose of having an administrative assistant do it.

**Q** Do you perform any just, like, basic math of here's the numbers that are on the page, let me make sure they do add up to the total that's on the bottom?

**A** I do on occasion.

**Q** Earlier you said that if it appeared appropriate, you would then sign it. What would be a situation where something would appear inappropriate that would stop you from signing it?

**A** Lots of different things. The wrong name. The wrong county on the caption. Numbers that are

**glaringly potentially obvious.  Wrong date sometimes.  I mean, there's different things that might catch your eye.**

Q    You mentioned wrong county, wrong name, wrong debt amount.

How are you able to recall that information when you're looking at the garnishment form?

A    **Well, if it's a Perry County Hospital case and it says Ste. Genevieve County at the top, I pretty much know that's the wrong county.  So that type of thing.  I don't specifically recall each name.  Although, again, I live in a small community, sometimes I do know the people.**

Q    So on an average file, you're not pulling up anything on the -- on your computer to verify, it's only if something really glares out at you that you would -- cause you to second-guess the admins.

Does that seem fair?

A    **I don't, typically, go back and compare the numbers that are on the garnishment with what's in the file.**

Q    Okay.  Mr. Huelskamp, I am going to -- I apologize -- I have one more piece of question.

Is the process for receiving a garnishment

payment very similar to the process of receiving a cash payment in the office, or is there a special procedure that is done in your office for the garnishment payments that come in?

    **A    No.  I mean, they all get put into a pouch for depositing.**

    Q    I've noticed, just because of the documents that you've given me in this case, and I -- you alluded to it earlier -- that one -- one check might cover multiple files.

        Does that seem fair?

    **A    When I get a check from the county clerk, it often has garnishments from several different cases, yes.**

    Q    Who is the person at the firm who parses out where this money goes to, the checks, the accounts that are on there, and makes sure it's being applied to the right accounts?

    **A    Well, it -- it's on the -- as you can see on the forms that we get from the circuit clerk, it says what garnishment was.  And so the administrative assistant who is inputting it into QuickBooks sees that right there.**

    Q    When the check or checks come in from the courts, is that something that the admin would be

the first line going into it and being the one inputting the numbers and then handing them off to you, or do they come to you first and you process them in some way and then give them to the admins?

A    I thought we'd been over this.  But I -- I deposit.  I make copies of the checks and the -- the upper part of the check which shows who is on that particular check, because they send the check in a lump sum based on whatever garnishments they've collected during that time period.  Then I give those to the administrative assistant who inputs them into QuickBooks.

Q    I apologize.  Just to be clear.

With the garnishments, your admins are receiving a copy of the actual check that came in, and then they use that information to input into the QuickBooks system.  Is that correct?

A    Well, they get the -- like I mentioned, the portion -- the checks come in two or three parts.  The check itself, and then one of the parts with the perforation that you tear away is the breakdown of what makes up the lump sum payment in the check.  Sometimes there's a check that's six, seven different people who make up the lump sum. Sometimes there's just one.

**Perryville has a practice of sending out the garnishments almost immediately.  Some of the other counties wait at the end of the month or whatever, but Perry does it very -- very quickly.**

Q   As -- let's say in either case, whether they're paying under a payment plan, whether it's through wage garnishment or other garnishment, if you're able to find something else, how -- what is the policy and procedure for you -- for you or your admins being alerted that something has been paid in full?

**A   It would show up on the QuickBooks, and it would also show up on the garnishment.  I don't know if you've ever seen one.  They show zero balance.**

Q   On the garnishment?  You mean on the document --

**A   Case.net.**

Q   -- that you receive?

**A   On Case.net.**

Q   On Case.net, the -- I believe it is a tab that says garnishment, it would -- it would say zero balance at that point?

**A   They do when they are paid, the judgment is -- right.**

Q   So when payments come into your office

and -- I'll give an example.

Let's say that they're making a hundred dollar a month payment, and they still -- the next payment to pay everything off in full will be $99.

Is there a policy and procedure from your office of letting the debtor know that there is less than the monthly amount due still owing, and so they should make a less payment to pay it in full? What is the policy and procedure in those circumstances?

A   **I probably wouldn't send a letter out for a buck missing. You said 99 and --**

Q   No, I meant --

A   **-- and you owe $100.**

Q   Let me rephrase. I apologize.

Let's say that they have been paying a hundred dollars a month for a year and they still owe $99. And so instead of -- if they were to make their regular monthly payment of a hundred dollars, they would overpay on the amount due under the judgment.

Is there any policy and procedure from your office to reach out to the debtor and let them know that they don't need to make that full payment because in actuality the amount that still is due is less?

A   We don't, I think, have a letter that goes out.  But if they overpay, we reimburse them.  In your scenario, it'd be a dollar, I guess.

Q   How frequently do those overpayments occur?

A   I don't know.  It happens.

Q   If there is an overpayment, what would the internal process be at your firm to handle that overpayment?

A   We reimburse the overpayment.

Q   When you say you reimburse it, will you take me through that process?

A   We write a check and put it in the mail, normally.

Q   Payable to the order of the debtor?

A   Well, sure.

Q   I imagine it's much less frequent, but is there ever circumstances where under a garnishment you receive an overpayment and have to go through the reimbursement process?

A   I assume we're talking generally here. Correct?

Q   Correct.

A   Yes.  There have been times where garnishment exceeded the judgment amount, for

whatever reason.  Often it's the employer's fault who keeps sending the money even though we filed a release.  That's happened frequent -- well, not frequently, but it's happened.

Q   In your office, how would you be alerted that there had been an overpayment on an account?

A   A lot of different ways.  The client might call.  The -- when inputting the amount of the garnishment, they might say, well, this is more than what they thought was owed, that kind of thing.  The employer might call sometimes and say, hey, are we supposed to still keep withholding such and such.

Q   In your system I'm also assuming that it would show, like, a weird balance at some point.

Is that fair to say?

A   A what balance?

Q   A balance that would probably in this case be a negative or a positive, depending on how it's being tracked if there's been an overpayment.  Is that correct?

A   Oh, I don't know what QuickBooks shows in that regard.

Q   So in your QuickBooks system, if -- let's say for Connie Essmyer, would I be able to go into your QuickBooks and see what a debtor owes on a

certain day, or is it QuickBooks just mainly tracking payments along the way?

A   **I don't know if that's not the same thing. Because they -- we put the date of the payment in when we do the QuickBooks entry.  It's --**

Q   In your QuickBooks system, does it automatically calculate interest, or is that something that is done in another process at your firm?

A   **I don't think so.**

Q   You don't think that it calculates interest?

A   **I don't think so.**

Q   In your QuickBooks, does it have a column that tracks interest over time at all?

A   **It probably does.  QuickBooks is pretty extensive, but I don't know -- I don't think it applies in this particular instance.  You can tell QuickBooks to do a lot of different things.**

Q   Does your QuickBooks system track interest?

A   **It tracks what's owed.**

Q   In your opinion, under a judgment, what -- what silos of what is owed exist?  The judgment balance and what else?

**A**     You said silos?

**Q**     Yeah.  What -- what categories of --

**A**     I'm not familiar with that term.

**Q**     What categories of -- of debt -- what categories of debits are accruing on a judgment.  So you have the judgment balance, and then what is the variables that would change that amount to be greater than the judgment?

**A**     Well, interest.  If you have to do multiple garnishments, there are additional fees involved with that that get tacked on.  So that's basically it.

**Q**     So when your admins are pulling the numbers for your garnishment forms, are they pulling the interest from QuickBooks to input into the garnishment form?

**A**     I don't think so.  Well, I -- I better say I don't know.  They're putting in what's been paid and then calculating the interest.

**Q**     Is that a hand calculation?

**A**     Well, using a calculator, or something that pops up on QuickBooks that is a calculator.

**Q**     I -- I guess -- I apologize -- a better question would have been, there's not a document like an Excel spreadsheet they pull up to input

something into and it spits out a number.  Is that correct?

A    I don't know for sure, but I don't think so.

Q    And you also mentioned costs, are those tracked in QuickBooks, or how are those costs tracked as they accrue?

A    Well, it's added to the judgment amount. And we do keep track of them because they have to be recovered.  We pay the costs up-front, and then they get recovered as they're paid back.

Q    When they're input, is it a cost applied to the account in QuickBooks and that's how they're being tracked, or is there a separate document that is keeping track of costs that, then, your admins are adding to the garnishment forms?

A    You'll have to restate that.  I'm sorry.

Q    In QuickBooks, is there a column or a box or something that is reporting what the global costs are for post-judgment collection on a file?

A    I don't know.  I know it's calculated somewhere and maintained somewhere, but I don't know if there's something specific on QuickBooks about that.

Q    And I apologize.  I -- I truly have no

experience about QuickBooks, so that's why I might be asking dumb questions.

But in --

A    I don't have a lot either.

Q    -- in the QuickBooks system, is -- is the actual, we'll call it a file -- that might be the wrong name -- but is it by the debtor?  So there would be, like, a -- I could in some way pull Connie Essmyer, and it would pull up a full ledger of payments that have been received, costs that have been incurred, or is it kept in another format?

A    No.  I know that you can call up each individual person and see what they have paid.

Q    Okay.  I'm going to -- I'm going to hand you a document that I've labeled Exhibit 1.

(Exhibit 1 was marked for identification.)

MR. HUNKINS:  Thank you.

MR. CHRISTIAN:  Uh-huh.

Q    (By Mr. Christian) Does this document look familiar to you, Mr. Huelskamp?

A    Yes.

Q    Can you identify the document for us?

A    Say again?  I'm sorry.

Q    Can you identify the document for us?

A    Oh, Exhibit 1 appears to be Responses to

**Plaintiff's First Set of Interrogatories Directed to Defendant Huelskamp Law, LLC.**

Q   And under interrogatory number 1, it says that you were the person who provided the information that went into these interrogatory responses.  Is that correct?

**A   It does say that, yes.**

Q   And if I turn to the very last page, which I'm -- if I turn to the very last page, it should be a verification page.

Does that page look familiar?

**A   Yes.**

Q   And there should be a signature on that page.

Does that signature look familiar?

**A   That's my signature.**

Q   So I think upon my review of both this document and your responses to my client's request for production, it pretty much takes us through the whole remainder of this case.  So for a way of kind of scoping our -- or going through what occurred during post-judgment with my client, Connie Essmyer, I'm going to just kind of go number by number, and I will have a couple more documents along the way. I'm hoping this kind of streamlines the process and

gets us through in a pretty quick fashion.  So in --
give me one second.

Okay.  I'm going to turn first to interrogatory number 5.  It should be on the second page.

Interrogatory number 5 says, Identify any employee or agent, including independent contractor of yours who performed work -- or excuse me -- who performed any work on or related to your collection of Plaintiff's judgment and/or debt, and describe what the person did, and what date he or she performed said action.

I'm going to -- give me one second.

Mr. Huelskamp, I'm going to hand you three documents -- I apologize -- hand you three documents.  One of those documents is a document that was previously labeled as Plaintiff's Exhibit A.

MR. HUNKINS:  Defendant's Exhibit A.

MR. CHRISTIAN:  I apologize.

MR. HUNKINS:  Defendant's --

MR. CHRISTIAN:  Oh, I apologize.

Q    (By Mr. Christian) Defendant's Exhibit A. I also have a document that I have labeled Exhibit 2, and I also have a document that I have

labeled as Exhibit 3.

(Exhibits 2 and 3 were marked for

identification.)

MR. HUNKINS:  Thanks.

Q    (By Mr. Christian) Mr. Huelskamp, in your

response to interrogatory number 5 your answer says,

A legal assistant prepared an initial debt letter,

petitions, and summons to send to appropriate

process server.  I've presented you what was marked

as Plaintiff's Exhibit 2.

Do you recognize these documents?

**A    There's three letters you're referring**

**to --**

Q    Yes.

**A    -- with three different dates, they appear**

**to be standard initial debt letter, yes.**

Q    So in your response to interrogatory

number 5, this would be -- is this an example of

something that the -- a legal assistant would

prepare and you would, then, identify that as an

initial debt letter?

**A    Yes.**

Q    Do you remember if a legal assistant was

the person who actually drafted these three letters?

**A    Say again?  I'm sorry.**

Q   Do you remember if the legal assistant was the one to actually draft these three letters?

A   As opposed to?

Q   You personally?

A   Oh, I didn't do it.  JAR is Jennifer Robbins on February 13, 2015, also on March 12th, 2015, and on September 21st, 2015.

Q   And on the bottom of, I believe, each one of these documents there is a signature.

Does that signature look familiar to you?

A   Appears to be my signature.

Q   So is it your policy and practice to receive an initial debt letter, review, and sign? Is that kind of the process you go through?

A   Yes.

Q   Okay.  Turning to what I've marked as -- I apologize -- what was previously marked as Defendant's Exhibit A.

Do these documents look familiar to you, Mr. Huelskamp?

A   Yes, they do.

Q   And what does this represent?

A   There is the consent judgment and stipulation signed by Joseph Essmyer and Connie Essmyer and myself.  And there is the corresponding

judgment entered by the Court on September 12th of 2019.

Q    Earlier when we were discussing the process of getting to a judgment -- and I apologize for the loud construction noise in the background at this time.  Earlier when we were discussing these -- the process of securing a judgment, you mentioned that you would go to court with forms.

Is this a representation of the forms that you would go to court with?

A    These are the forms I would have brought with me, they would have been blank.

Q    And just to be clear for the record.  When you say they would have been blank, for example, on document Defendant 2 there are some handwritten numbers and letters in there.

Is that the blanks that you would fill in while you were at court?

A    I mean, they would be blank in those areas where there are the handwriting now.  The rest was preprepared.

Q    And were they preprepared by your legal administrator?

A    Yes.

Q    And then I will turn to what I've marked

as Plaintiff's Exhibit 3, and it should be documents
numbered DEF 4 through 15.

A    Yes.

Q    Are you familiar with these documents?

A    Yes.

Q    What are -- how would you identify these
documents?

A    **They appear to be the garnishment**
**applications September -- excuse me --**
**July 30th, 2020, May 21st, 2021, and**
**April 18th, 2022.  In this -- in the case of Perry**
**County Memorial Hospital versus Connie and**
**Joseph Essmyer.**

Q    On all three of the garnishments that
you've just listed by date, there appears a
signature next to that date.

Does that signature look familiar to you?

A    **That is my signature.**

Q    And when you are affixing your signature
to a garnishment order, what do you think that
signature signifies?

A    **That it's me signing.**

Q    Does it have any representation as to
information presented on the document?

A    **Right above the signature is some language**

that I believe would be applicable.

Q    And the dates that appear on these garnishments, are -- is that your handwriting as well?

**A    It is not.**

Q    Is it your policy and practice to not -- to -- did it come to you dated, or are they dated after you sign?

**A    They're dated after I sign, because we don't always know exactly when the administrative assistant is going to get around to sending it out or they might be on vacation or something.  So they sign it when they do actually file it.**

Q    So at this point, would these three garnishments -- there's no way for us to know when the numbers that appear on the face of the form were pulled because the date on that -- under your signature, it may not be the same date that those numbers were pulled.  Is that correct?

**A    The date is fairly contemporaneous with the time that I signed it, but I can't tell you it was the same day or the -- within two or three days.**

Q    Okay.  Moving to interrogatory number 7, the interrogatory states, Identify the date of all communications, both oral and written, between you

and Plaintiff relating to Plaintiff's judgment and/or debt.

The answer begins, Letters were dated February 13th, 2015, March 12th, 2015, and September 21st, 2015.

Are those letters referred to, the letters that we just went over and I labeled as Exhibit 2?

**A     I would imagine, yes.**

Q     Your answer then continues, Plaintiffs appeared at the court date and signed a consent judgment and agreed to make monthly payments.

Am I safe to assume that the documents referred to there are the documents that I -- was previously marked as Defendant's Exhibit A?

**A     Yes.**

Q     The answer continues, I recall that Connie Essmyer came to my office on one occasion, but I do not have notes of our conversation or the exact date.

Does that recollection stand to this day, that there are no notes or other exact dates to when this conversation occurred?

**A     Yes.  I recall she did come to the office. It was just her.  It was not her husband.  And I made -- I have no notes of that conversation or**

meeting.

Q    Do you have any general recollections about that meeting?

A    I don't know what you mean by general.

Q    Do you have any memories at all of the meeting besides it occurring?

A    No.  And I probably would not have even recognized her had I seen her subsequent to that because of the passage of time.  I might have said that's a person I -- I've seen before, but I would not have placed a name with her.

Q    How frequently do debtors come to your law firm's office?

A    Not frequent.

Q    How frequently do debtors have one-on-one conversations with you?

A    All the time.

Q    How often are those conversations --

A    At the courthouse in particular.

Q    -- taking place at your office?

A    At my office?  Infrequent, as I said.

Q    How often does a debtor bring a debt dispute to you in your office and have a one-on-one conversation?

A    Not frequently.

Q    How many times has that occurred in your practice of debt collection?

**A    You're talking almost 30 years here.  The number of times?**

Q    In the last five years, how many times has that occurred?

**A    More often it's a call, not an in-person visit.  So in person, I don't know.**

Q    The answer to interrogatory number 7 continues, She called the office at least once and spoke with a secretary before meeting with me.

Obviously you were not the one who picked up that call by the very answer of it, but do you have any knowledge that was passed on to you by your secretary of what that conversation entailed?

**A    No.  Nothing specific.**

Q    You then finish off your answer to interrogatory number 7, Plaintiff also provided a handwritten note dated February the 8th, 2020.

Mr. Huelskamp, I'm going to present you with a document that has previously been labeled Defendant's Exhibit C.

Does this document look familiar to you?

**A    Yes.**

Q    And can you identify it for us?

**A      This is the note I'm referring to in the answer to interrogatory 7.  I have the original of this in my file, dated February 8th, 2020, in which he indicates that she was laid off and would be paying 150 on the debt that she owed.**

Q      Turning now to interrogatory number 11, in summary it states, Describe how you calculate the total amount of the post-judgment debt, including post-judgment interest, principal, and costs.

And in your answer you state, Statutory 9 percent interest on per annum basis on balance.

And on what did you base this answer?

**A      My knowledge of the law.**

**(Exhibit 4 was marked for identification.)**

Q      (By Mr. Christian) Mr. Huelskamp, I have presented to you what I have labeled as Plaintiff's Exhibit 4.  As I printed it out this morning, I doubt you have actually seen this specific document before.

But have you seen something akin to the contents of the documents before?

**A      I'm sorry.  Repeat.**

Q      Have you ever seen this document before?

**A      This particular document, no, but I've seen the statute.**

Q    And what statute is this?

A    **It appears to be 408.040.**

Q    To be clear, is that 408.040?

A    **Isn't that what I said?**

Q    I apologize.  I couldn't hear you over the traffic.

A    **Oh, I'm sorry.**

Q    No, you're fine.

So to your knowledge, is this the statute you're referring to when you state in your answer to interrogatory number 11 that statutory 9 percent interest on per annum basis on balance?

A    **I believe it is.**

Q    Under the statute, in what order are -- is judgment balances and then the post-judgment interest satisfied?  Meaning when a payment comes in, in what order is that payment applied to the account?

MR. HUNKINS:  Object to the form.  The statute speaks for itself.

Q    (By Mr. Christian) What is your understanding of what the statute says about how payments are applied to an account?

A    **Well, we -- we give the credit against the balance, calculate the interest based on the balance**

**remaining after the credit.**

Q   So when you're -- in your system and the way that your QuickBooks handles a file, when a payment comes in, whether it be from them personally mailing it or delivering it to you by hand or if you get a check from the Court through a garnishment, that amount is applied directly to the judgment balance.

Is that how that math is handled?

A   **It's a credit towards what the debtor owes.**

Q   And what does the debtor owe in the system?

A   **In general, I mean, I'm not sure.  The judgment --**

Q   What is --

A   **-- plus interest.**

Q   Plus costs as well?

A   **Well, the judgment includes costs, just like the Essmyer judgment includes costs.**

Q   Does the judgment -- in the Essmyer case, does the judgment include costs up until a certain date?

A   **It includes the filing fee and the service fees.  They are spelled out in the judgment.**

Q    Are there post-judgment costs that accrue?

A    **We've talked about that already.  The garnishment does incur additional costs.**

Q    So those costs would not be reflected in the language of the judgment.  Is that correct?

A    **Because no garnishment --**

MR. HUNKINS:  Object to the form.

A    **-- is issued yet as of the time of the judgment.**

Q    (By Mr. Christian) In your understanding of the statutes -- I just want to be clear -- what are the numbers that make up the judgment balance?

A    **The initial judgment, which like I just said, includes costs, any credits that might be applicable, and any interest that is applicable, and potentially post-judgment costs.**

Q    I apologize for the long breaks.  You've done such a good job of answering earlier that you've already answered some of my questions, so I'm skipping ahead in a good way.

MR. HUNKINS:  When you get a chance, can we take a break?

MR. CHRISTIAN:  We can take a break right now.  We can go off the record.

(Off the record at 12:58 p.m.)

(On the record at 1:04 p.m.)

Q   (By Mr. Christian) I'm going to quickly turn us, Mr. Huelskamp, to interrogatory number 12. And in number 12, it, in summary, states that -- asking you to identify how calculations were made on the garnishments that we previously discussed as, I believe, Exhibit 3.  In your answer, you go to state, Defendant did keep a running total on its accounts system, as well as copy of all receipts by direct payment or through garnishments for amounts owed to its client.

Are those -- is the accounting system referred to here, is that the QuickBooks system that we've been discussing this whole time?

**A   Yes.**

Q   And are the -- I'm assuming that the receipts by direct payment or through garnishments or amounts owed to its client, is that referring to -- I apologize, now that we've moved our exhibits, mine on my paper are no longer helpful to me -- are those referring to the documents referring to the check stub that you receive from the court and the three cash/money order payments that came into your office?

**A   We keep hard copies of all of those, and**

that's where this exhibit came from.

Q   And as far as documents that reflect the calculations that were made for the numbers that appear on the three garnishments that I've labeled as Exhibit 3, are those numbers that appear on the three discrete garnishments only contained on the face of those garnishments?  Those numbers don't appear anywhere else?

A   I -- I guess I'm not sure what you're saying.

Q   For an example, on the garnishment form it would state post-judgment interest.  Is there a place where that number can be found to corroborate that calculation, or is that something that is only preserved on the face of this document?

A   I don't know.

Q   And I apologize, as far as copies of receipts, I have presented you with one exhibit previously labeled as Defendant's Exhibit D and an exhibit I've labeled as Exhibit 5.

(Exhibit 5 was marked for identification.)

Q   (By Mr. Christian) I will represent to you, Mr. Huelskamp, that both of these exhibits are completely from the production that you've provided my clients through the discovery process.  And the

only thing that I would note, which was previously noted when Exhibit D was marked, is that it contains a check numbered 31637 dated March the 2nd, 2021, this does not contain a Bates stamp number. Otherwise, every one of those documents in those two exhibits are production that came from your side.

A   I just located that one yesterday.  I overlooked it when I was going through the receipts, which was a very laborious task.  But I did it personally, and I did, apparently, overlook that one.

Q   And I -- well, I'll represent to you that I knew that you had accidentally done that, because in the exhibit, which I'm sure you were looking at, is that payment.  And so I wasn't even going to ask you about that, I was just going to say I bet that you would say that that came in.

But as long as you and your attorney are comfortable with me stating that everything in there is just the documents that you provided us, I would submit that we can move forward with those documents.

And my question regarding those documents, Mr. Huelskamp, are in your response to interrogatory number 12 you state, As well as copies of all

receipts.

Are these examples of the receipts that you're referring to in interrogatory number 12?

**A     It is that, correct.**

Q     Okay.  And interrogatory number 13, the question states, Identify any interest, fees, costs, or other non-principal charges or amounts that you are seeking to collect or have already collected from Plaintiff.

And in your response you state, Defendant is not currently seeking to collect anything, and any non-principal charges would be identified on the garnishment paperwork.

In your response, what are you referring to when you state any non-principal charges?

**A     Well, the principal, of course, is the amount of the judgment of 9,351.14.  Non-principal charges would be interest and post-judgment costs.**

Q     Mr. Huelskamp, in your understanding of the statute that we've looked at previously, is your understanding that the principal is the same number throughout the lifetime of the judgment, or does that number fluctuate?

**A     Well, the principal changes depending upon the payments that are made.  They get a credit.**

Q   And, Mr. Huelskamp, covering, I think, several of these interrogatories and several of the requests, as -- excepting the one check that I previously identified and you admitted you only through your own hard work last night found -- during that search you've come up with no other proofs of payment or receipts or any other document that has not already been produced for Connie Essmyer.  Is that correct?

**A   I'm satisfied that we've produced all the receipts for all payments made by the Essmyers.**

Q   In interrogatory number 16, the interrogatory states, Describe Defendants FDCPA compliance policy specifically as it relates to collection of judgments.

And in response, you answered, Defendants compliance is per statutory guidelines.

Can you tell me what statutory guidelines you're referring to this answer?

**A   I'm referring to the ones set out in the FDCPA.**

Q   Mr. Huelskamp, like the previous statute I gave you, I doubt that you have seen this specific document before, but are you familiar with the statute that is presented on this document?

**A**     I've read it previously, yes.

Q     And can you tell us what this statute is?

**A**     It appears to be part of the FDCPA.

Q     And from everything you've stated up until this point I think you would agree -- but correct me if I'm wrong -- that this statute applies to you as a debt collector as you perform debt collection for your clients.  Is that correct?

**A**     I try to adhere to this statute in my actions as -- working on behalf of my clients.

Q     So when you say you try to adhere to it, do you think this is a controlling statute over you, or is this a statute that is meant to guide your actions in some way?

MR. HUNKINS:  Object to the form.

**A**     Yeah.  I -- I don't --

Q     (By Mr. Christian) Mr. Huelskamp, are you required to follow this law as a debt collector?

**A**     You're asking me if, in fact, I fall under the category of debt collector as per the statute?

Q     We can start there, yes.

Are you a debt collector under the FDCPA?

MR. HUNKINS:  I'll object.  It calls for a legal conclusion.

But you can answer.

A    Yeah, I -- I'm not absolutely ready to state one hundred percent, but probably.  More likely than not.

Q    (By Mr. Christian) Are -- in your debt collection, which you've admitted occurs at your practice, are you collecting on debts that you own?

A    That I own?

Q    That they are debts owed to Robert -- excuse me -- to Huelskamp Law, LLC?

A    I have tried to collect on debts that are owed to the LLC.

Q    Do you collect on debts that are owed to entities that are not Huelskamp Law, LLC?

A    I think that's why we're here, isn't it?

Q    Are you affiliated in any way with Perry County Memorial Hospital beyond the attorney/client relationship?

A    No.

Q    You have no interest in or otherwise sit on a board of Perry County Memorial Hospital?

A    That is correct.

Q    And you collect debts that are owed to Perry County Memorial Hospital.  Is that correct?

A    Yes.

Q    And in your pursuit of collecting the debt

owed to Perry County Memorial Hospital you send demands/dunning letters, you file Petitions, you receive judgments, you then do post-judgment collection on those judgments. Is that correct?

**A      That is true, in general, yes.**

Q      Under your understanding of the FDCPA, what accounts as a false representation of a debt?

**A      I don't know.**

Q      Under your understanding of the FDCPA, is it permissible to mischaracterize the debt that is owed?

**A      It depends --**

MR. HUNKINS:  Object to the form.

**A      -- on the circumstances.**

Q      (By Mr. Christian) I apologize.  Will you repeat your answer?

**A      I -- I object to your term mischaracterize, so I'm not going to answer that as to the form of that question.  But there are circumstances where we all know the law calls for bona fide error, for instance, and that type of thing, if that's what you're talking about.  And I --**

Q      I present to you, Mr. Huelskamp, that characterized -- or character is part of the

statute, and, thus, my decision to use the word mischaracterize.

So there -- are there circumstances where a mischaracterization of a debt is permissible under the FDCPA?

MR. HUNKINS:  Object to the form.

A     **Again, I don't know what you mean by permissible.  I'm sure it happens.**

Q     (By Mr. Christian) Is it permissible under the FDCPA to misstate the amount due of the debt?

A     **To the extent it's possible you're supposed to have the appropriate amount due.**

Q     And when you say to the extent possible, what is involved in that determination of the extent of possibility?

A     **Well, in general, calculations can be wrong.  You can sometimes get the wrong person, wrong party.  You can get the wrong address, the wrong employer.  I mean, there's lots of different things that can happen that don't involve abuse or intent or malicious action.**

Q     Is it your opinion, Mr. Huelskamp, that abuse, intent, or malicious action is required for a false representation under the FDCPA?

A     **I have no idea what you're talking about.**

Q    Mr. Huelskamp, I used a phrase that you just said, abuse, intent -- and I forget the other one, we could ask the stenographer, if necessary -- but do you think that those must be involved for a violation of that FDCPA to occur?

**A    I think there are provisions in the statute that allow for bona fide errors and other things that certainly don't amount to abuse or malice or intent as you're trying to infer.**

Q    In your opinion, what is a bona fide error under the FDCPA?

MR. HUNKINS:  Object to form.  Calls for a legal conclusion.

Go ahead.

**A    It can include a mal -- a math miscalculation.  It can include the wrong party.  It can include wrong address.  It can include wrong employer.  Wrong court.  I mean, a lot of different things, in my opinion.**

Q    (By Mr. Christian) And based on previous answers, that's an opinion that's informed by a debt collection practice that extends back to 1996.  Is that correct?

**A    Among other things.**

Q    What are the other things that are being

relied on to make that opinion?

A   **Legal experience.  Wisdom gained by age, practice.  Discussion with other people.  Discussion with other people involved in the area.  I mean, I've been an attorney for 37 years.**

Q   Under the FDCPA, is it permissible for a debt collector to collect more than what is allowed to be collected under the judgment?

A   **I don't believe it is.**

Q   I apologize.  Would you repeat that?

A   **I don't believe it is.**

Q   Under the FDCPA, is it permissible for documents that are presented to the consumer to state an amount of debt that is inaccurate?

MR. HUNKINS:  Object to the form.

A   **Say again?**

Q   (By Mr. Christian) Under the FDCPA, is it permissible to present the consumer with a document, whether that be through the mail or through the court system, that incorrectly states the amount of the debt?

MR. HUNKINS:  Same objection.

A   **Do you have something where that's occurred?**

Q   (By Mr. Christian) I'm asking you merely

in generalities if that is a permissible action.

A    **In general, saying -- you're supposed to, as much as possible, present the debt in the correct amount.**

Q    And I apologize, but, again, I'm going to have to ask.

In as much as possible, what does that mean?

A    **That is too general a question to respond to.**

Q    In your earlier discussion of bona fide error you listed several things that you believe would fall under that category.

Is that from your practice experience that you've come into those circumstances where things, in your opinion, were a bona fide error?

A    **And that wasn't an exhaustive list.  But my experience, my reading of case law, my understanding of the statute, it's not a specific act that it's referring to, but anything that could be deemed as a reasonable bona fide error.**

Q    A very quick question, Mr. Huelskamp.

For interrogatory number 20, in summary it's asking for anyone besides yourself that might be a witness, that could provide information on

this -- towards this case or your affirmative defenses.

Has your response of unknown other than the parties changed between your answer and today?

**A      I mean, potentially my administrative assistants might, that we've talked about already.**

Q      And, finally on this document, interrogatory number 21, it just says, Identify all facts, documents, communications and persons with knowledge that support your affirmative defenses.

And in your answer there was an objection, but it goes on to state that, Without waiving, see receipts relating to payments made by Plaintiffs.

Between the time of answering this interrogatory and today, have you become knowledgeable of any other responsive document, communication, or person, excepting the well-known receipt from March of 2021 that we previously talked about that you found last night?

**A      I'm not aware of any other receipts.**

Q      Thank you.

Mr. Huelskamp, I have presented you with what I've marked as Plaintiff's Exhibit 7.

(Exhibit 7 was marked for identification.)

Q      (By Mr. Christian) And that -- does that

document look familiar to you?

**A    Yes.**

Q    And what is this document?

**A    Appears to be a request to produce directed to Defendant from Plaintiff.**

Q    And I -- if you turn to the last page of this document, it does show a sworn signature.  But I do believe that this was inadvertently added to this document and not to the interrogatories.  I just wanted to point that out so that there's -- I could be corrected if it should have been attached to this document.

Do you remember if this should be attached to this document?

**A    I don't know offhand.  We typically don't sign the request to produce, at least not in state court.  I don't -- I don't know about federal, necessarily.**

MR. HUNKINS:  Yeah.  I mean, I'll just represent that it was attached to the interrogatories as well.  It was probably just an error on our part to attach it.  It does state interrogatories, so it was just an error.

**A    Yes, it does.**

Q    (By Mr. Christian) Mr. Huelskamp, have you

seen the responses in this document before today?

A    Yes.

Q    And who was involved in the creation of the responses to this document?

A    I don't know.

Q    Were you involved in the creation of them?

A    Yes.

Q    If we go to request number 2, request number 2 states, Your entire collection file for Plaintiff's debt.

To your knowledge, are the documents that we've previously labeled as all of the exhibits in this case that have come from your production, are -- do they represent the entire collection file that you hold for the Plaintiff's debt?

A    I don't know what you received.

Q    Okay.  Did you have a chance to go over the documents that were produced to -- in response to my client's document request before they were sent to me?

A    I don't remember.

Q    Probably going back to a previous question about an interrogatory.

To your knowledge, you've produced every payment that would be possible under --

(Phone ringing.)

A   Sorry.

Q   -- under the collection file.  Is that correct?

A   **I produced all of the receipts showing payments by the Essmyers on their debt to the hospital.**

Q   Do you maintain a physical file for Joseph Essmyer and Connie Essmyer in your office?

A   **Yes.**

Q   Do you know if I've a received a copy of the contents of that physical file as production?

A   **I do not know.**

Q   All right.  Are -- I believe we referred to earlier what was labeled as Defendant's Exhibit C as the handwritten note from my client that was received by your office.

To your knowledge, is that the only handwritten note, whether from my client or from anyone else, that exists in the collection file?

A   **I believe that is the only note.  They've signed the other documents, the consent document.**

Q   So beyond the consent judgment and the entered judgment and this note, what other documents are in the physical file for Connie Essmyer?

A    There'd be a copy of the original account. There'd be a copy of the Petition that was filed.  A copy of the summons.  Copies of the payment for court costs and for service fees.  Beyond that, I don't know specifics.

Q    In that collection file, would there be any notes from either you or your legal administrators as to any part of the litigation or collection process where you would have been reaching out to my client or communicating in any way with my client?

A    I don't know.  Sometimes.  But I don't know in this case.

Q    So in preparation of your answers to the -- the Plaintiff's request for production, did you go through the physical file at that time?

A    I don't remember.

Q    So in interrogatory number 2, your entire collection file for Plaintiff's debt, would you agree that the entire collection file would include the physical file that you hold in your office?

A    I don't know.  I'm not the attorney.  But if you need those things I mentioned, we'll get them.

Q    Interrogatory number -- excuse me --

request number 3 requested screenshots of each possible screen that can be displayed on the software program or other electronic system you use for ordinary general recordkeeping in your debt collection activities that contain information relating to Plaintiff's debt.

And in response was an objection from you saying that you would have to create a document to provide that.

And that being considered, if I were to request a date with your attorney to come to your office and view your QuickBooks system, is that something that you would be fine with us doing so that I could view your QuickBooks system?

A    No.

MR. HUNKINS:  Object to the form.

Q    (By Mr. Christian) You would not be fine with that?

A    Not without a Court order.

Q    Not without a Court order?

A    Has this objection been taken up?  I don't know.

Q    I'm asking you if that would be something that you would be willing to do?

A    No.  I would not let you go through my

**QuickBooks software.**

Q    You would not let me see the QuickBooks software for my client, Connie Essmyer?

**A    Say that last part?**

Q    You would not let me see your records for the payments and the interest and the costs that are in your system that were used to create the garnishments for Connie Essmyer.

**A    I provided them right here.**

Q    You would not allow me to see the computer system to track those payments?

**A    Not without a Court order.**

Q    And what do you think allows that court -- me to be necessitated to get a Court order to get those?

MR. HUNKINS:  Object to the form.

**A    Go see the judge about that if there's an issue about it.  But I have -- there -- there -- talk about confidentiality breaches.**

Q    (By Mr. Christian) Confidentiality of whom?

**A    Of all my other clients.**

Q    And that would be revealed through my viewing of Connie Essmyer's files within the QuickBooks system?

**A**     I don't know.

**Q**     And you don't know because you don't know how that page looks?

**A     I'm not entirely familiar with every aspect of QuickBooks.  But I'm not comfortable with some an outside person going through my QuickBooks.**

**Q**     In request number 4 it states, Produce all documents received by Defendant from the original creditor, and the response says will supplement.

As far as a previous statement you made was that in the physical file would be the original contract or original debts that were sent over from Perry County Memorial Hospital.

Is that something that you would be able to supplement following today's date?

**A     Yeah, I can.**

**Q**     In interrogatory number -- excuse me again -- in request number 16, it states, All materials pertaining to Defendant's policy for obtaining and/or collecting judgments.

Based off of previous responses that we've had today, it sounds like that there may be some documents within your possession or control in the form of your legal admins' how-to guides that they've created.

Would that be a possibility for supplementation or a further request from us for production in response to this request?

MR. HUNKINS:  Just to be clear, I think his response earlier was that he doesn't know if it has to deal with debt collection.  But if it does -- such policy exists, I will supplement.

Q    (By Mr. Christian) Okay.  That is all with that, Mr. Huelskamp.

So now I will turn to the documents that I have labeled as Plaintiff's Exhibit Number 3, which should be the three garnishments in this case.  I'll begin with the garnishment that the front page is Defendant's 0004 that has the date of 7/30/2020 on it.

You previously identified, Mr. Huelskamp, that that is your signature in the signature block of this garnishment.  Is that correct?

**A    Yes.**

Q    Turning now to the numbers that appear on the right side column of this document, I'd like for us to take a step-by-step guide through your understanding of where these numbers come from.

So the first number reported on the form

is judgment balance, and it reports that the judgment balance is $9,351.14.  Is that correct?

A    That's what it says.

Q    And to your knowledge, where does this number come from?

A    It would have been the original judgment amount.

Q    The next number that is listed is post-judgment interest and that number states $750.11.

Can you explain to me where that number came from?

A    I assume it's a calculation based on a 9 percent interest.

Q    Can you explain to me what that calculation is?

A    9 percent times the judgment balance, total due is what I believe in there.

Q    The next item on the list is service fee for the writ which states $8.35.

Do you know where that number comes from?

A    It is on the form, preprinted.

Q    I think that might be the $10?

A    I believe.  I'm not positive.

Q    Okay.

**A     I think it's on the form, preprinted.**

Q     I'll represent to you that that is a number that is input and that the $10 one, the next one is the preprinted one, which I think the last garnishment will show.

So just in general, where would that $8.35 number come from?

**A     That would be the cost of the mailing by way of the little green card thingy.**

Q     Certified Mail?

**A     Certified Mail, return receipt requested, there that's what that is.**

Q     The next number that is reported, it says less credits, and it states $1,016.61.  Is that correct?

**A     That's what it says.**

Q     And how would that number be calculated and input into the form?

**A     I don't know.**

Q     Is that a number that exists somewhere in the accounting system?  Is that -- is that a number that is kept in a separate document in your office? How -- how would I know the credits on an account?

**A     I don't know where that number came from.**

Q     And at the bottom it says total due

$9,102.99.  Is that correct?

**A    That's what it says.**

Q    And do you know where that number comes from?

**A    I didn't do the math, so at this moment -- so I assume it's calculated based on those numbers above it.**

Q    Okay.  I'm going to move now to it's 8, Defendant's 0008, which should be the May 21st, 2021 garnishment application.

And I believe, Mr. Huelskamp, that you previously stated that the signature that appears on this May 21, 2021 dated garnishment is yours.  Is that correct?

**A    It is.**

Q    And we're going to, unfortunately, go through the side numbers once again.  So as far as the judgment balance, that states $9,351.14.

Where did that number come from?

**A    It appears to be the judgment amount from the September 2019 judgment.**

Q    And the next item is post-judgment interest, and it is reported as $634.73.

Do you know where that number comes from?

**A    It's just -- no.**

Q    And for the service fee for this writ it states $8.40.

Based on your previous answer, is that the cost of mailing this by certified mail?

A    I would imagine.

Q    The next reported number on here is less credits of $2,000 -- excuse me -- $2,050.47.  Is that correct?

A    That's what it says.

Q    And where does this number come from?

A    I don't know.

Q    And under total due it states $7,953.80. Is that correct?

A    That's what it says.

Q    And what does that number come from?

A    I don't know.

Q    I'll, then, turn to Defendant's 0012, which is the April 18th, 2022 dated garnishment application.

And, Mr. Huelskamp, I believe, yet again, and for the last time, that you stated that the signature that appears on this garnishment application is yours.  Is that correct?

A    It is my signature, yes.

Q    On this document there are some

computer-entered numbers and some handwritten numbers.

Does that seem like a fair characterization?

A    Yes.

Q    Are -- is that your handwriting that wrote the numbers in that column?

A    It is not.

Q    Yet again, we will start with the judgment balance which reads $9,351.14.  Is that correct?

A    That's what it says.

Q    And where did that number come from?

A    It would be the judgment entered on September 12th, 2019.

Q    And for post-judgment interest it reports $1,758.95.  Is that correct?

A    That's what it says.

Q    And where does that number come from?

A    I don't know.

Q    For post-judgment costs it states $18.40.

Where does that number come from?

A    I don't know.

Q    It next states service fee for this writ and it states $10.85.

Where does that number come from?

**A** I would imagine that was the certified letter.

Q And under less credits it states $4,776.86. Is that correct?

**A** That's what it says.

Q And where did that number come from?

**A** I -- I didn't do it, so I don't know.

Q And under total due it states $6,372 -- excuse me -- and 48 cents. Is that correct?

**A** It does say that.

Q And where does that number come from?

**A** Again, I didn't calculate it, so I don't know.

Q Mr. Huelskamp, I am now going to present you with something that I've labeled Plaintiff's Exhibit 8.

(Exhibit 8 was marked for identification.)

Q (By Mr. Christian) And it should look very familiar to something that your attorney created earlier, but I assume you would want to take a chance to look over that, briefly. So we'll take that break for you to look over that.

**A** I'm sorry? You said it's something my attorney created?

Q I apologize. It is something like what

your attorney created earlier.  This, I will represent to you, is an input of the -- the documents that we have received as far as your -- your payments from the garnishment and the three hand-delivered payments, also utilizing the -- the actual ledgers that you provided us of the payments being received from the garnishments.  And I'll represent to you that the only differences from what your attorney went through earlier -- and I'll point them out for your ease, if you desire -- is where the gray -- and I'll point -- I'll -- we'll go through it -- is the grade number, the 366.61 was the difference that I held based on your attorney's calculations plus that 11.25.  The 366.61 is based off of looking at the garnishment, the first garnishment on July the 30th, 2020, which reports that there were credits of $1,016.61.

Based on the documents that you've provided, the payments, the only proof of payment that was provided was the two $250 cash payments for my client and a $150 money order payment.  So the difference between that $600 and the -- and the 1,016.61 reported on the judgment balance is where I got that number of 366.61.

And before we move further with that, I

Page 92

also want to point out that the 11.25 -- if you'll give me one second -- and I apologize, but due to wanting to save paper, I think I might have given you my only copy.  If I could ask for the --

MR. HUNKINS:  Huh-uh.  It's part of the -- it's part of the exhibits.

Q    (By Mr. Christian) On the document labeled Defendant's 0019, there was a reported payment to PCMH of 11.25.

**A     That is an error.**

Q     That is an error?

**A     That -- yes.  That is the cost of filing the garnishment, it should not have appeared on that.**

Q     It should not have appeared in -- in your --

**A     It's not --**

Q     -- in your system?

**A     -- a credit on the account.  When you file electronically, there is a dollar and a quarter service charge.  So every time it says $10 on a garnishment sheet, it's actually 11.25 we have to pay.**

Q     So I'm hearing it's a prefilled number on there that isn't even good anymore, but you can't

change it.  What I'm saying is they're forcing you to lose a dollar twenty-five on this transaction. Is that my understanding?

**A      There's an additional $1.25 that goes to some credit card company somewhere.**

Q    Okay.  And so this -- of the 11.25 on the, I believe, Defendant's 0019 is -- was it -- is that an entry that was done I believe -- is that the correct page?  19?  Is that an entry that was generated -- how was that entry generated is a better question?

**A      I don't know.  I believe it was a mistake.**

Q    My question, Mr. Huelskamp, is that just a mistake from an entering error by your legal admin? How would that appear on the books?

**A      Right.  That's what I'm suggesting.**

Q    Okay.

**A      I don't know for sure.**

Q    And as far as the $366.61, that is, presumably, part of the less credits on the first garnishment.

Do you have any recollection as to how that number would be calculated as $1,016.61 when, based off of your records, there were only $600 in payment at that time?

**A    650.**

MR. HUNKINS:  650.

Q    (By Mr. Christian) I apologize, $650.

**A    Well, no, I don't know for sure.  But there was no payment of 366.61 made.**

Q    Before the filing of the --

**A    Before that garnishment was prepared and filed.**

Q    Okay.  So I'll represent to you that the number at the bottom of this exhibit is based off of the inclusion of the 366.61 and that 11.25.  And I'll also represent to you that based off of calculations your attorney previously did, that if you subtract those numbers from this number, you do get the same number as your attorney, which I believe was 9,365.75.

In your opinion, if -- and if you desire to do some quick math, I believe that you would show that that does equal out to be the correct thing.

Is -- is this a fair representation of the payments in your -- in your -- to your knowledge, that have been made for Connie Essmyer?

**A    As I said, the 11.25 was incorrect.  The 366.61 was never paid in any respect.  So whatever those numbers come to would probably be what you**

**just stated.  So 9,743.61 less 11.25 and 366.61.  Is that correct?**

Q    I believe it is, but I -- I'm with you.

**A    Because I didn't prepare this, and I don't think my attorney's office did either.**

Q    They did not.  I prepared it based on documents I was provided.  So as long as that's -- and we're in agreement on that, I think we can go off the record.

(Off the record at 1:48 p.m.)

(On the record at 1:57 p.m.)

Q    (By Mr. Christian) Mr. Huelskamp, I'm going to present to you a document that I've marked as Plaintiff's Exhibit 9.

(Exhibit 9 was marked for identification.)

Q    (By Mr. Christian) I will represent to you -- but, of course, please verify yourself -- that the difference between this document and the document I've labeled as Plaintiff's Exhibit 8 is that I have removed the charge of 366.61 and what was previously marked as an 8/21/2020 credit of 11.25 because you represented that was a misapplication of a credit to the account.  And at the bottom I believe that the reported total will match your attorney's calculation of payments

totaling $9,365.75.

On this document I -- beyond removing the 366.61 and the 11.25, I've also added in, in a column that matches with the date where they're -- where they appear for the three garnishments in this case.  I will represent to you that garnishment -- if we look at the first garnishment, which was on July the 30th, 2020 and, therefore, it appears, after the 2/13/2020 payment of $150 because that was the last payment before July 30th, 2020, on the garnishment in Exhibit 3 for July 30th, 2020, it is reported less credits of $1,016.61.

Based on your records, it appears that the amount actually paid by Ms. Essmyer is $650.

Does that seem correct?

**A     It does seem correct.**

Q     That would lead to a difference of $366.61.

Does that seem mathematically correct?

**A     Mathematically correct.**

Q     Do you have an under -- any understanding of how this difference between the amount actually paid and the amount that was reported as less credits on the July 30th, 2020 garnishment came to be?

**A**     I would be speculating, so no.

Q     Moving down.

For the second garnishment on May the 21st, 2021, its number appears next to the payment on May the 10th, 2021 of $261.46, which would be the final payment before the application for the second garnishment.

Does that make sense?  Is that correct?

**A     I -- if that's what you're saying this column is about, okay.**

Q     So on the second garnishment, which bears a date of May 21st, 2021, the less credits that was reported was $2,050.47.  Based off -- which we can take a look at.

MR. HUNKINS:  Here it is.

Q     (By Mr. Christian) I believe that would be on page 8.

**A     Okay.**

Q     And if -- I -- this is done using a Google sheet, so I did a summation function on the payments made between 11/4/2019 and May 10th, 2021, and the amount actually paid was $2,700.47 leading to a difference of $650.

Does that mathematically seem sound to you?

A    Well, I'll have to take your word for it. I haven't done the math.

Q    With the difference of $650, do you know how an underreporting of $650 might occur on the second garnishment dated May the 21st, 2021?

A    No.

Q    On -- going all the way to the bottom to the third garnishment, which appears on page 12 of Exhibit 3, it -- the third garnishment is dated April the 18th, 2022, and, therefore, I've placed it beside the final payment before that date, per your records, which was 3/29/2022.  That final payment received being $239.28.  On the garnishment dated April the 18th, 2022 the less credits reported is $4,776.86.

Using a summation function in Google sheets, I'll represent to you that if you add up all payments between 11/4/2019 and March 29th, 2022, the actual amount paid by Ms. Essmyer is $7,697.91, leading to a difference of $2,921.05.

Do you have any understanding as to how that difference could occur on underreporting the amount of credits that have been received on Ms. Essmyer's account as reported on the third garnishment?

**A** **No.**

Q I know it was talked about a lot today, but in the brief recess that we had, or in any time that we've been talking, have -- can you recall anything that you would wish to clarify, modify, or in any way else amend regarding your testimony today?

**A** **Not that I -- not that I specifically recall at this moment.**

MR. CHRISTIAN: That's all my questions for now.

MR. HUNKINS: I've got nothing.

COURT REPORTER: Signature?

MR. HUNKINS: What would you -- do you have a preference?

THE WITNESS: How long will it take to get ready? Do you know?

COURT REPORTER: A couple weeks.

THE WITNESS: I can read it.

(Off the record at 2:04 p.m.)

(On the record at 2:06 p.m.)

COURT REPORTER: And then same orders as your other ones?

MR. HUNKINS: Yeah.

MR. CHRISTIAN: I apologize. Can we --

and you don't even have to -- I mean, you probably want to hear it, but I'll go through the exhibits, just to make sure that I haven't flubbed something.

(Discussion off the record.)

MR. CHRISTIAN: At the end of this deposition, for clarity of the record and for covering up my shortcomings, I'm going to quickly go through Plaintiff's exhibits just to make sure that everyone knows what we're referring to.

Plaintiff marked the Defendant's Answers to Plaintiff's First Set of Interrogatories as Exhibit 1.

Plaintiff marked the three initial demand letters sent by Rottler & Huelskamp as Exhibit 2.

Plaintiff marked the three garnishments numbered Defendant's 4 through Defendant's 15 as Exhibit 3.

Plaintiff marked RSMo 408.040 as Exhibit 4.

Plaintiff marked the Huelskamp Law Firm, LLC deposit details, Defendant's 16 through Defendant's 58, as Exhibit 5.

Plaintiff marked 15 U.S.C.A. Section 1692e as Exhibit 6.

Plaintiff marked Defendant's Answers to Plaintiff's First Request for Production as Exhibit 7.

Plaintiff marked a tabulation of payments entitled Essmyer Payments as Exhibit 8.

And Plaintiff marked a document entitled Essmyer Payments, including garnishment information, as Exhibit 9.

(Deposition concluded at 2:07 p.m.)

CERTIFICATE OF REPORTER

I, Julie Ann Whiting, Certified Court Reporter within and for the State of Missouri, and Registered Professional Reporter, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly placed under oath by me; the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

_____

Julie Ann Whiting, CCR 830, RPR

State of Missouri

I, ROBERT HUELSKAMP, do hereby certify:

That I have read the foregoing deposition;

That I have made such changes in form and/or substance to the within deposition as might be necessary to render the same true and correct;

That having made such changes thereon, I hereby subscribe my name to the deposition.

I declare under penalty of perjury that the foregoing is true and correct.

Executed the _____ day of _____, 20____, at

_____.


_____.


My Commission Expires:

_____

Notary Public:

_____

JAW/

                          Errata Sheet

Witness:  ROBERT HUELSKAMP

In Re:  CONNIE ESSMYER VS. HUELSKAMP LAW, LLC

Upon reading the deposition and before subscribing thereto the deponent indicated the following changes should be made:

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Page     Line     Should read:
Reason assigned for change :

Reporter:  Julie Ann Whiting

**A**

**a.m** 3:16 5:9
**ability** 102:10
**able** 10:1,7,23
  23:19 27:21
  29:22 39:6 42:8
  45:24 83:14
**absolutely** 70:1
**abstract** 24:16
**abuse** 72:20,23
  73:2,8
**accept** 10:4
**accepts** 27:1
**access** 31:13,14
  32:6,7,9,11
**accidentally**
  66:13
**account** 19:11
  21:1,3 30:4 45:6
  48:13 61:18,23
  80:1 86:23
  92:19 95:23
  98:24
**accounting** 64:12
  86:21
**accounts** 18:5
  40:17,18 64:9
  71:7
**accrue** 48:7 63:1
**accruing** 47:5
**act** 75:20
**action** 24:14
  51:12 72:21,23
  75:1 102:13,18
**actions** 69:10,14
**activities** 81:5
**actual** 10:20
  14:11 29:19
  32:21 41:15
  49:6 91:6 98:19
**actuality** 43:24
**add** 38:17 98:17
**added** 48:8 77:8
  96:3
**adding** 48:16
**additional** 47:10
  63:3 93:4
**address** 72:18
  73:17
**adhere** 69:9,11
**admin** 18:21 19:1
  29:15 35:1
  37:17 40:25
  93:14
**administrative**
  13:23 14:4,8,18
  25:9 29:18

34:15 36:12
38:13 40:22
41:11 56:10
76:5
**administrator**
  54:23
**administrators**
  80:8
**admins** 14:7,13
  14:25 15:8,9,10
  15:12,14 16:10
  17:17 18:2
  20:20 26:22
  29:22 33:3
  34:10 36:3
  39:18 41:4,14
  42:10 47:13
  48:15
**admins'** 83:24
**admission** 21:2
**admitted** 68:4
  70:5
**advance** 7:5 8:4
**advertise** 11:2,5
**affiliated** 70:15
**affirmative** 76:1
  76:10
**affixing** 55:19
**age** 5:11 74:2
**agent** 51:7
**ago** 25:15
**agree** 8:23 23:8
  23:11,20,24
  69:5 80:20
**agreed** 5:1 23:4
  24:11 25:2
  35:21 57:11
**agreement** 21:8
  23:1,20 95:8
**ahead** 16:6 63:20
  73:14
**akin** 60:20
**alerted** 42:10 45:5
**alleged** 20:24
**allow** 73:7 82:10
**allowed** 74:7
**allows** 82:13
**alluded** 40:9
**alphabetical**
  31:19,25
**alphanumeric**
  25:18
**amend** 99:6
**amount** 21:1 23:9
  39:5 43:7,19,24
  44:25 45:8 47:7
  48:8 60:8 62:7
  67:17 72:10,12

73:8 74:14,20
75:4 85:7 87:20
96:14,22,23
97:22 98:19,23
**amounts** 29:21
  64:10,18 67:7
**and/or** 51:10 57:2
  83:20 103:4
**Anderson** 15:22
  16:23
**Ann** 1:14 3:17
  4:22 5:4 102:3
  102:22 104:22
**announce** 22:18
**announcement**
  23:14
**annum** 60:11
  61:12
**answer** 29:2 52:6
  57:3,9,16 59:9
  59:13,17 60:2
  60:10,12 61:10
  64:7 68:19
  69:25 71:16,18
  76:4,11 88:3
**answered** 63:19
  68:16
**answering** 63:18
  76:14
**answers** 2:6,16
  73:21 80:14
  100:12 101:3
**anymore** 92:25
**apologize** 8:4
  16:15,16,19
  20:5 34:25
  39:24 41:13
  43:14 47:23
  48:25 51:15,20
  51:22 53:17
  54:4 61:5 63:17
  64:19 65:17
  71:15 74:10
  75:5 90:25 92:2
  94:3 99:25
**apparently** 66:10
**appear** 38:22
  52:15 55:8 56:2
  56:16 65:4,5,8
  84:21 93:15
  96:5
**appeared** 38:20
  57:10 92:13,15
**APPEARING** 4:2
  4:8
**appears** 37:22
  49:25 53:11
  55:15 61:2 69:3

77:4 87:12,20
88:22 96:8,13
97:4 98:8 102:7
**applicable** 56:1
  63:15,15
**application** 2:10
  34:6 87:10
  88:19,23 97:6
**applications** 55:9
**applied** 40:18
  48:12 61:17,23
  62:7
**applies** 46:18
  69:6
**apply** 12:11
**appropriate** 37:22
  38:21 52:8
  72:12
**April** 55:11 88:18
  98:10,14
**area** 37:20 74:4
**areas** 26:2 37:1
  54:19
**articles** 13:12
  14:21
**artificially** 20:3
**asked** 24:5
**asking** 36:23 49:2
  64:5 69:19
  74:25 75:24
  81:23
**aspect** 83:5
**aspects** 14:15
  28:21
**assigned** 104:6,8
  104:9,11,12,14
  104:15,17,18,20
  104:21
**assistant** 38:14
  40:22 41:11
  52:7,19,23 53:1
  56:11
**assistants** 13:23
  14:4,8,18 25:9
  29:18 34:15
  36:13 76:6
**assume** 21:15
  35:12 44:21
  57:12 85:13
  87:6 90:20
**assuming** 14:20
  23:20 45:13
  64:16
**attach** 77:22
**attached** 2:22
  77:11,13,20
**attempting** 9:22

**attorney** 5:19,20
  7:15 66:18 74:5
  80:22 81:11
  90:19,24 91:1,9
  94:13,15 102:15
**attorney's** 91:13
  95:5,25
**attorney/client**
  7:16 29:4 70:16
**automatically**
  46:7
**available** 12:4,23
  28:5
**average** 39:15
**aware** 76:20

**B**

**back** 17:15 21:22
  22:2,4 23:13
  27:17 28:19
  34:9 38:12
  39:20 48:11
  73:22 78:22
**background** 54:5
**backtrack** 36:11
**backtracking**
  34:25
**balance** 42:14,22
  45:14,16,17
  46:25 47:6
  60:11 61:12,25
  61:25 62:8
  63:12 85:1,2,17
  87:18 89:10
  91:23
**balances** 61:15
**ballpark** 6:1
**bank** 33:7
**bankruptcy** 8:25
**base** 60:12
**based** 17:25 41:9
  61:25 73:20
  83:21 85:13
  87:6 88:3 91:13
  91:14,18 93:24
  94:10,12 95:6
  96:13 97:13
**basic** 38:15
**basically** 47:12
**basis** 18:17 28:23
  34:1 35:16
  60:11 61:12
**Bates** 66:4
**bears** 97:11
**began** 11:11
  13:18 16:8
**beginning** 11:11

begins 57:3
behalf 1:12 4:2,8
  5:12 7:19 8:7
  69:10
believe 7:1 15:17
  16:9,16 21:2
  27:24 42:20
  53:8 56:1 61:13
  64:7 74:9,11
  75:12 77:8
  79:14,21 85:18
  85:24 87:11
  88:20 93:7,8,12
  94:16,18 95:3
  95:24 97:16
believes 20:25
benevolent 30:12
best 102:9
bet 66:16
better 47:17,23
  93:11
beyond 29:11
  70:16 79:23
  80:4 96:2
bi-weekly 34:1
biannually 18:15
big 9:2 11:9
bit 16:1,6,20
  31:20 36:11
blank 54:12,14,19
blanks 54:17
block 84:18
board 70:20
bona 71:21 73:7
  73:10 75:11,16
  75:21
bono 29:6,8
book 28:4
books 27:18,21
  28:16 93:15
bottom 38:18 53:8
  86:25 94:10
  95:24 98:7
Boulevard 3:15
  4:4
bound 11:25
box 48:18
breaches 82:19
break 20:3 63:22
  63:23 90:22
breakdown 41:22
breaks 63:17
brief 99:3
briefly 90:21
bring 19:4 20:10
  23:7 26:18,20
  35:10,23 58:22

bringing 29:12
brings 26:7
Broadway 4:23
brought 7:19
  12:18 17:6 19:6
  23:25 54:11
Bub 4:9
bubbling 13:18
buck 43:11
built 10:25

———————
C
———————
C 4:1 59:22 79:15
calculate 46:7
  60:7 61:25
  90:12
calculated 48:21
  86:17 87:6
  93:23
calculates 46:11
calculating 47:19
calculation 47:20
  65:14 85:13,16
  95:25
calculations 64:5
  65:3 72:16
  91:14 94:13
calculator 47:21
  47:22
Caleb 4:3
caleb@voytasl...
  4:6
call 9:2 14:1 18:3
  23:5 30:16 45:8
  45:11 49:6,12
  59:7,13
called 33:23 59:10
calling 18:11
calls 22:17 69:23
  71:20 73:12
caption 38:25
carbon 27:12,14
  28:7,9
card 86:9 93:5
case 1:4 3:4 7:7
  7:11 10:2,13
  13:18 14:16
  18:20 22:12
  23:12,19 30:5
  32:18 35:17
  39:9 40:8 42:5
  45:17 50:20
  55:11 62:21
  75:18 76:1
  78:13 80:13
  84:13 96:6
case-by-case

35:16
Case.net 42:17,19
  42:20
cases 9:21 30:24
  32:3 40:14
cash 26:13,16,18
  27:2 32:18 40:2
  91:20
cash/money
  64:23
catch 7:24 39:3
categories 47:2,4
  47:5
category 69:20
  75:13
cause 3:20 39:18
CCR 1:14 4:22
  102:22
cents 90:9
certain 20:1 37:3
  46:1 62:22
certainly 21:4
  34:13 73:8
CERTIFICATE
  102:1
certified 3:18 5:5
  86:10,11 88:4
  90:1 102:3
certify 102:6
  103:1
chance 7:9,17 8:5
  63:21 78:17
  90:21
change 47:7 93:1
  104:6,8,9,11,12
  104:14,15,17,18
  104:20,21
changed 8:15
  15:10 76:4
changes 14:6
  67:24 103:3,7
  104:4
character 71:25
characterization
  89:4
characterized
  71:25
charge 92:21
  95:20
charges 67:7,12
  67:15,18
check 25:24 26:1
  26:18 34:18
  38:12 40:10,12
  40:24 41:7,8,8
  41:15,20,23,23
  44:13 62:6
  64:22 66:3 68:3

checklist 13:4
  36:7
checklists 13:9
  14:22
checks 26:2,19
  40:16,24 41:6
  41:19
Christian 2:2 4:3
  5:14 16:15 29:5
  49:18,19 51:20
  51:22,23 52:5
  60:15 61:21
  63:10,23 64:2
  65:22 69:17
  70:4 71:15 72:9
  73:20 74:17,25
  76:25 77:25
  81:17 82:20
  84:9 90:18 92:7
  94:3 95:12,16
  97:16 99:10,25
  100:6
chronology 5:25
circuit 40:20
circumstances
  43:9 44:18
  71:14,20 72:3
  75:15
civil 22:7 32:3
claim 33:20
clarify 99:5
clarity 37:2 100:7
clear 41:13 54:13
  61:3 63:11 84:4
clerk 40:12,20
click 31:15
client 10:16,22
  20:17 22:2 24:1
  24:5 31:22
  32:11 45:7
  50:22 64:11,18
  79:16,19 80:10
  80:11 82:3
  91:21
client's 50:18
  78:19
clients 9:6 10:23
  11:4 17:7 28:21
  29:6 65:25 69:8
  69:10 82:22
collect 9:22 10:4
  10:16,18 67:8
  67:11 70:10,12
  70:22 74:7
collected 41:10
  67:8 74:8
collecting 10:9
  70:6,25 83:20

collection 7:11
  9:4,5,6,13,19
  10:1,13,23 11:4
  11:12,15,20
  12:1,7,19 13:12
  14:11,15,23
  17:19,24 19:9
  19:10,20 20:18
  24:6 25:15
  28:22 29:6,8
  35:24 37:4,11
  48:20 51:9 59:2
  68:15 69:7 70:5
  71:4 73:22 78:9
  78:14 79:3,20
  80:6,9,19,20
  81:5 84:6
collector 69:7,18
  69:20,22 74:7
column 46:14
  48:18 84:22
  89:7 96:4 97:10
come 8:21 11:5
  18:5 19:23 23:1
  23:2,19 25:6,11
  26:16 40:4,24
  41:3,19 42:25
  56:7 57:23
  58:12 68:6
  75:15 78:13
  81:11 84:24
  85:5 86:7 87:19
  88:10,15 89:12
  89:18,21,25
  90:6,11 94:25
comes 22:2 25:22
  32:19 61:16
  62:4 85:21 87:3
  87:24
comfortable
  66:19 83:5
coming 26:5
commence 24:13
  25:3
Commission
  103:19
communicating
  80:10
communication
  76:17
communications
  56:25 76:9
community 39:13
companies 9:11
company 93:5
compare 39:20
Complaint 7:7,8
  17:6

completely 65:24
compliance 68:14
  68:17
computer 30:9,22
  30:23 31:16
  32:7 39:16
  82:10
computer-enter...
  89:1
concluded 101:11
conclusion 69:24
  73:13
conducts 14:12
conference 22:23
confidentiality
  82:19,20
Connie 1:2 3:2,22
  7:21 8:8 45:24
  49:9 50:22
  53:24 55:12
  57:17 68:8 79:9
  79:25 82:3,8,24
  94:22 104:3
consent 8:5 22:11
  23:5,15 24:4,7
  24:12 53:23
  57:10 79:22,23
considered 81:10
consistent 8:16
construction 54:5
consumer 74:13
  74:18
contact 21:3
contain 66:4 81:5
contained 65:6
contains 66:2
contemporaneo...
  56:20
contents 60:21
  79:12
contingency
  28:23
continues 57:9,16
  59:10
contract 83:12
contractor 51:7
control 83:23
controlling 69:12
convenient 32:2
conversation
  57:18,22,25
  58:24 59:15
conversations
  58:16,18
copied 33:8
copies 2:22 26:11
  28:10 31:7 41:6
  64:25 65:17

66:25 80:3
copy 27:12,14,16
  28:7 33:6 41:15
  64:9 79:11 80:1
  80:2,3 92:4
correct 9:9,25
  28:1 29:6 31:21
  32:22 33:4,6
  35:4,18 41:17
  44:22,23 45:20
  48:2 50:6 56:19
  63:5 67:4 68:9
  69:5,8 70:21,23
  71:4 73:23 75:3
  79:4 84:19 85:2
  86:15 87:1,14
  88:8,13,23
  89:10,16 90:4,9
  93:9 94:19 95:2
  96:15,16,19,20
  97:8 103:6,10
corrected 77:11
correctly 34:4,11
corresponding
  53:25
corroborate
  65:13
cost 48:12 86:8
  88:4 92:12
costs 48:5,6,10
  48:15,19 49:10
  60:9 62:18,19
  62:20,22 63:1,3
  63:4,14,16 67:6
  67:18 80:4 82:6
  89:20
counsel 5:2,2
  102:11,15
counties 42:3
county 7:20 8:7
  20:8 22:22
  24:17 26:15
  29:9 31:18
  38:25 39:4,9,10
  39:11 40:12
  55:12 70:16,20
  70:23 71:1
  83:13
couple 50:24
  99:18
course 34:16
  67:16 95:17
court 1:1 3:1,18
  3:21 4:21 5:5
  22:10,14 23:14
  25:25 54:1,8,10
  54:18 57:10
  62:6 64:22

73:18 74:20
  77:17 80:4
  81:19,20 82:12
  82:13,14 99:13
  99:18,22 102:3
courthouse 58:19
courtroom 22:24
  23:13
courts 40:25
cover 40:10
covering 68:1
  100:8
create 81:8 82:7
created 12:3,17
  35:3 36:10
  83:25 90:19,24
  91:1
creation 78:3,6
credit 61:24 62:1
  62:10 67:25
  92:19 93:5
  95:21,23
creditor 83:9
creditors 9:7
credits 34:2 63:14
  86:14,23 88:7
  90:3 91:17
  93:20 96:12,24
  97:12 98:14,23
criminal 9:1
crossroads 7:25
  8:4
culling 28:16
currently 6:16
  8:12 15:21
  27:18 67:11

_____

**D**

D 5:17 27:25
  65:19 66:2
Daniel 4:9
date 9:17 20:11
  20:13 21:2 25:4
  39:1 46:4 51:11
  55:15,16 56:17
  56:18,20,24
  57:10,19 62:23
  81:11 83:15
  84:15 96:4
  97:12 98:11
dated 2:9 20:14
  56:7,7,9 57:3
  59:19 60:3 66:3
  87:13 88:18
  98:5,9,13
dates 52:15 56:2
  57:21

day 3:13 11:14
  14:2 19:4 21:12
  21:13 22:13
  28:10 30:7
  32:25 38:10
  46:1 56:22
  57:20 103:12
days 21:4 56:22
deal 84:6
dealing 29:15
  37:4,6
debits 47:5
debt 7:11 9:6,11
  9:13,19 10:1,13
  10:23 11:4,11
  11:20 12:1,6,19
  13:12 14:11,15
  14:22 17:19
  19:9,10,20
  20:18 24:6,11
  25:15 28:22
  29:5,8 37:4,11
  39:5 47:4 51:10
  52:7,16,21
  53:13 57:2
  58:22 59:2 60:5
  60:8 69:7,7,18
  69:20,22 70:4
  70:25 71:7,10
  72:4,10 73:21
  74:7,14,21 75:3
  78:10,15 79:6
  80:19 81:4,6
  84:6
debtor 20:24
  23:25 24:18
  25:1 30:6 31:2
  31:23 32:22
  35:21 43:6,22
  44:15 45:25
  49:7 58:22
  62:10,12
debtors 30:19
  58:12,15
debts 9:22 10:10
  10:11 70:6,8,10
  70:12,22 83:12
decision 35:6,25
  72:1
declare 103:9
deemed 75:21
DEF 55:2
default 24:19
  35:22
defeat 38:13
Defendant 1:6 2:7
  2:17 3:6,24 4:8
  5:3 50:2 54:15

64:8 67:10 77:5
  83:8
Defendant's 2:6
  2:16 27:25
  51:19,21,23
  53:18 57:14
  59:22 65:19
  79:15 83:19
  84:15 87:9
  88:17 92:8 93:7
  100:12,19,19,24
  100:25 101:3
Defendants 68:13
  68:16
defense 6:6
defenses 76:2,10
definitely 34:21
degrees 11:13
delivering 62:5
Dellwood 4:10
demand 100:15
demands/dunni...
  71:2
depending 10:15
  45:18 67:24
depends 26:23
  71:12
deponent 104:4
deposes 5:12
deposit 2:13 33:7
  41:6 100:24
depositing 40:6
deposition 1:12
  3:12 5:3,9 7:5
  100:7 101:11
  102:7,13 103:2
  103:4,8 104:4
deposits 26:10
  33:5
describe 36:3
  51:10 60:7
  68:13
desire 91:10
  94:17
desk 26:24 30:17
  33:9
Detail 2:13
details 100:24
determination
  72:14
dhunkins@ww...
  4:11
difference 91:13
  91:22 95:18
  96:17,22 97:23
  98:3,20,22
differences 91:8

**different** 8:19 15:14 36:25 38:24 39:2 40:13 41:24 45:7 46:19 52:15 72:19 73:18
**digital** 30:14,18
**direct** 64:10,17
**directed** 2:7,17 50:1 77:5
**direction** 102:11
**directly** 62:7
**disclosed** 26:4
**discovery** 65:25
**discrete** 65:6
**discuss** 18:4 22:25 23:8
**discussed** 64:6
**discussing** 19:7 34:7 54:3,6 64:14
**discussion** 18:16 19:1 74:3,3 75:11 100:5
**discussions** 18:10,22
**displayed** 81:2
**dispute** 21:5 58:23
**District** 1:1,1 3:1 3:1,21,21
**docket** 22:17,22
**document** 2:19,20 11:19,23,24,25 12:15,16 27:24 36:2,2 38:4 42:16 47:24 48:14 49:15,19 49:22,24 50:18 51:16,24,25 54:15 55:24 59:21,23 60:18 60:23,24 65:15 68:7,24,25 74:18 76:7,16 77:1,3,7,9,12,14 78:1,4,19 79:22 81:8 84:22 86:22 88:25 92:7 95:13,18 95:19 96:2 101:8
**documentation** 21:6
**documents** 7:10 7:12,18 8:10 12:23,25 14:21

31:1 32:6,12 33:8 37:20 40:8 50:24 51:15,16 51:16 52:11 53:9,19 55:1,4,7 57:12,13 60:21 64:21 65:2 66:5 66:20,22,23 74:13 76:9 78:11,18 79:22 79:24 83:8,23 84:11 91:3,18 95:7
**doing** 5:23 9:3,13 9:14 11:11 18:14 28:22 34:13 81:13
**dollar** 43:3 44:3 92:20 93:2
**dollars** 43:16,18
**domestic** 8:25
**door** 20:17 32:19
**double-check** 21:21
**doubt** 26:21 60:18 68:23
**downtown** 6:3,5
**draft** 53:2
**drafted** 52:24
**dredge** 6:8
**drive** 33:7
**due** 43:7,19,24 72:10,12 85:18 86:25 88:12 90:8 92:2
**duly** 102:7
**dumb** 49:2

**E**

**E** 4:1,1
**earlier** 30:2 38:20 40:9 54:3,6 63:18 75:11 79:15 84:5 90:20 91:1,9
**ease** 91:10
**Eastern** 1:1 3:1 3:21
**efficient** 36:17
**either** 11:17 26:23 42:5 49:4 80:7 95:5
**electronic** 31:8 81:3
**electronically** 2:22 92:20
**Ely** 6:3,5

**employed** 102:12 102:15
**employee** 14:1 51:7 102:15
**employees** 13:20
**employer** 45:11 72:19 73:18
**employer's** 45:1
**employment** 5:25
**engaged** 13:9
**entailed** 59:15
**enter** 16:22 23:10 26:12,15
**entered** 6:11 54:1 79:24 89:13
**entering** 23:4 93:14
**entire** 78:9,14 80:18,20
**entirely** 36:15 83:4
**entities** 9:11 70:13
**entitled** 2:19,20 29:3 101:7,8
**entry** 34:5 46:5 93:8,9,10
**equal** 94:19
**Errata** 104:1
**error** 34:5 71:21 73:10 75:12,16 75:21 77:22,23 92:10,11 93:14
**errors** 73:7
**especially** 18:19
**Esq** 4:3,4,9
**Essmyer** 1:2 2:19 2:20 3:2,22 7:21 7:21 8:8,9 25:22 45:24 49:9 50:22 53:24,25 55:13 57:17 62:20,21 68:9 79:9,9,25 82:3,8 94:22 96:14 98:19 101:7,9 104:3
**Essmyer's** 20:8 82:24 98:24
**Essmyers** 68:11 79:6
**estate** 8:24 9:3 24:17
**event** 24:18
**evidence** 16:14
**exact** 33:21 57:19 57:21

**exactly** 7:13 11:5 56:10
**Examination** 2:2 5:13
**examined** 3:13 5:11
**example** 30:6 34:17 43:1 52:18 54:14 65:11
**examples** 8:20 67:2
**exceeded** 44:25
**Excel** 47:25
**excepting** 68:3 76:17
**excuse** 6:24 21:19 51:8 55:9 70:9 80:25 83:17 88:7 90:9
**Executed** 103:12
**execution** 24:14
**exhaustive** 75:17
**exhibit** 2:5,6,8,10 2:11,13,14,16 2:18,20 27:25 49:15,16,25 51:18,19,23,25 52:1,10 53:18 55:1 57:7,14 59:22 60:14,17 64:7 65:1,5,18 65:19,20,20,21 66:2,14 76:23 76:24 79:15 84:12 90:16,17 94:10 95:14,15 95:19 96:11 98:9 100:14,17 100:20,22,25 101:2,5,7,10
**exhibits** 2:22 52:2 64:20 65:23 66:6 78:12 92:6 100:3,9
**exist** 46:24
**exists** 79:20 84:7 86:20
**expect** 20:19 36:3
**experience** 49:1 74:2 75:14,18
**Expires** 103:19
**explain** 14:22 85:11,15
**expressly** 5:7
**extends** 73:22
**extensive** 46:17

**extent** 10:12 72:11,13,14
**extrapolating** 31:20
**eye** 39:3

**F**

**F** 7:20
**face** 56:16 65:7,15
**fact** 69:19
**facts** 76:9
**fair** 11:14 12:12 32:13 37:8 39:19 40:11 45:15 89:3 94:20
**fairly** 56:20
**fall** 69:19 75:13
**false** 71:7 72:24
**familiar** 33:15 47:3 49:20 50:11,15 53:10 53:19 55:4,17 59:23 68:24 77:1 83:4 90:19
**far** 12:14 27:17,20 28:7 32:19 65:2 65:17 83:10 87:17 91:3 93:19
**fashion** 51:1
**fault** 45:1
**FDCPA** 12:12 17:19,24 68:13 68:21 69:3,22 71:6,9 72:5,10 72:24 73:5,11 74:6,12,17
**February** 53:6 57:4 59:19 60:3
**federal** 12:11 77:17
**fee** 62:24 85:19 88:1 89:23
**fees** 47:10 62:25 67:6 80:4
**fide** 71:21 73:7,10 75:11,16,21
**field** 9:19
**file** 10:2,14 19:14 20:8,10,16 21:15 22:5 25:16,18,21,22 30:11,13,14,15 34:2 35:3,13 39:15,22 48:20 49:6 56:13 60:3

62:3 71:2 78:9 78:14 79:3,8,12 79:20,25 80:6 80:16,19,20,21 83:11 92:19
**filed** 7:7 8:7 16:9 17:6 22:3 23:15 32:14 35:7,15 35:20 37:19,23 45:2 80:2 94:8
**files** 30:8,18 40:10 82:24
**filing** 9:21 20:17 21:22 31:9 35:17 62:24 92:12 94:6
**fill** 23:11 54:17
**final** 97:6 98:11 98:12
**finally** 76:7
**financially** 102:16
**financials** 29:1
**find** 37:5 42:8
**fine** 18:10 61:8 81:13,17
**finish** 59:17
**firm** 2:13 5:23 6:3 6:4,6,6,7 8:12 8:15 9:23,24 11:21 12:2,3,6 16:22 17:5 20:19 24:9,20 24:23 25:6,7,20 26:8 27:1,19 36:2 37:14 40:15 44:8 46:9 100:24
**firm's** 6:19 58:13
**firms** 10:1,3
**first** 2:6,16 6:2 7:22 8:13 15:6,8 16:9 20:6,23 21:6 41:1,3 50:1 51:3 84:25 91:15 93:20 96:7 100:13 101:4
**five** 27:10 59:5
**flexible** 23:10
**flubbed** 100:4
**fluctuate** 67:23
**fluctuates** 13:16
**folder** 31:1,12,17
**follow** 12:8,13 69:18
**following** 83:15 104:4

**forced** 17:14
**forcing** 93:1
**foregoing** 102:7 103:2,10
**forget** 73:2
**form** 13:8 20:24 23:7,11 24:14 27:8 28:24 29:19,21 35:3 36:5 37:17,25 38:5,8,11 39:8 47:16 56:16 61:19 63:7 65:11 69:15 71:13,19 72:6 73:12 74:15 81:16 82:16 83:24 84:25 85:22 86:1,18 103:3
**formal** 17:19
**formalized** 11:19 11:23 15:2
**format** 49:11
**forms** 40:20 47:14 48:16 54:8,9,11
**forth** 19:16 21:2
**forward** 24:22 35:11,25 66:21
**found** 65:13 68:5 76:19
**four** 6:9 15:19 17:17 27:10
**Fox** 6:7
**frequent** 44:17 45:3 58:14
**frequently** 13:9 18:7 30:10 44:4 45:4 58:12,15 58:25
**front** 26:24 32:20 84:14
**full** 42:11 43:4,8 43:23 49:9
**fully** 33:20
**function** 97:20 98:16
**further** 84:2 91:25 102:14

**G**

**gained** 74:2
**garnished** 26:3
**garnishing** 25:24
**garnishment** 2:10 16:8 24:14,16 25:5 26:20

29:16 31:15 35:4,6,13,15,17 35:24 36:5,10 37:4,15,18,24 39:7,21,25 40:4 40:21 42:7,7,13 42:15,21 44:18 44:25 45:9 47:14,16 48:16 55:8,20 62:6 63:3,6 65:11 67:13 84:14,19 86:5 87:10,13 88:18,22 91:4 91:15,16 92:13 92:22 93:21 94:7 96:6,7,11 96:24 97:3,7,11 98:5,8,9,13,25 101:9
**garnishment's** 35:20
**garnishments** 7:19 8:6 29:13 34:24 40:13 41:9,14 42:2 47:10 55:14 56:3,15 64:6,10 64:17 65:4,6,7 82:8 84:13 91:7 96:5 100:18
**Gen** 8:17 10:25
**general** 8:18 19:9 20:22 24:24 35:9,19 36:25 58:2,4 62:14 71:5 72:16 75:2 75:9 81:4 86:6
**generalities** 75:1
**generally** 23:10 30:15 44:21
**generated** 93:10 93:10
**Genevieve** 6:11 6:15 39:10
**getting** 29:1,12 35:20 54:4
**give** 8:20 19:5 20:22 24:20 26:12,21,22 27:15 41:4,10 43:1 51:2,13 61:24 92:2
**given** 40:8 92:3
**glares** 39:17
**glaringly** 39:1
**gleaned** 15:1

**global** 48:19
**go** 9:20 17:14 20:2,20 22:6 23:13 25:4 29:21 34:9,14 34:18 38:12 39:20 44:19 45:24 50:23 53:14 54:8,10 63:24 64:7 73:14 78:8,17 80:16 81:25 82:17 87:16 91:11 95:8 100:2,9
**go-to** 10:24
**goes** 25:21,22 40:16 44:1 76:12 93:4
**going** 7:23 15:5 15:25 16:13,19 17:15 19:24 20:3 23:21 24:10 25:3 29:2 29:11 30:7 34:24 35:7,20 39:23 41:1 49:14,14 50:21 50:23 51:3,13 51:14 56:11 59:20 64:2 66:8 66:15,16 71:18 75:5 78:22 83:6 87:8,16 90:14 95:13 98:7 100:8
**Goldblatt** 6:7
**good** 5:15 19:25 63:18,20 92:25
**Google** 97:19 98:16
**grade** 91:12
**gray** 91:11
**great** 11:7
**greater** 47:8
**green** 86:9
**guess** 8:13 9:25 13:25 14:17 15:8 31:6,17 32:8 33:6 35:8 36:14 44:3 47:23 65:9
**guide** 37:10,14 69:13 84:23
**guidelines** 68:17 68:18
**guides** 36:20 83:24

**guy** 31:12

**H**

**H** 32:1
**Hailey** 15:21 16:18,21,25 17:5,12 26:12
**Hailey's** 16:1
**hallway** 22:23
**hand** 22:20 25:14 47:20 49:14 51:14,15 62:5
**hand-delivered** 91:5
**handing** 41:2
**handle** 11:20 14:15 24:23 44:8
**handled** 26:8 62:9
**handles** 62:3
**handling** 11:13,15
**handwriting** 54:20 56:3 89:6
**handwritten** 54:15 59:19 79:16,19 89:1
**Hansmann** 4:9
**happen** 18:5 72:20
**happened** 45:3,4
**happens** 8:1 18:15 19:10,12 19:14 30:10 44:6 72:8
**hard** 31:7 64:25 68:5
**hard-and-fast** 35:14
**heading** 38:3
**Health** 20:8
**hear** 21:10 61:5 100:2
**hearing** 8:3 92:24
**held** 91:13
**help** 15:25
**helpful** 14:22 64:20
**helping** 9:16
**hey** 23:16 25:2 45:11
**high** 13:25 28:17
**highly** 24:13
**hire** 8:21,22 14:18
**hold** 78:15 80:21
**holding** 27:24 28:2
**honest** 8:2

**hoping** 50:25
**hospital** 7:20 8:8
  20:25 21:21
  22:5 26:15 29:9
  31:18 39:9
  55:12 70:16,20
  70:23 71:1 79:7
  83:13
**hours** 3:16
**housed** 30:9,14
  32:6
**how-to** 83:24
**Huelskamp** 1:5
  1:12 2:7,13,17
  3:5,12,23 5:4,10
  5:17 6:17,20
  8:21 10:6,7
  11:10 12:17
  13:19 14:12
  39:23 49:20
  50:2 51:14 52:5
  53:20 59:20
  60:15 64:3
  65:23 66:24
  67:19 68:1,22
  69:17 70:9,13
  71:24 72:22
  73:1 75:22
  76:22 77:25
  84:10,17 87:11
  88:20 90:14
  93:13 95:12
  100:16,23 103:1
  104:2,3
**Huh-uh** 92:5
**Hullverson** 6:4,6
**hundred** 43:2,16
  43:18 70:2
**Hunkins** 4:9 16:13
  28:24 49:17
  51:19,21 52:4
  61:19 63:7,21
  69:15,23 71:13
  72:6 73:12
  74:15,22 77:19
  81:16 82:16
  84:4 92:5 94:2
  97:15 99:12,14
  99:24
**husband** 57:24

**I**

**icons** 33:22
**idea** 72:25
**identification**
  49:16 52:3
  60:14 65:21

  76:24 90:17
  95:15
**identified** 67:12
  68:4 84:17
**identify** 49:22,24
  51:6 52:20 55:6
  56:24 59:25
  64:5 67:6 76:8
**ignoring** 35:12
**imagine** 44:17
  57:8 88:5 90:1
**immediately** 9:15
  42:2
**implemented**
  12:6
**in-person** 59:7
**inaccurate** 74:14
**inadvertently**
  77:8
**inappropriate**
  38:23
**inches** 27:10
**include** 62:22
  73:15,16,17,17
  80:20
**includes** 62:19,20
  62:24 63:14
**including** 12:12
  51:7 60:8 101:9
**inclusion** 94:11
**incorrect** 94:23
**incorrectly** 74:20
**incur** 63:3
**incurred** 49:11
**independent** 51:7
**INDEX** 2:1,5
**indicated** 104:4
**indicates** 60:4
**indicating** 27:23
**individual** 30:8
  49:13
**infer** 73:9
**informal** 17:23
**information** 14:25
  29:3,23 36:4,8
  39:7 41:16 50:5
  55:24 75:25
  81:5 101:10
**informed** 73:21
**Infrequent** 58:21
**initial** 52:7,16,21
  53:13 63:13
  100:15
**injury** 6:6
**input** 33:3,16 34:3
  34:10,19 41:16
  47:15,25 48:12
  86:3,18 91:2

**inputs** 33:9 41:11
**inputting** 40:22
  41:2 45:8
**instance** 26:4
  46:18 71:21
**instruct** 29:2
**insurance** 6:5
**intent** 72:21,23
  73:2,9
**interest** 46:7,12
  46:15,21 47:9
  47:15,19 60:9
  60:11 61:12,16
  61:25 62:17
  63:15 65:12
  67:6,18 70:19
  82:6 85:9,14
  87:23 89:15
**interested** 102:17
**intern** 14:7
**internal** 36:7 44:8
**Internet** 12:4,24
**interns** 14:14
**internship** 13:25
  14:9
**interrogate** 38:3
**interrogatories**
  2:7 50:1 68:2
  77:9,21,23
  100:13
**interrogatory**
  50:3,5 51:4,6
  52:6,17 56:23
  56:24 59:9,18
  60:2,6 61:11
  64:3 66:24 67:3
  67:5 68:12,13
  75:23 76:8,15
  78:23 80:18,25
  83:17
**intranet** 32:4
**involve** 72:20
**involved** 14:9,17
  31:7 47:11
  72:14 73:4 74:4
  78:3,6
**irrelevant** 28:25
**issue** 16:8 22:16
  35:23 82:18
**issued** 63:8
**issues** 7:15 13:17
  18:18,25 19:5
  19:10 22:25
  36:24
**it'd** 44:3
**item** 85:19 87:22

**J**

**Jacob** 4:4
**jacob@voytasl...**
  4:6
**January** 16:9
**JAR** 53:5
**JAW/** 103:23
**Jennifer** 53:5
**job** 6:2 14:15
  63:18
**joined** 9:14
**Joseph** 7:20 8:8
  53:24 55:13
  79:9
**judge** 22:17,20
  23:14,16 82:17
**judgment** 7:18 8:6
  8:6 10:2,4,14,17
  10:19 19:16
  20:14,21 22:8
  22:11 23:5,5,15
  24:1,2,4,4,6,8
  24:12,16 35:22
  42:23 43:20
  44:25 46:23,24
  47:5,6,8 48:8
  51:10 53:23
  54:1,4,7 57:1,11
  61:15 62:7,15
  62:19,20,21,22
  62:25 63:5,9,12
  63:13 67:17,22
  74:8 79:23,24
  85:1,2,6,17
  87:18,20,21
  89:9,13 91:23
**judgments** 10:11
  68:15 71:3,4
  83:20
**Julie** 1:14 3:17
  4:22 5:4 102:3
  102:22 104:22
**July** 16:12,16
  55:10 91:16
  96:8,10,11,24
**Jumping** 16:6

**K**

**keep** 30:23 31:4,4
  45:12 48:9 64:8
  64:25
**keeping** 22:18
  48:15
**keeps** 45:2
**kept** 49:11 86:22
**kind** 5:22 10:1
  11:25 13:4,17

  14:6 16:8 25:14
  25:17 27:12
  30:4 31:6,21
  45:10 50:20,23
  50:25 53:14
**knew** 24:21 66:13
**know** 7:13 10:21
  11:6,22 13:6,7
  17:13 18:3
  20:11 22:19
  23:14,17 24:25
  25:10,12,15,17
  26:5,19 27:9,17
  27:20 28:4
  29:23 31:12
  32:1 33:22,23
  34:7,20 36:12
  36:22 39:11,14
  42:13 43:6,23
  44:6 45:21 46:3
  46:17 47:18
  48:3,21,21,22
  49:12 56:10,15
  58:4 59:8 65:16
  71:8,20 72:7
  77:15,17 78:5
  78:16 79:11,13
  80:5,12,13,22
  81:22 83:1,2,2
  84:5 85:21
  86:19,23,24
  87:3,24 88:11
  88:16 89:19,22
  90:7,13 93:12
  93:18 94:4 98:3
  99:2,17
**knowledge** 59:14
  60:13 61:9
  76:10 78:11,24
  79:18 85:4
  94:21
**knowledgeable**
  33:20 76:16
**knows** 100:10
**Kortenhof** 6:3,5

**L**

**labeled** 49:15
  51:17,24 52:1
  57:7 59:21
  60:16 65:4,19
  65:20 78:12
  79:15 84:12
  90:15 92:7
  95:19
**laborious** 66:9
**laid** 60:4

**language** 55:25 63:5
**late** 7:1,2 16:24 17:9 30:7
**law** 1:5 2:7,13,17 3:5,14,23 4:3 6:2,3,4,17,19 10:6 12:13,17 13:20 14:12 37:1 50:2 58:12 60:13 69:18 70:9,13 71:20 75:18 100:23 104:3
**lawful** 5:11
**lawsuit** 28:25
**lead** 96:17
**leading** 97:22 98:20
**learning** 9:19
**leave** 6:25 16:21 17:12
**ledger** 49:9
**ledgers** 91:6
**left** 8:15 17:1,5 28:7
**legal** 8:19 52:7,19 52:23 53:1 54:22 69:24 73:13 74:2 80:7 83:24 93:14
**let's** 21:7,7 22:10 23:2,24 24:5 31:14 32:17 42:5 43:2,15 45:23
**letter** 2:9 20:23,24 25:1 43:10 44:1 52:7,16,21 53:13 90:2
**letters** 52:12,24 53:2 54:16 57:3 57:6,6 71:2 100:16
**letting** 43:6
**level** 31:22
**lifetime** 67:22
**limit** 13:15,16
**Lindbergh** 3:15 4:4
**line** 41:1 104:6,7,9 104:10,12,13,15 104:16,18,19,21
**list** 28:2 33:3 75:17 85:19
**listed** 55:15 75:12 85:8

**lists** 12:1 25:25
**literally** 26:10
**litigation** 20:9,18 80:8
**little** 9:3 16:1,6,20 22:23 31:20 36:11 86:9
**live** 23:17 39:13
**LLC** 1:5 2:7,13,17 3:5,23 4:3,9 6:17 12:17 13:20 14:12 50:2 70:9,11,13 100:24 104:3
**local** 13:25
**located** 66:7
**long** 5:20,22 9:12 19:4 63:17 66:18 95:7 99:16
**long-winded** 16:20
**longer** 14:9 64:20
**look** 7:6 13:1 22:19,19 23:16 25:2 27:7 33:24 38:1,2,2,5 49:19 50:11,15 53:10 53:19 55:17 59:23 77:1 90:18,21,22 96:7 97:14
**looked** 7:8,12 12:16,24 33:2 67:20
**looking** 14:21 39:7 66:14 91:15
**looks** 83:3
**lose** 93:2
**lot** 8:19,25 9:3 12:22 13:11 17:2 28:18 36:24,25 45:7 46:19 49:4 73:18 99:2
**lots** 38:24 72:19
**loud** 7:23 54:5
**Louis** 3:15 4:5,10 4:23 6:3,5
**lump** 41:9,22,24

**M**

**mail** 44:13 74:19 86:10,11 88:4
**mailing** 62:5 86:8 88:4

**maintain** 30:4,18 79:8
**maintained** 48:22
**making** 43:2
**mal** 73:15
**malice** 73:9
**malicious** 72:21 72:23
**March** 53:7 57:4 66:3 76:18 98:18
**marked** 27:25 49:16 52:2,9 53:16,17 54:25 57:14 60:14 65:21 66:2 76:23,24 90:17 95:13,15,21 100:12,15,18,21 100:23 101:1,3 101:6,8
**match** 95:25
**matches** 96:4
**materials** 83:19
**math** 38:15 62:9 73:15 87:5 94:18 98:2
**mathematically** 96:19,20 97:24
**matters** 11:15 19:21
**McKenzie** 15:21 16:17,25 17:4
**mean** 11:22 12:9 13:3 19:15 25:13 27:4 30:25 33:15 35:9 38:1 39:2 40:5 42:15 54:19 58:4 62:14 72:7,19 73:18 74:4 75:8 76:5 77:19 100:1
**meaning** 32:5 34:8 61:16
**means** 34:22
**meant** 43:12 69:13
**meet** 22:22,24
**meeting** 10:21 58:1,3,6 59:11
**meetings** 17:23 18:2,3,7
**member** 6:18
**Memorial** 7:20 8:7 29:9 31:18 55:12 70:16,20

**memories** 58:5
**mentioned** 17:22 18:20,24 20:1 39:4 41:18 48:5 54:7 80:23
**merely** 74:25
**mind** 5:15 22:18
**mine** 64:20
**misapplication** 95:23
**miscalculation** 73:16
**mischaracteriz...** 72:4
**mischaracterize** 71:10,18 72:2
**missing** 43:11
**Missouri** 1:1 3:1 3:16,19,22 4:5 4:10,23 6:11,15 12:11 102:4,23
**misstate** 72:10
**misstates** 16:14
**mistake** 93:12,14
**modify** 99:5
**Mohrmann** 4:4
**moment** 87:5 99:9
**money** 23:3 25:25 26:5,7,21 27:3 40:16 45:2 91:21
**month** 42:3 43:3 43:16
**monthly** 18:14 23:21,22,23,24 24:19 34:1 43:7 43:18 57:11
**months** 21:13
**morning** 5:15 60:17
**mouth** 10:24 11:8
**move** 29:11 35:11 35:25 66:21 87:8 91:25
**moved** 6:10 64:19
**moving** 24:22 31:5 56:23 97:2
**multiple** 40:10 47:10
**mutually** 8:23

**N**

**N** 4:1
**name** 5:16 6:19 16:2 31:2,23

38:24 39:4,13 49:7 58:11 103:8
**named** 6:7 31:18
**names** 15:19
**necessarily** 33:24 77:18
**necessary** 73:3 103:5
**necessitated** 82:14
**need** 19:14 43:23 80:23
**needed** 18:18
**needs** 19:11,13 19:14
**negative** 45:18
**neither** 102:11
**networked** 32:8
**never** 94:24
**newer** 18:19,21
**night** 68:5 76:19
**noise** 54:5
**non-principal** 67:7,12,15,17
**normally** 18:17 44:14
**Notary** 103:21
**note** 30:11,13,16 59:19 60:1 66:1 79:16,19,21,24
**noted** 66:2
**notes** 30:5,8 57:18,21,25 80:7
**notice** 24:21
**noticed** 40:7
**number** 7:7 13:16 23:12 25:17,18 25:21 30:23 48:1 50:3,23,23 51:4,6 52:6,18 56:23 59:4,9,18 60:6 61:11 64:3 64:4 65:13 66:4 66:25 67:3,5,21 67:23 68:12 75:23 76:8 78:8 78:9 80:18,25 81:1 83:7,17,18 84:12,25 85:5,8 85:9,11,21 86:3 86:7,13,17,20 86:21,24 87:3 87:19,24 88:6 88:10,15 89:12 89:18,21,25 90:6,11 91:12

91:24 92:24
93:23 94:10,14
94:15 97:4
**numbered** 55:2
66:3 100:19
**numbers** 21:1,21
29:24 34:10
35:2 38:2,7,11
38:12,16,25
39:21 41:2
47:14 54:16
56:16,19 63:12
65:3,5,7 84:21
84:24 87:6,17
89:1,2,7 94:14
94:25
**numerous** 7:12

**O**

**oath** 102:8
**object** 16:13
28:24 61:19
63:7 69:15,23
71:13,17 72:6
73:12 74:15
81:16 82:16
**objection** 74:22
76:11 81:7,21
**obtained** 35:22
**obtaining** 83:20
**obvious** 39:1
**Obviously** 10:20
31:7 59:12
**occasion** 25:1,4
35:23 38:19
57:17
**occupation** 5:18
**occur** 18:8,10
44:5 73:5 98:4
98:22
**occurred** 34:4
50:21 57:22
59:1,6 74:24
**occurring** 36:9
58:6
**occurs** 22:1,9
70:5
**October** 1:13 3:13
20:14
**offer** 9:24
**offhand** 77:15
**office** 6:14,20
14:7 18:9 28:8
29:14 32:4,5
37:11 40:2,3
42:25 43:6,22
45:5 57:17,23

58:13,20,21,23
59:10 64:24
79:9,17 80:21
81:12 86:22
95:5
**offices** 3:14
**oh** 33:22 34:18
45:21 49:25
51:22 53:5 61:7
**okay** 8:11 12:14
15:14 17:14
20:16 39:23
49:14 51:3
53:16 56:23
67:5 78:17 84:9
85:25 87:8 93:6
93:17 94:9
97:10,18
**old** 28:16 31:7
**Olivia** 15:20,22
16:17,21,22,23
16:25 17:4
26:12
**Olivias** 15:23,24
**once** 22:4 23:25
24:3 28:17
31:22 59:10
87:17
**one-on-one** 58:15
58:23
**ones** 35:10 37:6
68:20 99:23
**opinion** 9:25
46:23 72:22
73:10,19,21
74:1 75:16
94:17
**opposed** 9:8 53:3
**oral** 56:25
**order** 2:10 27:3
44:15 55:20
61:14,17 64:23
81:19,20 82:12
82:14 91:21
**orders** 99:22
**ordinary** 81:4
**original** 2:22 60:2
80:1 83:8,11,12
85:6
**outcome** 102:17
**outline** 20:22
**outside** 12:15
22:24 83:6
**overlook** 66:10
**overlooked** 66:8
**overpay** 43:19
44:2

**overpayment**
44:7,9,10,19
45:6,19
**overpayments**
44:4
**owe** 20:25 23:2,3
23:8 43:13,17
62:12
**owed** 9:11 24:12
45:10 46:22,24
60:5 64:11,18
70:8,11,12,22
71:1,11
**owes** 45:25 62:11
**owing** 43:7

**P**

**P** 4:1,1,9
**p.m** 3:17 63:25
64:1 95:10,11
99:20,21 101:11
**page** 2:2,6,8,10
2:11,13,14,16
2:18,20 27:10
38:16 50:8,9,10
50:11,14 51:5
77:6 83:3 84:14
93:9 97:17 98:8
104:6,7,9,10,12
104:13,15,16,18
104:19,21
**paid** 28:25 42:10
42:23 47:18
48:11 49:13
94:24 96:14,23
97:22 98:19
**paper** 64:20 92:3
**papers** 11:3
**paperwork** 67:13
**Parkway** 4:10
**parses** 40:15
**part** 7:22 14:1
24:3 38:10 41:7
69:3 71:25
77:22 80:8 82:4
92:5,6 93:20
**particular** 24:25
26:1 41:8 46:18
58:19 60:24
**parties** 26:3 76:4
102:13,16
**partner** 6:12,21
8:15 11:17
**partners** 6:13
**parts** 41:20,20
**party** 35:12 72:18
73:16

**pass** 10:3
**passage** 58:9
**passed** 59:14
**pay** 43:4,8 48:10
92:23
**Payable** 44:15
**paying** 42:6 43:15
60:5
**payment** 23:21,24
24:8,19 25:22
26:13 27:1,3
28:8 32:17,18
32:21 34:5,19
35:21 40:1,2
41:22 42:6 43:3
43:4,8,18,23
46:4 61:16,17
62:4 64:10,17
66:15 68:7
78:25 80:3
91:19,21 92:8
93:25 94:5 96:9
96:10 97:4,6
98:11,12
**payments** 2:19,20
24:11 25:6,11
29:12 33:2,16
40:4 42:25 46:2
49:10 57:11
61:23 64:23
67:25 68:11
76:13 79:6 82:6
82:11 91:4,5,6
91:19,20 94:21
95:25 97:20
98:18 101:6,7,9
**PCMH** 31:18 92:9
**peel** 27:11,15
**penalty** 103:9
**pending** 3:20
**people** 8:3 10:25
13:19 22:9,12
22:13,19 39:14
41:24 74:3,4
**percent** 60:11
61:11 70:2
85:14,17
**perforation** 41:21
**perform** 10:7 24:6
29:8 38:15 69:7
**performed** 8:15
14:13,13,14
51:8,9,12
**performing** 28:22
**period** 41:10
**perjury** 103:9
**permissible** 71:10
72:4,8,9 74:6,12

74:18 75:1
**Perry** 7:20 8:7
20:8 22:22
26:15 29:9
31:18 39:9 42:4
55:11 70:15,20
70:23 71:1
83:13
**Perryville** 42:1
**person** 27:1 29:14
40:15 49:13
50:4 51:11
52:24 58:10
59:8 72:17
76:17 83:6
**personal** 6:6
**personally** 27:6
33:5 53:4 62:4
66:10
**persons** 76:9
**pertaining** 83:19
**Petition** 19:14
21:16,20,23
80:2
**petitions** 21:11
52:8 71:2
**phase** 29:12
**Phone** 79:1
**phrase** 73:1
**physical** 30:13,15
79:8,12,25
80:16,21 83:11
**physically** 29:19
**picked** 59:12
**piece** 39:24
**pile** 28:17
**piled** 32:25
**place** 14:3 15:17
28:15 58:20
65:13
**placed** 58:11
98:10 102:8
**Plaintiff** 1:3,12 3:3
3:23 4:2 5:2,12
57:1 59:18 67:9
77:5 100:12,15
100:18,21,23
101:1,3,6,8
**Plaintiff's** 2:5,6,16
50:1 51:10,17
52:10 55:1 57:1
60:16 76:23
78:10,15 80:15
80:19 81:6
84:12 90:15
95:14,19 100:9
100:13 101:4

| | | | | |
|---|---|---|---|---|
| **Plaintiffs** 57:9 76:13 | **practices** 17:20 17:24,24 | 32:25 43:10 45:17 46:16 | **pulling** 39:15 47:13,14 | **reading** 75:18 104:4 |
| **plan** 23:25 24:8 42:6 | **practicing** 9:18 **practitioner** 6:14 | 58:7 70:2 77:21 78:22 94:25 | **purpose** 20:17 38:13 | **reads** 89:10 **ready** 70:1 99:17 |
| **planning** 8:24 | 8:18 36:25 | 100:2 | **pursuit** 70:25 | **real** 9:3 24:17 |
| **pleading** 31:10 | **pre-judgment** | **problems** 17:3 | **put** 11:2 12:22 | **really** 8:1 24:2 |
| **pleadings** 30:20 31:8 32:14 | 20:4 **preference** 99:15 | **procedure** 12:1,6 12:7,19 22:7,15 | 22:21 30:11,16 33:8 34:2 36:4 | 34:7,18 39:17 **reason** 45:1 104:6 |
| **please** 21:3 95:17 | **prefilled** 92:24 | 23:4 26:9,25 | 36:13 37:10,14 | 104:8,9,11,12 |
| **plus** 62:17,18 91:14 | **preparation** 80:14 **prepare** 7:6 29:19 | 28:15 35:15 36:1 37:18 40:3 | 37:20 40:5 44:13 46:4 | 104:14,15,17,18 104:20,21 |
| **PohlmanUSA** 4:22 | 33:7 36:16 52:20 95:4 | 42:9 43:5,9,21 **procedures** 11:20 | **putting** 47:18 | **reasonable** 75:21 **recall** 13:24 20:11 |
| **point** 6:10 13:12 | **prepared** 21:20 | 18:4 19:2 37:15 | | 22:21 37:12,13 |
| 19:12,13,15 21:9,11 22:5 | 23:8 36:17 38:6 52:7 94:7 95:6 | **process** 12:7 13:10 14:23 | **Q** | 37:16 39:6,12 57:16,23 99:4,9 |
| 24:7 33:25 | **prepares** 37:17 | 20:2,9 24:7 | **quarter** 92:20 | **receipt** 26:17 27:2 |
| 37:18 42:22 45:14 56:14 | **preparing** 21:11 **preprepared** | 29:16 33:19,21 36:9 37:25 | **quarterly** 18:14 34:1 | 27:18,21 28:3 28:16 32:22 |
| 69:5 77:10 91:9 91:11 92:1 | 54:21,22 **preprinted** 85:22 | 39:25 40:1 41:3 44:8,12,20 46:8 | **question** 7:23 8:14 19:22,23 | 76:18 86:11 **receipts** 27:5,7,8 |
| **policies** 11:19 19:1 | 86:1,4 **present** 7:14 | 50:25 52:9 53:14 54:4,7 | 39:24 47:24 66:23 67:6 | 28:2 64:9,17 65:18 66:8 67:1 |
| **policy** 12:1,5,19 21:23 22:15 | 11:14 59:20 71:24 74:18 | 65:25 80:9 **produce** 27:21 | 71:19 75:9,22 78:22 93:11,13 | 67:2 68:7,11 76:13,20 79:5 |
| 26:8,25 28:15 28:18 35:9,14 | 75:3 90:14 95:13 | 77:4,16 83:7 **produced** 3:12 | **questions** 5:14 13:15 19:4 49:2 | **receive** 20:7 42:18 44:19 |
| 36:1 42:9 43:5,9 43:21 53:12 | **presented** 52:9 55:24 60:16 | 5:11 68:8,10 78:18,24 79:5 | 63:19 99:10 **quick** 51:1 75:22 | 53:13 64:22 71:3 |
| 56:6 68:14 83:19 84:7 | 65:18 68:25 74:13 76:22 | **production** 2:17 50:19 65:24 | 94:18 **QuickBooks** | **received** 28:8 49:10 78:16 |
| **pops** 47:22 | **preserved** 65:15 | 66:6 78:13 | 25:12 26:13 | 79:11,17 83:8 |
| **portion** 41:19 **positive** 45:18 | **presumably** 93:20 **pretty** 8:16 28:5 | 79:12 80:15 84:3 101:4 | 30:1 33:9,11,12 33:13 40:23 | 91:3,7 98:13,23 **receiving** 39:25 |
| 85:24 | 39:11 46:16 | **Professional** 3:19 | 41:12,17 42:12 | 40:1 41:15 |
| **possession** 83:23 | 50:19 51:1 | 102:5 | 45:21,23,25 | **recess** 99:3 |
| **possibility** 72:15 84:1 | **previous** 68:22 73:20 78:22 | **program** 13:25 14:10 81:3 | 46:1,5,6,14,16 46:19,20 47:15 | **recognize** 52:11 **recognized** 58:8 |
| **possible** 10:12 | 83:10,21 88:3 | **proof** 91:19 | 47:22 48:6,13 | **recollection** 20:13 |
| 72:11,13 75:3,7 78:25 81:2 | **previously** 6:19 10:6 27:25 | **proofs** 68:7 **provide** 27:2 | 48:18,23 49:1,5 62:3 64:13 | 57:20 93:22 **recollections** 58:2 |
| **possibly** 22:16 **post-judgment** | 51:17 53:17 57:14 59:21 | 75:25 81:9 **provided** 26:2 | 81:12,14 82:1,2 82:25 83:5,6 | **record** 5:16 37:2 54:13 63:24,25 |
| 20:4 28:20 48:20 50:22 | 64:6 65:19 66:1 67:20 68:4 69:1 | 33:2 50:4 59:18 65:24 66:20 | **quickly** 22:8 42:4 64:2 100:9 | 64:1 95:9,10,11 99:20,21 100:5 |
| 60:8,9 61:15 | 76:18 78:12 | 82:9 91:6,19,20 | **quite** 7:24 30:10 | 100:7 |
| 63:1,16 65:12 67:18 71:3 85:9 | 84:17 87:12 94:13 95:21 | 95:7 **providing** 32:21 | | **recordkeeping** 81:4 |
| 87:22 89:15,20 | **principal** 6:16 | 32:21 | **R** | **records** 17:11 |
| **potentially** 39:1 63:16 76:5 | 60:9 67:16,21 67:24 | **provisions** 73:6 **prying** 10:20 | **R** 4:1 **raise** 22:20 | 27:18 29:23,25 82:5 93:24 |
| **pouch** 40:5 | **printed** 11:24 | **Public** 103:21 | **ran** 24:8 | 96:13 98:12 |
| **practice** 6:12,25 | 60:17 | **pull** 29:22 35:17 | **rarely** 21:12 24:15 | **recovered** 48:10 |
| 7:3 8:13 11:1,18 42:1 53:12 56:6 | **privilege** 7:16 29:4 | 36:4 47:25 49:8 49:9 | **reach** 43:22 **reached** 21:8 | 48:11 **redacted** 26:1 |
| 59:2 70:6 73:22 | **pro** 29:6,8 | **pulled** 35:2 56:17 | **reaching** 80:10 | **reduced** 36:2 |
| 74:3 75:14 | **probably** 9:15,22 14:20 15:16 | 56:19 | **read** 69:1 99:19 103:2 104:6,7,9 104:10,12,13,15 104:16,18,19,21 | 102:10 |

**referred** 57:6,13 64:13 79:14
**referring** 7:13 12:10 28:3 30:2 52:12 60:1 61:10 64:18,21 64:21 67:3,14 68:19,20 75:20 100:11
**reflect** 65:2
**reflected** 63:4
**regard** 9:21 30:12 36:18 45:22
**regarding** 7:10,18 14:25 17:15,19 17:24 24:25 29:15 37:10,11 37:14 66:23 99:6
**Registered** 3:19 102:5
**regular** 43:18
**reimburse** 44:2 44:10,11
**reimbursement** 44:20
**related** 51:9 102:12
**relates** 68:14
**relating** 35:23 57:1 76:13 81:6
**relation** 19:8
**relations-related** 9:1
**relationship** 10:15 70:17
**relative** 102:14
**release** 45:3
**relevant** 32:18
**relied** 74:1
**remainder** 50:20
**remaining** 62:1
**remedying** 22:16
**remember** 14:3 16:11 17:4,8 19:6,18 36:19 36:21 37:9 52:23 53:1 77:13 78:21 80:17
**removed** 95:20
**removing** 96:2
**render** 103:5
**repeat** 60:22 71:16 74:10
**rephrase** 43:14
**reported** 84:25 86:13 87:23

88:6 91:23 92:8 95:24 96:12,23 97:13 98:14,24
**Reporter** 3:18,20 4:21 5:5 99:13 99:18,22 102:1 102:4,5 104:22
**reporting** 48:19
**reports** 85:1 89:15 91:16
**represent** 8:24 53:22 65:22 66:12 77:20 78:14 86:2 91:2 91:8 94:9,12 95:16 96:6 98:17
**representation** 54:9 55:23 71:7 72:24 94:20
**represented** 95:22
**representing** 28:21
**reputation** 11:7
**request** 21:6 50:18 77:4,16 78:8,8,19 80:15 81:1,11 83:7,18 84:2,3 101:4
**requested** 81:1 86:11
**requests** 2:17 68:3
**required** 69:18 72:23
**respect** 94:24
**respond** 75:9
**response** 19:13 35:12 52:6,17 66:24 67:10,14 68:16 76:3 78:18 81:7 83:9 84:3,5
**responses** 49:25 50:6,18 78:1,4 83:21
**responsive** 76:16
**rest** 54:20
**restate** 48:17
**retire** 6:24
**retired** 6:12 7:1
**return** 86:11
**revealed** 82:23
**review** 7:9,17,17 8:5 37:21,24,25 38:4,10 50:17 53:13

**reviewed** 8:10 13:11 37:21
**reviewing** 14:19
**right** 9:24 12:20 16:7 17:10 18:22 19:3 21:4 22:7 23:3 27:14 27:23 40:18,23 42:24 55:25 63:23 79:14 82:9 84:22 93:16
**ringing** 79:1
**rise** 21:3
**Robbins** 53:6
**Robert** 1:12 3:12 5:3,10,17 70:8 103:1 104:2
**room** 22:23 28:19
**roster** 30:19
**Rottler** 6:20,22,23 6:23 9:14 10:6 100:16
**routine** 34:22,23
**RPR** 1:14 4:22 102:22
**RSMo** 100:21
**running** 7:2 8:12 64:8

---

**S**

**S** 4:1 8:8
**S-C-H-W-E-I-S-S** 16:3
**S-O-L-T-Y-S** 15:22
**safe** 57:12
**sake** 13:14
**sample** 19:5
**satisfied** 61:16 68:10
**save** 32:2 92:3
**saved** 31:11,24
**saying** 29:20 65:10 75:2 81:8 93:1 97:9
**says** 5:12 21:3 22:21 25:2 39:10 40:21 42:21 50:3 51:6 52:6 61:22 76:8 83:9 85:3 86:13 86:16,25 87:2 88:9,14 89:11 89:17 90:5 92:21
**scan** 31:8,10,11

31:15,16
**scenario** 44:3
**scheduled** 18:17 34:13
**school** 6:2 13:25 14:2 31:7
**Schweiss** 15:21 16:5,18 17:5
**scoping** 50:21
**screaming** 8:3
**screen** 33:11,13 33:14,24 81:2
**screenshots** 81:1
**search** 68:6
**second** 17:12 51:2,4,13 92:2 97:3,6,11 98:5
**second-guess** 39:18
**secretary** 59:11 59:15
**secretary's** 30:17 33:8
**Section** 101:1
**securing** 54:7
**see** 24:10 26:13 26:14 40:19 45:25 49:13 76:12 82:2,5,10 82:17
**seeing** 37:9,13
**seeking** 67:8,11
**seeks** 29:4
**seen** 13:9 26:1 33:18 36:16,19 36:24 37:6 42:14 58:8,10 60:18,20,23,25 68:23 78:1
**sees** 40:23
**sell** 10:11
**seminars** 15:3
**send** 20:23 21:5 21:22 25:1 41:8 43:10 52:8 71:1
**sending** 15:3 42:1 45:2 56:11
**sense** 29:17 97:8
**sent** 21:20 78:20 83:12 100:16
**separate** 12:15,16 31:3 48:14 86:22
**September** 53:7 54:1 55:9 57:5 87:21 89:14
**server** 52:9

**service** 22:9 62:24 80:4 85:19 88:1 89:23 92:21
**set** 2:7 10:16 11:19 31:2 50:1 68:20 100:13
**sets** 21:2
**seven** 41:24
**sheet** 92:22 97:20 104:1
**sheets** 98:17
**shortcomings** 100:8
**shorthand** 5:4
**shortly** 16:24
**shoulder** 22:20
**show** 17:12 22:9 22:13,13 25:14 42:12,13,14 45:14 77:7 86:5 94:18
**showing** 79:5
**shows** 41:7 45:21
**side** 66:6 84:22 87:17
**sign** 21:22 23:12 37:22 38:21 53:13 56:8,9,13 77:16
**signature** 5:6 50:13,15,16 53:9,10,11 55:16,17,18,19 55:21,25 56:18 77:7 84:18,18 87:12 88:22,24 99:13
**signed** 23:17 37:21 53:24 56:21 57:10 79:22
**signifies** 55:21
**signing** 38:23 55:22
**signs** 23:15
**silos** 46:24 47:1
**similar** 40:1
**Singer** 6:8
**sir** 5:15
**sit** 36:22 70:19
**sit-downs** 18:4
**sitting** 15:4
**situation** 18:25 38:22
**six** 41:23
**skipping** 63:20

**slip** 33:7
**small** 8:18 11:9 39:13
**software** 81:3 82:1,3
**solo** 5:23 6:14 7:3 8:12 11:18
**Soltys** 15:22 16:23
**solve** 17:2
**someone's** 34:2
**sorry** 7:22 48:17 49:23 52:25 60:22 61:7 79:2 90:23
**sort** 17:20 18:6 23:18
**sound** 97:24
**sounded** 32:24,25
**sounds** 83:22
**South** 3:14 4:4,23
**speaks** 61:20
**special** 40:2
**specific** 6:8 13:13 20:11 33:21 35:9 36:23 48:23 59:16 60:18 68:23 75:19
**specifically** 17:8 28:3 37:9 39:12 68:14 99:8
**specifics** 7:14 24:25 80:5
**speculating** 97:1
**spell** 16:2
**spelled** 62:25
**spits** 48:1
**spoke** 14:19 30:6 59:11
**sporadically** 14:21
**spreadsheet** 47:25
**St** 3:15 4:5,10,23 6:3,5
**stamp** 66:4
**stand** 57:20
**standard** 20:24 27:9 52:16
**start** 5:9 8:3 13:17 15:6 21:11 28:17 30:21 69:21 89:9
**started** 9:15
**state** 3:19 36:15 60:10 61:10 64:8 65:12

66:25 67:10,15 70:2 74:14 76:12 77:16,23 102:4,23
**stated** 69:4 87:12 88:21 95:1
**statement** 37:8 83:10
**states** 1:1 3:1,21 56:24 60:7 64:4 67:6 68:13 74:20 78:9 83:7 83:18 85:9,20 86:14 87:18 88:2,12 89:20 89:23,24 90:3,8
**stating** 5:15 20:24 66:19
**statute** 60:25 61:1 61:9,14,20,22 67:20 68:22,25 69:2,6,9,12,13 69:20 72:1 73:7 75:19
**statutes** 12:8,10 12:11,12,15 17:25 63:11
**statutory** 60:10 61:11 68:17,18
**stayed** 8:16
**Ste** 6:11,15 8:17 10:25 39:10
**stenographer** 16:1 73:3
**step** 13:2,2 21:6,9
**step-by-step** 12:23,25 36:13 36:20 37:10,13 84:23
**step-by-steps** 36:16
**Stephanie** 15:22 16:22,23
**steps** 20:2,19
**STIPULATED** 5:1
**stipulation** 53:24
**stop** 38:23
**storage** 28:19
**straight** 25:5
**streamlines** 50:25
**stub** 64:22
**stuff** 19:17 25:18 28:18
**subfolders** 31:23
**subject** 26:4
**submit** 66:21
**subscribe** 103:8

**subscribing** 104:4
**subsequent** 7:19 8:6 58:8
**substance** 103:4
**subtract** 94:14
**suggesting** 93:16
**Suite** 3:15 4:4,10 4:23
**sum** 41:9,22,24
**summaries** 30:5
**summary** 60:7 64:4 75:23
**summation** 97:20 98:16
**summons** 52:8 80:3
**supplement** 83:9 83:15 84:8
**supplementation** 84:2
**support** 76:10
**supposed** 22:14 45:12 72:12 75:2
**sure** 9:19,23 11:22 13:2,15 18:8 22:21 24:1 28:5,9,11 30:25 34:9 36:9,15 38:1,17 40:17 44:16 48:3 62:14 65:9 66:14 72:8 93:18 94:4 100:3,10
**surprise** 28:11
**surprised** 37:5
**sworn** 3:13 5:11 77:7
**system** 20:8 24:19 25:16,20 30:5,9,22,23 31:3 33:4,17 35:2 41:17 45:13,23 46:6 46:20 49:5 62:2 62:13 64:9,12 64:13 74:20 81:3,12,14 82:7 82:11,25 86:21 92:18

---

**T**

**tab** 42:20
**tabulate** 29:24
**tabulation** 101:6

**tacked** 47:11
**take** 7:6 26:19 27:8 33:10 44:12 63:22,23 84:23 90:20,21 97:14 98:1 99:16
**taken** 1:12 5:4 81:21 102:9,14
**takes** 50:19
**talk** 7:14 22:12 33:21 82:19
**talked** 63:2 76:6 76:18 99:2
**talking** 15:2,4,15 16:7 22:11,15 24:24 44:21 59:3 71:22 72:25 99:4
**task** 66:9
**tasked** 29:15 32:20
**tasks** 10:8,8
**tear** 41:21
**tell** 18:12 20:25 21:1 23:16 24:1 46:18 56:21 68:18 69:2
**term** 47:3 71:17
**terms** 23:9 30:20
**Terry** 6:22 7:1
**testimony** 99:6 102:6,8
**Thank** 16:4 49:17 76:21
**Thankfully** 9:2
**Thanks** 52:4
**thereon** 103:7
**thereto** 102:16 104:4
**thing** 11:9 18:6 19:19 20:23 23:18 39:12 45:10 46:3 66:1 71:22 94:19
**things** 9:16 21:14 31:4,24 38:24 39:2 46:19 72:20 73:8,19 73:24,25 75:12 75:15 80:23
**thingy** 86:9
**think** 11:8 15:25 16:12 18:7 35:19 44:1 46:10,11,13,17 47:17 48:3 50:17 55:20

68:1 69:5,12 70:14 73:4,6 82:13 84:4 85:23 86:1,4 92:3 95:5,8
**third** 98:8,9,24
**third-party** 31:3
**thought** 41:5 45:10
**three** 14:10 29:17 41:19 51:14,15 52:12,15,24 53:2 55:14 56:14,22 64:23 65:4,6 84:13 91:4 96:5 100:15,18
**time** 5:9 8:2 13:16 14:2 16:10,25 19:20 20:19 21:13 26:24 32:11 34:13 36:10,19,21 41:10 46:15 54:6 56:21 58:9 58:17 63:8 64:14 76:14 80:16 88:21 92:21 93:25 99:3
**times** 44:24 59:1 59:4,5 85:17
**titled** 31:17
**today** 13:14 14:5 15:9 16:8 17:6 76:4,15 78:1 83:22 99:2,7
**today's** 7:5 83:15
**top** 31:22 39:10
**top's** 27:15
**topics** 37:7
**tossing** 28:17
**total** 38:17 60:8 64:8 85:18 86:25 88:12 90:8 95:24
**totaling** 96:1
**town** 8:19 9:3 11:9
**track** 25:11 30:24 46:20 48:9,15 82:11
**tracked** 45:19 48:6,7,14
**tracking** 36:8 46:2
**tracks** 25:6 46:15 46:22

| | | | | |
|---|---|---|---|---|
| **traffic** 61:6 | **United** 1:1 3:1,20 | **Watters** 4:9 | **working** 8:17 | 3:4 7:7 |
| **training** 14:24 | **unknown** 76:3 | **way** 10:9 11:1 | 32:10 69:10 | **1:48** 95:10 |
| 17:16,19,20 | **up-front** 48:10 | 12:5 19:19 | **worried** 24:3 | **1:57** 95:11 |
| **trainings** 15:3 | **upper** 41:7 | 29:22 33:16 | **wouldn't** 28:11 | **10** 4:23 85:23 86:3 |
| **transaction** 93:2 | **use** 25:12 30:23 | 36:8 41:4 46:2 | 37:5 43:10 | 92:21 |
| **transcribed** 5:6 | 41:16 72:1 81:3 | 49:8 50:20,24 | **writ** 85:20 88:1 | **10.85** 89:24 |
| **tried** 70:10 | **user** 34:5 | 56:15 62:3 | 89:23 | **100** 43:13 |
| **trigger** 35:17 | **uses** 24:20 | 63:20 69:14 | **write** 30:16 44:13 | **101** 2:14 |
| **true** 71:5 103:5,10 | **usual** 10:9,9 | 70:15 80:11 | **writes** 27:4 | **10th** 97:5,21 |
| **truly** 48:25 | **usually** 10:22 | 86:9 98:7 99:6 | **written** 27:5 36:2 | **11** 60:6 61:11 |
| **try** 10:4 69:9,11 | 11:3 21:12 | **ways** 11:13 45:7 | 56:25 | **11.25** 91:14 92:1,9 |
| **trying** 13:24 22:6 | 23:21 | **we'll** 13:17 15:6 | **wrong** 9:25 31:21 | 92:22 93:6 |
| 22:7 23:3 73:9 | **utilize** 31:4 | 18:8 21:5 24:13 | 38:24,25 39:1,4 | 94:11,23 95:1 |
| **turn** 50:8,9 51:3 | **utilizing** 91:5 | 32:17 49:6 | 39:4,5,11 49:7 | 95:22 96:3 |
| 54:25 64:3 77:6 | | 80:23 90:21 | 69:6 72:17,17 | **11/4/2019** 97:21 |
| 84:11 88:17 | — **V** — | 91:11 | 72:18,18,19 | 98:18 |
| **Turning** 53:16 | **v** 1:4 3:4 | **we're** 14:17 16:7 | 73:16,17,17,18 | **11:32** 3:16 5:9 |
| 60:6 84:21 | **V.A.M.S** 2:12 | 22:11 24:22 | **wrote** 89:6 | **12** 64:3,4 66:25 |
| **twenty-five** 93:2 | **vacation** 56:12 | 25:3,24 29:11 | | 67:3 98:8 |
| **two** 13:23 14:3,6 | **variables** 47:7 | 29:12 30:11 | — **X** — | **12:58** 63:25 |
| 14:8,25 15:7,9 | **various** 9:10 | 31:6 35:20 | | **120** 4:10 |
| 15:10,12,16,17 | 13:11 | 44:21 70:14 | — **Y** — | **12th** 53:7 54:1 |
| 15:23,24 16:10 | **varying** 11:13 | 87:16 95:8 | **yeah** 9:10,23 | 57:4 89:14 |
| 21:13 41:19 | **vehicle** 7:23 | 100:10 | 16:13 17:11 | **13** 53:6 67:5 |
| 56:22 66:5 | **verification** 22:1 | **we've** 35:21 63:2 | 33:22 47:2 | **13th** 57:4 |
| 91:20 | 50:10 | 64:14,19 67:20 | 69:16 70:1 | **1400** 4:23 |
| **type** 9:16 12:23 | **verified** 21:24,25 | 68:10 76:6 | 77:19 83:16 | **15** 2:15 55:2 |
| 39:12 71:21 | 34:3 | 78:12 83:21 | 99:24 | 100:19 101:1 |
| **typed** 12:21 | **verify** 38:7 39:16 | 99:4 | **year** 9:20 43:16 | **150** 60:5 91:21 |
| **types** 8:19 | 95:17 | **weekly** 23:22 | **years** 6:8,9,13 | 96:9 |
| **typewriting** 5:6 | **versus** 7:20 8:8 | 33:25 | 8:17 12:24 | **16** 68:12 83:18 |
| 102:10 | 55:12 | **weeks** 99:18 | 13:11 14:20 | 100:24 |
| **typical** 10:13 | **view** 10:1 81:12 | **weird** 45:14 | 25:15 59:3,5 | **1692e** 2:15 101:1 |
| 38:10 | 81:14 | **well-known** 76:17 | 74:5 | **18** 1:13 |
| **typically** 13:1 | **viewing** 82:24 | **went** 6:4,7 7:15 | **yellow** 27:14 | **18.40** 89:20 |
| 21:16 31:24 | **violation** 73:5 | 33:2 50:5 57:7 | **yesterday** 66:7 | **18th** 3:13 55:11 |
| 39:20 77:15 | **visit** 59:8 | 91:9 | | 88:18 98:10,14 |
| | **Voytas** 3:14 4:3 | **white** 27:15 | — **Z** — | **19** 93:9 |
| — **U** — | **VS** 104:3 | **Whiting** 1:14 3:17 | **zero** 42:14,21 | **1984** 5:21,23,24 |
| **U.S.C.A** 2:15 | | 4:22 5:5 102:3 | | **1996** 9:15,18 |
| 101:1 | — **W** — | 102:22 104:22 | — **0** — | 11:12 14:20 |
| **Uh-huh** 49:18 | **wage** 42:7 | **whoever's** 27:4 | **0004** 84:15 | 73:22 |
| **ultimately** 33:9 | **wait** 24:10 42:3 | **willing** 81:24 | **0008** 87:9 | **19PR-AC00283** |
| **underlying** 7:10 | **waived** 5:7 | **Wisdom** 74:2 | **0012** 88:17 | 7:11 |
| 7:11 | **waiving** 76:12 | **wish** 99:5 | **0019** 92:8 93:7 | |
| **underreporting** | **walk** 5:22 32:16 | **withholding** | | — **2** — |
| 98:4,22 | 32:16 | 45:12 | — **1** — | **2** 2:8 13:2 16:22 |
| **understand** 32:19 | **walked** 13:10 | **witness** 5:7 75:25 | **1** 2:6 13:2 49:15 | 27:10 51:25 |
| **understanding** | **want** 5:25 31:13 | 99:16,19 102:6 | 49:16,25 50:3 | 52:2,10 54:15 |
| 35:8 61:22 | 63:11 90:20 | 102:9 104:2 | 100:14 | 57:7 78:8,9 |
| 63:10 67:19,21 | 92:1 100:2 | **Wolf** 4:9 | **1,016.61** 86:14 | 80:18 100:17 |
| 71:6,9 75:19 | **wanted** 8:21 | **word** 10:24 11:8 | 91:17,23 93:23 | **2,000** 88:7 |
| 84:24 93:3 | 31:14 77:10 | 72:1 98:1 | 96:12 | **2,050.47** 88:7 |
| 96:21 98:21 | **wanting** 92:3 | **work** 8:14,19 9:1 | **1,758.95** 89:16 | 97:13 |
| **understood** 35:19 | **warning** 24:21 | 9:1,3,4,5,10 | **1.25** 93:4 | **2,700.47** 97:22 |
| **unfortunately** | **wasn't** 18:13,13 | 10:18 51:8,9 | **1:04** 64:1 | **2,921.05** 98:20 |
| 7:25 87:16 | 66:15 75:17 | 68:5 | **1:22-cv-00140** 1:4 | **2/13/2020** 96:9 |

**2:04** 99:20
**2:06** 99:21
**2:07** 3:17 101:11
**20** 6:13 75:23
  103:13
**2015** 53:6,7,7 57:4
  57:4,5
**2018** 7:1,2
**2019** 20:12,15,16
  54:2 87:21
  89:14
**2020** 13:17,21,22
  13:24 14:3,5
  15:9,15,18,20
  16:12 17:18
  20:5,12 27:22
  55:10 59:19
  60:3 91:16 96:8
  96:10,11,24
**2021** 16:9,16
  55:10 66:3
  76:18 87:9,13
  97:4,5,12,21
  98:5
**2022** 16:24 17:9
  55:11 88:18
  98:10,14,18
**2023** 1:13 3:14
**21** 76:8 87:13
**21st** 53:7 55:10
  57:5 87:9 97:4
  97:12 98:5
**239.28** 98:13
**25** 8:17
**250** 32:19 91:20
**261.46** 97:5
**29th** 98:18
**2nd** 66:3

_____
**3**

**3** 2:10 27:10 52:1
  52:2 55:1 64:7
  65:5 81:1 84:12
  96:11 98:9
  100:20
**3/29/2022** 98:12
**30** 21:4 59:3
**30th** 16:16 55:10
  91:16 96:8,10
  96:11,24
**31** 21:12
**314)380-3166** 4:5
**314)421-0099**
  4:24
**31637** 66:3
**366.61** 91:12,14
  91:24 93:19

  94:5,11,24 95:1
  95:20 96:3,18
**37** 74:5

_____
**4**

**4** 2:11 55:2 60:14
  60:17 83:7
  100:19,22
**4,776.86** 90:4
  98:15
**400B** 3:15 4:4
**408.040** 2:12 61:2
  61:3 100:21
**453** 25:21
**48** 90:9
**49** 2:6

_____
**5**

**5** 2:2,13 51:4,6
  52:6,18 65:20
  65:21 100:25
**52** 2:8
**55** 2:10
**58** 100:25

_____
**6**

**6** 2:14 101:2
**6,372** 90:8
**60** 2:11
**600** 4:10 91:22
  93:24
**63017** 4:10
**63102** 4:23
**63125** 4:5
**634.73** 87:23
**636)798-0570**
  4:11
**65** 2:13
**650** 94:1,2,3 96:14
  97:23 98:3,4

_____
**7**

**7** 2:16 56:23 59:9
  59:18 60:2
  76:23,24 101:5
**7,697.91** 98:19
**7,953.80** 88:12
**7/30/2020** 84:15
**7321** 3:14 4:4
**750.11** 85:10
**76** 2:16

_____
**8**

**8** 2:18 87:8 90:16
  90:17 95:19
  97:17 101:7
**8.35** 85:20 86:6

**8.40** 88:2
**8/21/2020** 95:21
**830** 1:14 102:22
**830(MO)** 4:22
**8th** 59:19 60:3

_____
**9**

**9** 2:20 60:11 61:11
  85:14,17 95:14
  95:15 101:10
**9,102.99** 87:1
**9,351.14** 67:17
  85:2 87:18
  89:10
**9,365.75** 94:16
  96:1
**9,743.61** 95:1
**9/21/15** 2:9
**90** 2:18
**95** 2:20
**99** 43:4,11,17