**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI**

|  |  |
|---|---|
| **CONNIE ESSMYER,** | |
| Plaintiff, | |
| v. | Case No.   1:22-cv-00140-SNLJ |
| **HUELSKAMP LAW, LLC,** | |
| Defendant. | |

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT HUELSKAMP LAW, LLC'S
("HUELSKAMP") STATEMENT OF UNCONTROVERTED MATERIAL FACTS**</u>

1.     Plaintiff received medical care from Perry County Memorial Hospital ("Perry County") on or around 2014, for which she incurred debt. (See Plaintiff's deposition, pp. 12 – 14, attached as Exhibit A).

**RESPONSE ("R-SUMF 1"): Plaintiff Connie Essmyer ("Connie," "Plaintiff") admits SUMF 1.**

2.     Defendant, acting on behalf of Perry County, filed suit in the name of Perry County against Plaintiff on June 6, 2019, in Perry County, Missouri, Case No. 19PR-AC00283. (See Plaintiff's Complaint, ¶ 18; See Robert Huelskamp's Affidavit, attached as Exhibit B, ¶5).

**RESPONSE ("R-SUMF 2"): Plaintiff admits SUMF 2.**

3.     Plaintiff entered into a Consent Judgment and Stipulation which was signed by Plaintiff. (See Exhibit A, p. 15; Exhibit B, ¶6; Exhibit B(1)).

**RESPONSE ("R-SUMF 3"): Plaintiff admits SUMF 3.**

4.      Plaintiff and Defendant agreed that beginning November 1, 2019, Plaintiff would pay Defendant $250 each month until the judgment was satisfied. (See Exhibit A, pp. 13-15; Exhibit B, ¶7; Exhibit B(1)).

**RESPONSE ("R-SUMF 4"): Plaintiff admits SUMF 4.**

5.      The Consent Judgment and Stipulation stated that "in the event any payment is late or less than the agreed amount, Perry County retains the right to take all action authorized by law." (See Exhibit A, pp. 15-16; Exhibit B, ¶8).

**RESPONSE ("R-SUMF 5"): Plaintiff controverts and disputes SUMF 5. The Consent Judgment and Stipulation actually states that "In the event any payment is late or less than the agreed amount, Perry County Memorial Hospital retains the right to take all action authorized by law." (See Defendant's Exhibit A, pp. 15-16; *see also* Defendant's Exhibit B, ¶8)**

6.      The Court entered a Judgment for Perry County for the principal amount of $9,351.14 on September 12, 2019. (See Exhibit B, ¶9; Exhibit B(2)).

**RESPONSE ("R-SUMF 6"): Plaintiff admits SUMF 6.**

7.      Pursuant to the Consent Judgment, Plaintiff made two $250 cash payments to Defendant. (See Exhibit A, pp. 16 – 17 & 28 – 29; Exhibit B, ¶10; and proof of payment, attached as Exhibit C).

**RESPONSE ("R-SUMF 7"): Plaintiff admits SUMF 7.**

8.      On February 8, 2020, Plaintiff paid Defendant $150 through a money order. (See Exhibit A, pp. 17 – 18; Exhibit B, ¶10; and Exhibit C).

**RESPONSE ("R-SUMF 8"): Plaintiff admits SUMF 8. Defendant failed to attach Page 18 in its Exhibit A. Plaintiff has provided Connie's entire deposition as <u>Exhibit 1,</u> Essmyer Deposition.**

9.      Plaintiff is not aware of any document showing she paid more than $650 before the garnishments. (See Exhibit A, p. 17).

**RESPONSE ("R-SUMF 9"): Connie controverts and disputes SUMF 9 pursuant to FRCP 56(c)(1)(A).   Connie denies SUMF 9. Connie's exact response from the cited deposition and the cited page states that Connie could not personally show Defendant Huelskamp Law, LLC ("Defendant," "Huelskamp") anything indicating that she made additional payments before the garnishments:**

So before any garnishment was issued you're not aware of any document showing that you paid more than $650. Correct?

A   No. I mean, I'm -- I'm sure I did, but it's been a few years ago.

Q   You're sure you did what?

A   Made some personal payments without a garnishment.

Q   Before the garnishment?

A   Before.

Q   Okay. Outside of the three that I've told you about, are you aware of any -- can you -- can you show anything to me establishing that you've made additional payments?

A   No, I can't.

**Exhibit 1**, Essmyer Deposition, p. 17.

Furthermore, Defendant's own reporting of credits on the First Garnishment Application and Order shows that more than $650 in payments was received prior to the First Garnishment. Defendant indicated that Defendant received $1,016.61 in payments prior to the First Garnishment, discussed further in SUMF 13. **Exhibit 2**, First Garnishment; Defendant's Exhibit B(3).

10.     On July 30, 2020, Defendant filed its First Garnishment Application and Order. (See Exhibit B, ¶12, Exhibit B(3)).

**RESPONSE ("R-SUMF 10"): Plaintiff admits SUMF 10.**

11.     On May 21, 2021, Defendant filed its Second Garnishment Application and Order. (See Exhibit B, ¶12, Exhibit B(4)).

**RESPONSE ("R-SUMF 11"): Plaintiff admits SUMF 11.**

12.     On April 19, 2022, Defendant filed its Third Garnishment Application and Order. (See Exhibit B, ¶12, Exhibit B(5)).

**RESPONSE ("R-SUMF 12"): Plaintiff admits SUMF 12.**

13.     Plaintiff's payments to Defendant totaled $9,365.75 (See Exhibit A, pp. 28 – 34; Exhibit B, ¶14; and Exhibit C).

**RESPONSE ("R-SUMF 13"): Plaintiff controverts and disputes SUMF 13 pursuant to FRCP 56(c)(1)(A).  Connie denies SUMF 13.**

**In Connie's cited testimony, after Defendant's counsel goes through payments line-by-line on his own deposition exhibit used to calculate the alleged total of $9,365.75 in payments, the following line of questioning occurs:**

```
Q     And that comes to a total -- looking at
what we've marked as Exhibit D -- to $9,365.75.
Correct?
```

A    Yes.

Q    Okay.  And, ma'am, as you sit here today you can't tell me that you've paid more than $9,365.75.  Correct?

A    I don't know.

Q    You're not aware of any document showing that you've paid more than that.  Correct?

A    I don't know.

Q    The only documents that you have are the documents that we just went through.  Correct?

A    I -- what's in front of me.

Q    What's in front of you.  Correct?

A    I don't know.

Q    You would agree that the documents we just went over, the receipts we just went over, came to $9,365.75.  Correct?

A    Yes.

Q    Okay.  You watched me do the math.

A    Yes, I did.

**Exhibit 1, Essmyer Deposition, pp. 33–34.**

In the First Garnishment, Defendant reported $1,016.61 in credits, indicating that Defendant previously received $1,016.61 in payments from Connie. **Exhibit 2, First Garnishment. In Defendant's cited documents, which Defendant uses to calculate the**

**number, it displays two $250 cash payments, and a $150 money order payment received before the First Garnishment. <u>Defendant's Exhibit C</u>. This leaves $366.61 ($1,016.61 minus $650) that Defendant credited on the First Garnishment which is not accounted for in Defendant's $9,365.75 total. See <u>Exhibit 4</u>, Huelskamp Deposition, pp. 90–92 (further explaining this calculation). See also <u>Defendant's Exhibit C</u>.**

**Additionally, there was a payment reported of $11.25 on August, 21, 2020 which was not included in the numbers or documents used to calculate the total number of $9,365.75. <u>Exhibit 5</u>, Defendant's 0019. See <u>Defendant's Exhibit C</u>.**

14.    Plaintiff never looked at any of the three Garnishment Applications and Orders. (See Exhibit A, p. 20).

**RESPONSE ("R-SUMF 14"): Plaintiff controverts and disputes SUMF 14 pursuant to FRCP 56(c)(1)(A).  Connie denies SUMF 14. In Connie's deposition, she discusses going to her employer and to the courthouse to get more information about her garnishment but could not recall the exact document she received at the courthouse, which likely included the garnishment applications and orders.**

Q   Okay. Earlier you mentioned that you went to your company and to the courthouse. Correct?

A   **Yes.**

Q   What courthouse did you go to?

A   **Perryville.**

Q   Do you recall when that was?

A   **No, I don't.**

Q   Can you give me a year?

A   **I would say 2021.**

Q   You filed this Complaint in October of 2022.

A   **Yes.**

Q   Do you recall how far before that you went to the courthouse?

A   **I really don't.**

Q   Okay. And what did you do at the courthouse?

A   **What?**

Q   What did you do?

A   **What do you mean what I did -- what did I do?**

Q   Well, you went to the courthouse. Right?

A    Yes.

Q    For what purpose?

A    **To get information.**

Q    What kind of information?

A    **To my garnishment.**

Q    And -- and what information did you receive?

A    **Paperwork of -- showing what was paid so far.**

Q    And -- and what was that document?  Do you know?

A    No.

Q    And -- well, what did it tell you?

A    **Just -- it was kind of vague, really.**

Q    Okay.  That's -- that's all you can say, is that it was vague?

A    **Yes.**

Q    You can't tell me anything else it told you?

A    No.

**Exhibit 1, Essmyer Deposition, pp. 34-36.**

**Connie also recounted how she reached out to Defendant numerous times in person and over the phone to discuss the fact that the garnishment numbers were not adding up.**

Q    Okay.  When -- that -- that note that you handwrote earlier --

A    Yes.

Q    -- in 2020 --

A    Yes.

Q    -- did you deliver that personally to my client's office?

A    I'm not -- I'm sure I did.

Q    Okay.  Had you been -- have you visited with my client or his office since that date?

A    Yes.

Q    How many times?

A    Once.

Q    Okay.  Was that a phone call?  E-mail?  In

person?

A    In person.

Q    Okay.  And do you recall when that was?

A    Not exact date, no.

Q    How about an approximate date?

A    I'm going to say 2021, probably in June or July.

Q    June or July in 2021?

A    Yeah.  But I'm not for sure.

Q    And what was the purpose of going there?

A    To go over this garnishment and the payments being made.

Q    And who did you speak with?  Do you know?

A    That man right there (indicating).

Q    I'm sorry.  I wasn't -- say it again.  Who?

A    Mr. Huelskamp.

Q    Okay.  And you went into his office and talked to him?

A    Yes.

Q    And what was that conversation?  Can you tell me?

A    **It was to go over the payment of the garnishment that I was being garnished for.**

Q    And what -- can you tell me any specific conversation you had?

A    No.

Q    You can't tell me anything that Rob told you?

A    No.

Q    How long was the conversation?

A    **I don't -- I don't know.**

**Exhibit 1, Essmyer Deposition, pp. 37-38**

Q    In your Petition you claim that you reached out to his office multiple times.

When was that?

A    I don't remember.

Q    This was different --

A    I don't know.

Q    -- than the time you went in and talked to him?

A    I don't know.

Q    Well, it's your allegation.

A    Uh-huh.

Q    So is there any basis in that allegation?

A    Yeah.  There is basis in that allegation.

Q    Okay.

A    I did call.

Q    Okay.

A    Several times.

Q    And what number did you call from?

A    My cell phone.

Q    Okay.  And was this before or after your meeting in June or July of '21?

A    After.

Q     Okay.  And do you recall how long after?

A     A couple weeks.

Q     A couple weeks after the -- the meeting in June --

A     Yes.

Q     -- or July of '21?

A     Yes.

Q     Okay.  And what was the purpose of the follow-up?

A     To see if things -- anything was going to be done about it.

Q     Anything going to be done about what?

A     The things not adding up.

Q     Okay.  What do you mean by things?

A     The garnishment not adding up.

Q     In what way?

A     Just in the calculations that my husband and I did, they were not adding up.  And I went to his office to have a sit-down talk with him, him and my husband and I, and got nothing.

Q     Okay.  So this -- that was for the meeting in June or July of '21.  Right?

A     Yeah.  I'm not sure of the date, but there was a meeting.

Q     You and your husband went and tried to talk to Rob.  Correct?

A     Yes.

Q     And you can't tell me as you sit here today any conversation, specific conversation, you had with Rob.  Correct?

A     Other than it not adding up and -- no, I really can't.

**Exhibit 1**, Essmyer Deposition, pp. 38–40

And then -- then you follow up a few times later --

A    Yes.

Q    -- on -- attempt to call his office, I guess?

A    Yes.

Q    Okay.  How many times?

A    **Probably two or three.**

Q    Okay.  And that was within a couple weeks after the meeting?

A    **After the meeting, yes.**

Q    What was the purpose of the follow-up?

A    **To see if they were going to do any investigation on how much was this garnishment.**

**Exhibit 1**, Essmyer Deposition, p. 41.

As discussed further in Connie's interrogatory answers, after identifying that some sort of issue was arising with her garnishments, Connie was forced to hire counsel due to the numbers not adding up and her inability to get answers.

**ANSWER:**   On 9/12/19, Defendant obtained judgment in the amount of $9351.14 against Plaintiff.   The judgment bore 9% interest.   There were no taxed costs.   With no payment whatsoever from Plaintiff, the maximum interest accrual to 7/30/20 was $742.84.   Plaintiff did pay at least $1016.61 according to Defendant's own garnishment application dated 7/30/20.   On that form, Defendant's inability to perform basic math manifested for the first time, resulting in

significant errors in Defendant's favor.   On 7/30/20, via the garnishment form, Defendant reported to the court and Plaintiff that interest in the amount of $750.11.   In reality, Plaintiff's payments would have significantly paid down the principal amount of the judgment from 9/12/19 to 7/30/20.   Even if the entire $1,016.61 had been paid on 7/30/20, the very day of the garnishment application, accrued interest in the amount of $742.84 would be paid in its entirety and the principal amount of the judgment would be reduced by $273.77 to $9,077.37.   When the $8.35 service fee and $10 garnishment clerk fee surcharge are added to this amount, the maximum balance that could be due was $9,095.72.   As the bulk of the $1,016.61 would have been received far earlier than 7/30/20, more principal would have been paid off and the true balance is likely far lower than the maximum possible balance of $9,095.72.   Defendant Huelskamp, a debt collector regulated by the strict liability FDCPA, errantly reported the balance due as $9,102.99.   This is an error of at least $7.27 in Defendant's favor, and constitutes an amount that Plaintiff could not possibly have owed.   Between 8/4/20 and 5/10/21, Plaintiff paid, according to case.net records, a total of $2,271.05 to Defendant.   Because the maximum possible

balance owed on 7/30/20 was $9,095.72, the maximum possible interest that could have accrued (even without any interim payments, which of course Defendant received) by 5/21/21 was $661.06. Assuming that all of Plaintiff's $2,271.05 in payments were made on the latest possible day, 5/21/21, the date of Defendant's next garnishment application, the entirety of the $661.06 in accrued interest would have been paid in addition to $1,609.99 in principal repayments. The maximum balance due was $7,485.73 plus $8.40 for service fees and $10 for the garnishment fee surcharge, for a grand total maximum possible balance of $7,504.13 as of 5/21/21. Defendant's difficulty with math persisted through the garnishment application dated 5/21/21, where he credited only $2,050.47 in total payments despite the fact that Plaintiff had made at least

$1,016.61 + $2,271.05 = $3,287.66 in payments. Once again, Defendant made an egregious error in calculating the total balance due on the 5/21/21 garnishment form, wrongly reporting that Plaintiff still owed a total of $7,953.80, at least $449.27 more than Plaintiff could possibly have owed. The effect of these errors was that Plaintiff was paying hundreds of dollars in interest that she did not owe. Defendant's math errors continued, and were always in Defendant's favor. For example from 6/1/21 to 3/17/22, Defendant garnished $4,776.86 from Plaintiff. Thus, by 3/17/22, Plaintiff had paid Defendant a minimum total of $8,064.52. Plaintiff's HR records, which she is producing herewith, show that Plaintiff actually paid $8,147.66. If this is the true amount Plaintiff paid, Defendant's misstatements of the debt are even more egregious. If the maximum possible balance on 5/21/21 was $7,504.13, then the maximum interest that could have accrued by 4/19/22, the date of Defendant's next garnishment application, was $616.47 and the maximum debt balance could be $8,120.60 without any

payments.   Once again, assuming all payments were made on 4/19/2022, the $4,776.86 in payments would result in a maximum balance owed, after $10.85 in service fees and the $10 garnishment surcharge, of $3,364.59.  On the 4/19/22 garnishment form, Defendant falsely and fraudulently inflated this balance by thousands of dollars, claiming that Plaintiff owed $6,372.48. On this same garnishment form, Defendant added $18.40 in "post judgment costs" that were false and illusory.  Defendant never filed a bill of costs for any amount, and the circuit clerk never taxed any such costs in Defendant's favor.  Undeterred by the rules, the law, or the rules of professional conduct, Defendant simply added this $18.40 to Plaintiff's balance due because he thought nobody was watching.   Subsequently, Defendant garnished Plaintiff for another $1,667.84 according to case.net records.  Because costs, then interest, and then principal are paid down (in that order), Plaintiff paid Defendant for the illicit $18.40 in "post judgment costs" in addition to post-judgment interest that Plaintiff did not owe.  Plaintiff was forced to hire the undersigned counsel to try and quash the garnishment in 19PR-AC00283.  Fortunately, counsel was able to stop the garnishment.  For counsel's work in the state court case, Plaintiff is indebted to counsel for 2.7 hours of time at $450 per hour, totaling $1,215.

Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9.


15.    The Garnishment Applications and Orders did not alter any of Plaintiff's decisions with regard to the judgment at issue. (See Exhibit A, p. 43).

**RESPONSE ("R-SUMF 15"): Plaintiff controverts and disputes SUMF 15 pursuant to FRCP 56(c)(1)(A).  Connie denies SUMF 15. Connie's answer indicates not that Connie's decisions were not altered by the Garnishment Applications and Orders, but that Connie**

was unable to tell Defendant's counsel how the garnishment applications altered her decisions regarding the debt:

```
        Q    Okay.  In your -- well, strike that.
             As you sit here today you would agree that
   you can't tell me how the garnishment applications
   altered any of your decisions with regard to the
   debt at issue.  Correct?
        A    Correct.
```

**Exhibit 1**, Essmyer Deposition, p. 43.

Additionally, Connie has highlighted numerous ways that Defendant's garnishment applications and orders and connected garnishments have altered her decision making. In Connie's deposition, she discusses going to her employer and to the courthouse to get more information about her garnishment.

Q    Okay.  Earlier you mentioned that you went to your company and to the courthouse.  Correct?

A    Yes.

Q    What courthouse did you go to?

A    Perryville.

Q    Do you recall when that was?

A    No, I don't.

Q    Can you give me a year?

A    I would say 2021.

Q    You filed this Complaint in October of 2022.

A    Yes.

Q    Do you recall how far before that you went to the courthouse?

A    I really don't.

Q    Okay.  And what did you do at the courthouse?

A    What?

Q    What did you do?

A    What do you mean what I did -- what did I do?

Q    Well, you went to the courthouse.  Right?

A    Yes.

Q    For what purpose?

A    **To get information.**

Q    What kind of information?

A    **To my garnishment.**

Q    And -- and what information did you receive?

A    **Paperwork of -- showing what was paid so far.**

Q    And -- and what was that document?  Do you know?

A    **No.**

Q    And -- well, what did it tell you?

A    **Just -- it was kind of vague, really.**

Q    Okay.  That's -- that's all you can say, is that it was vague?

A    **Yes.**

Q    You can't tell me anything else it told you?

A    **No.**

**Exhibit 1, Essmyer Deposition, pp. 34–36.**

**Connie also recounted how she reached out to Defendant numerous times in person and over the phone to discuss the fact that the garnishment numbers were not adding up.**

Q    Okay. When -- that -- that note that you handwrote earlier --

A    Yes.

Q    -- in 2020 --

A    Yes.

Q    -- did you deliver that personally to my client's office?

A    **I'm not -- I'm sure I did.**

Q    Okay. Had you been -- have you visited with my client or his office since that date?

A    **Yes.**

Q    How many times?

A    **Once.**

Q    Okay. Was that a phone call? E-mail? In

person?

A     In person.

Q     Okay.  And do you recall when that was?

A     Not exact date, no.

Q     How about an approximate date?

A     I'm going to say 2021, probably in June or July.

Q     June or July in 2021?

A     Yeah.  But I'm not for sure.

Q     And what was the purpose of going there?

A     To go over this garnishment and the payments being made.

Q     And who did you speak with?  Do you know?

A     That man right there (indicating).

Q     I'm sorry.  I wasn't -- say it again.  Who?

A    Mr. Huelskamp.

Q    Okay.  And you went into his office and talked to him?

A    Yes.

Q    And what was that conversation?  Can you tell me?

A    **It was to go over the payment of the garnishment that I was being garnished for.**

Q    And what -- can you tell me any specific conversation you had?

A    No.

Q    You can't tell me anything that Rob told you?

A    No.

Q    How long was the conversation?

A    **I don't -- I don't know.**

**Exhibit 1, Essmyer Deposition, pp. 37–38**

Q    In your Petition you claim that you reached out to his office multiple times.

When was that?

A    I don't remember.

Q    This was different --

A    I don't know.

Q    -- than the time you went in and talked to him?

A    I don't know.

Q    Well, it's your allegation.

A    Uh-huh.

Q    So is there any basis in that allegation?

A    Yeah.  There is basis in that allegation.

Q    Okay.

A    I did call.

Q    Okay.

A    Several times.

Q    And what number did you call from?

A    My cell phone.

Q    Okay.  And was this before or after your meeting in June or July of '21?

A    After.

Q    Okay.  And do you recall how long after?

**A    A couple weeks.**

Q    A couple weeks after the -- the meeting in June --

**A    Yes.**

Q    -- or July of '21?

**A    Yes.**

Q    Okay.  And what was the purpose of the follow-up?

A    To see if things -- anything was going to be done about it.

Q    Anything going to be done about what?

A    The things not adding up.

Q    Okay.  What do you mean by things?

A    The garnishment not adding up.

Q    In what way?

A    Just in the calculations that my husband and I did, they were not adding up.  And I went to his office to have a sit-down talk with him, him and my husband and I, and got nothing.

Q    Okay.  So this -- that was for the meeting in June or July of '21.  Right?

A    Yeah.  I'm not sure of the date, but there was a meeting.

Q    You and your husband went and tried to talk to Rob.  Correct?

A    Yes.

Q    And you can't tell me as you sit here today any conversation, specific conversation, you had with Rob.  Correct?

A    Other than it not adding up and -- no, I really can't.

**Exhibit 1, Essmyer Deposition, pp. 38–40.**

And then -- then you follow up a few times later --

A    Yes.

Q    -- on -- attempt to call his office, I guess?

A    Yes.

Q    Okay.  How many times?

A    **Probably two or three.**

Q    Okay.  And that was within a couple weeks after the meeting?

A    **After the meeting, yes.**

Q    What was the purpose of the follow-up?

A    **To see if they were going to do any investigation on how much was this garnishment.**

**Exhibit 1, Essmyer Deposition, p. 41.**

As discussed further in Connie's interrogatory answers, there are numerous ways that the numbers were miscalculated and the calculations are very complex. To help make sense of it, Connie was forced to take action by hiring and becoming indebted to counsel to get the incorrect garnishments to stop. Connie's exact words are included below:

**ANSWER:**    On 9/12/19, Defendant obtained judgment in the amount of $9351.14 against Plaintiff.    The judgment bore 9% interest.    There were no taxed costs.    With no payment whatsoever from Plaintiff, the maximum interest accrual to 7/30/20 was $742.84.    Plaintiff did pay at least $1016.61 according to Defendant's own garnishment application dated 7/30/20.    On that form, Defendant's inability to perform basic math manifested for the first time, resulting in

significant errors in Defendant's favor.    On 7/30/20, via the garnishment form, Defendant reported to the court and Plaintiff that interest in the amount of $750.11.    In reality, Plaintiff's payments would have significantly paid down the principal amount of the judgment from 9/12/19 to 7/30/20.    Even if the entire $1,016.61 had been paid on 7/30/20, the very day of the garnishment application, accrued interest in the amount of $742.84 would be paid in its entirety and the principal amount of the judgment would be reduced by $273.77 to $9,077.37.    When the $8.35 service fee and $10 garnishment clerk fee surcharge are added to this amount, the maximum balance that could be due was $9,095.72.    As the bulk of the $1,016.61 would have been received far earlier than 7/30/20, more principal would have been paid off and the true balance is likely far lower than the maximum possible balance of $9,095.72.    Defendant Huelskamp, a debt collector regulated by the strict liability FDCPA, errantly reported the balance due as $9,102.99.    This is an error of at least $7.27 in Defendant's favor, and constitutes an amount that Plaintiff could not possibly have owed.    Between 8/4/20 and 5/10/21, Plaintiff paid, according to case.net records, a total of $2,271.05 to Defendant.    Because the maximum possible

balance owed on 7/30/20 was $9,095.72, the maximum possible interest that could have accrued (even without any interim payments, which of course Defendant received) by 5/21/21 was $661.06. Assuming that all of Plaintiff's $2,271.05 in payments were made on the latest possible day, 5/21/21, the date of Defendant's next garnishment application, the entirety of the $661.06 in accrued interest would have been paid in addition to $1,609.99 in principal repayments. The maximum balance due was $7,485.73 plus $8.40 for service fees and $10 for the garnishment fee surcharge, for a grand total maximum possible balance of $7,504.13 as of 5/21/21. Defendant's difficulty with math persisted through the garnishment application dated 5/21/21, where he credited only $2,050.47 in total payments despite the fact that Plaintiff had made at least

$1,016.61 + $2,271.05 = $3,287.66 in payments. Once again, Defendant made an egregious error in calculating the total balance due on the 5/21/21 garnishment form, wrongly reporting that Plaintiff still owed a total of $7,953.80, at least $449.27 more than Plaintiff could possibly have owed. The effect of these errors was that Plaintiff was paying hundreds of dollars in interest that she did not owe. Defendant's math errors continued, and were always in Defendant's favor. For example from 6/1/21 to 3/17/22, Defendant garnished $4,776.86 from Plaintiff. Thus, by 3/17/22, Plaintiff had paid Defendant a minimum total of $8,064.52. Plaintiff's HR records, which she is producing herewith, show that Plaintiff actually paid $8,147.66. If this is the true amount Plaintiff paid, Defendant's misstatements of the debt are even more egregious. If the maximum possible balance on 5/21/21 was $7,504.13, then the maximum interest that could have accrued by 4/19/22, the date of Defendant's next garnishment application, was $616.47 and the maximum debt balance could be $8,120.60 without any

payments.   Once again, assuming all payments were made on 4/19/2022, the $4,776.86 in payments would result in a maximum balance owed, after $10.85 in service fees and the $10 garnishment surcharge, of $3,364.59.  On the 4/19/22 garnishment form, Defendant falsely and fraudulently inflated this balance by thousands of dollars, claiming that Plaintiff owed $6,372.48. On this same garnishment form, Defendant added $18.40 in "post judgment costs" that were false and illusory.  Defendant never filed a bill of costs for any amount, and the circuit clerk never taxed any such costs in Defendant's favor.  Undeterred by the rules, the law, or the rules of professional conduct, Defendant simply added this $18.40 to Plaintiff's balance due because he thought nobody was watching.   Subsequently, Defendant garnished Plaintiff for another $1,667.84 according to case.net records.  Because costs, then interest, and then principal are paid down (in that order), Plaintiff paid Defendant for the illicit $18.40 in "post judgment costs" in

addition to post-judgment interest that Plaintiff did not owe.  Plaintiff was forced to hire the undersigned counsel to try and quash the garnishment in 19PR-AC00283.  Fortunately, counsel was able to stop the garnishment.  For counsel's work in the state court case, Plaintiff is indebted to counsel for 2.7 hours of time at $450 per hour, totaling $1,215.

**Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9.**

**Connie's decision to seek counsel in response to the mistaken garnishments is further supported by Attorney Richard Voytas' Declaration. Exhibit 14, Richard Voytas Declaration.**

16.    Plaintiff does not know how she was oppressed by Defendant's Garnishment Applications and Orders. (See Exhibit A, p. 43).

**RESPONSE ("R-SUMF 16"): Plaintiff controverts and disputes SUMF 16 pursuant to FRCP 56(c)(1)(A). Connie denies SUMF 16. To support this claim Defendant cites the following single question about how Connie *felt* oppressed and response in which Connie stated "I don't know" and Defendant asked no follow up questions:**

```
Q   Okay.  In your discovery you state that
you felt oppressed.

    In what way did you feel oppressed?
A   I don't know.
```

**Exhibit 1**, Essmyer Deposition, p. 43.

**Furthermore, Defendant's question mischaracterizes Connie's discovery response. The only question that mentions oppression in the discovery sent by Defendant is the following question:**

24.   PUNITIVE DAMAGES

Regarding your contention that Defendant's garnishment related actions were "knowing, willful, and intentional justifying the imposition of punitive damages," please provide any and all information/facts:

    a. supporting your claim that Defendants alleged wrongful garnishment was done intentionally;

    b. supporting your claim that Defendant was aware Plaintiff did not owe the amount being sought in the garnishments;

    c. supporting your claim that Defendant intended to cause injury to Plaintiff by garnishing her;

    d. supporting your claim that Defendant's purpose in filing the garnishment applications was to harass and oppress her;

**In Connie's response, Connie highlights the exact ways in which Defendant's calculations could not possibly be correct and the effect this had on her, forcing her to hire counsel in order to stop Defendant's improper garnishments:**

**ANSWER:** On 9/12/19, Defendant obtained judgment in the amount of $9351.14 against Plaintiff. The judgment bore 9% interest. There were no taxed costs. With no payment whatsoever from Plaintiff, the maximum interest accrual to 7/30/20 was $742.84. Plaintiff did pay at least $1016.61 according to Defendant's own garnishment application dated 7/30/20. On that form, Defendant's inability to perform basic math manifested for the first time, resulting in significant errors in Defendant's favor. On 7/30/20, via the garnishment form, Defendant reported to the court and Plaintiff that interest in the amount of $750.11. In reality, Plaintiff's payments would have significantly paid down the principal amount of the judgment from 9/12/19 to 7/30/20. Even if the entire $1,016.61 had been paid on 7/30/20, the very day of the garnishment application, accrued interest in the amount of $742.84 would be paid in its entirety and the principal amount of the judgment would be reduced by $273.77 to $9,077.37. When the $8.35 service fee and $10 garnishment clerk fee surcharge are added to this amount, the maximum balance that could be due was $9,095.72. As the bulk of the $1,016.61 would have been received far earlier than 7/30/20, more principal would have been paid off and the true balance is likely far lower than the maximum possible balance of $9,095.72. Defendant Huelskamp, a debt collector regulated by the strict liability FDCPA, errantly reported the balance due as $9,102.99. This is an error of at least $7.27 in

Defendant's favor, and constitutes an amount that Plaintiff could not possibly have owed. Between 8/4/20 and 5/10/21, Plaintiff paid, according to case.net records, a total of $2,271.05 to Defendant. Because the maximum possible balance owed on 7/30/20 was $9,095.72, the maximum possible interest that could have accrued (even without any interim payments, which of course Defendant received) by 5/21/21 was $661.06. Assuming that all of Plaintiff's $2,271.05 in payments were made on the latest possible day, 5/21/21, the date of Defendant's next garnishment application, the entirety of the $661.06 in accrued interest would have been paid in addition to $1,609.99 in principal repayments. The maximum balance due was $7,485.73 plus $8.40 for service fees and $10 for the garnishment fee surcharge, for a grand total maximum possible balance of $7,504.13 as of 5/21/21. Defendant's difficulty with math persisted through the garnishment application dated 5/21/21, where he credited only $2,050.47 in total payments despite the fact that Plaintiff had made at least $1,016.61 + $2,271.05 = $3,287.66 in payments. Once again, Defendant made an egregious error in calculating the total balance due on the 5/21/21 garnishment form, wrongly reporting that Plaintiff still owed a total of $7,953.80, at least $449.27 more than Plaintiff could possibly have owed. The effect of these errors was that Plaintiff was paying hundreds

of dollars in interest that she did not owe. Defendant's math errors continued, and were always in Defendant's favor. For example from 6/1/21 to 3/17/22, Defendant garnished $4,776.86 from Plaintiff. Thus, by 3/17/22, Plaintiff had paid Defendant a minimum total of $8,064.52. Plaintiff's HR records, which she is producing herewith, show that Plaintiff actually paid $8,147.66. If this is the true amount Plaintiff paid, Defendant's misstatements of the debt are even more egregious. If the maximum possible balance on 5/21/21 was $7,504.13, then the maximum interest that could have accrued by 4/19/22, the date of Defendant's next garnishment application, was $616.47 and the maximum debt balance could be $8,120.60 without any payments. Once again, assuming all payments were made on

4/19/2022, the $4,776.86 in payments would result in a maximum balance owed, after $10.85 in service fees and the $10 garnishment surcharge, of $3,364.59. On the 4/19/22 garnishment form, Defendant falsely and fraudulently inflated this balance by thousands of dollars, claiming that Plaintiff owed $6,372.48. On this same garnishment form, Defendant added $18.40 in "post judgment costs" that were false and illusory. Defendant never filed a bill of costs for any amount, and the circuit clerk never taxed any such costs in Defendant's favor. Undeterred by the rules, the law, or the rules of professional conduct, Defendant simply added this $18.40 to Plaintiff's balance due because he thought nobody was watching. Subsequently, Defendant garnished Plaintiff for another $1,667.84 according to case.net records. Because costs, then interest, and then principal are paid down (in that order), Plaintiff paid Defendant for the illicit $18.40 in "post judgment costs" in addition to post-judgment interest that Plaintiff did not owe. Plaintiff was forced to hire the undersigned counsel to try and quash the garnishment in 19PR-AC00283. Fortunately, counsel was able to stop the garnishment. For counsel's work in the state court case, Plaintiff is indebted to counsel for 2.7 hours of time at $450 per hour, totaling $1,215.

**Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9.**

17.     Plaintiff did not seek medical treatment for anxiety nor can she state how she felt anxious as a result of Defendant's Garnishment Applications and Orders. (See Exhibit A, pp. 43 – 44).

**RESPONSE ("R-SUMF 17"): Connie controverts and disputes SUMF 17 pursuant to FRCP 56(c)(1)(A).  Connie denies SUMF 17. While Connie did state that she did not seek medical treatment for anxiety, she also specifically explained how she felt anxious as a result of Defendant's actions and improper garnishments:**

Q    Going back a little bit.

There was -- I believe it was in -- you were estimating June or July of 2021 was when you went and spoke with Attorney Huelskamp --

**A    Yes.**

Q    -- in person, if I remember correctly.  Is that right?

**A    Yes.**

Q    And you were having, I believe, some trouble remembering the exact contents of what was said during that meeting.  Is that correct?

**A    Yes.**

Q    Did you ever in that meeting ask Mr. Huelskamp what amount you owed for the rest of this debt?

**A    Yes.**

Q    Was Mr. Huelskamp able to give you an amount that you owed?

A    No.

Q    Did he provide any reason why he couldn't provide you that amount?

A    No.

Q    Earlier Mr. Huelskamp's attorney brought up words like harassed, oppressed, and you said you really didn't know how to respond to how that had occurred in this case.

A    Right.

MR. HUNKINS:  Object to the form. Misstates her testimony.

Q    (By Mr. Christian) On the day that you did go and see Mr. Huelskamp in his office, regardless of when it was, why -- what was the impetus for you to go in that day and speak with him?

A    Because it'd been going on -- the garnishment had been going on for several years, and I -- and it was about time to be done.  And when my husband and I went there, it was obvious to us that it was not going to be done and the math didn't add up.  And, then, I was getting nowhere with Mr. Huelskamp because I guess he didn't care.  He actually said most people don't come in here and question this.

Q    And when you say the math didn't add up, did you have a sheet of paper that you were making notes on?

A    No.

Q    Or -- just for clarity, was the answer no to that?

A    Sorry, yes.  No.

Q    And so when you say the math didn't add up, where were you performing the math?

A    My husband was performing the math, I actually was not.

Q    Okay.

**Exhibit 1, Essmyer Deposition, pp. 48–49.**

Q    (By Mr. Hunkins) You incurred this debt as a result of services performed in 2014.  Correct?

A    I guess I did.

Q    Okay.  And during that whole time frame you weren't anxious or didn't have anxiety as a result of this outstanding debt, correct, dating back to 2014?

A    No.

Q    Okay.  It was only when you had to start paying that debt you started feeling anxious?

A  No.

Q  Did -- so you never felt anxious.  Right?

A  **Whenever I felt like it was not being done right, yeah, I started feeling anxious.**

Q  Okay.  And when was that?

A  **I can't remember the date.**

Q  Was that in July or -- or June or July of '21 when you met with him?

A  **I don't know.**

Q  Well, that's when you said you --

A  **I don't -- I don't know the dates.**

Q  That's when you said you started feeling like it wasn't adding up.  Right?

A  **I believe that's the date, but I'm not for sure.**

**Exhibit 1, Essmyer Deposition, pp. 54–55.**

In Defendant's Interrogatories, Connie was asked the following question about damages related to anxiety:

9.    DAMAGES

Describe Plaintiff's physical, psychological, financial, and/or emotional injuries caused by, exacerbated by, sustained in, or otherwise arising out of the Incident; specifically including, but not limited to – monetary loss, loss of use of funds, embarrassment, stress, and anxiety. For each such injury, please state:

    a.  The exact amount of money lost;

    b.  Any limitations experienced as a result of the damage;

    c.  Any diagnosis communicated to Plaintiff as to any damage and the date of such communication;

    d.  Any financial difficulties or hardships resulting from the damage;

**Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9.**

**Consistent with her deposition, Connie responded highlighting the same miscalculations provided previously, highlighting the numerous improper and incorrect calculation errors performed by Defendant and their effects on her:**

**ANSWER:**  On 9/12/19, Defendant obtained judgment in the amount of $9351.14 against Plaintiff.  The judgment bore 9% interest.  There were no taxed costs.  With no payment whatsoever from Plaintiff, the maximum interest accrual to 7/30/20 was $742.84.  Plaintiff did pay at least $1016.61 according to Defendant's own garnishment application dated 7/30/20.  On that form, Defendant's inability to perform basic math manifested for the first time, resulting in

significant errors in Defendant's favor.  On 7/30/20, via the garnishment form, Defendant reported to the court and Plaintiff that interest in the amount of $750.11.  In reality, Plaintiff's payments would have significantly paid down the principal amount of the judgment from 9/12/19 to 7/30/20.  Even if the entire $1,016.61 had been paid on 7/30/20, the very day of the garnishment application, accrued interest in the amount of $742.84 would be paid in its entirety and the principal amount of the judgment would be reduced by $273.77 to $9,077.37.  When the $8.35 service fee and $10 garnishment clerk fee surcharge are added to this amount, the maximum balance that could be due was $9,095.72.  As the bulk of the $1,016.61 would have been received far earlier than 7/30/20, more principal would have been paid off and the true balance is likely far lower than the maximum possible balance of $9,095.72.  Defendant Huelskamp, a debt collector regulated by the strict liability FDCPA, errantly reported the balance due as $9,102.99.  This is an error of at least $7.27 in Defendant's favor, and constitutes an amount that Plaintiff could not possibly have owed.  Between 8/4/20 and 5/10/21, Plaintiff paid, according to case.net records, a total of $2,271.05 to Defendant.  Because the maximum possible

balance owed on 7/30/20 was $9,095.72, the maximum possible interest that could have accrued (even without any interim payments, which of course Defendant received) by 5/21/21 was $661.06.  Assuming that all of Plaintiff's $2,271.05 in payments were made on the latest possible day, 5/21/21, the date of Defendant's next garnishment application, the entirety of the $661.06 in accrued interest would have been paid in addition to $1,609.99 in principal repayments.  The maximum balance due was $7,485.73 plus $8.40 for service fees and $10 for the garnishment fee surcharge, for a grand total maximum possible balance of $7,504.13 as of 5/21/21. Defendant's difficulty with math persisted through the garnishment application dated 5/21/21, where he credited only $2,050.47 in total payments despite the fact that Plaintiff had made at least

$1,016.61 + $2,271.05 =  $3,287.66 in payments.  Once again, Defendant made an egregious error in calculating the total balance due on the 5/21/21 garnishment form, wrongly reporting that Plaintiff still owed a total of $7,953.80, at least $449.27 more than Plaintiff could possibly have owed.  The effect of these errors was that Plaintiff was paying hundreds of dollars in interest that she did not owe.  Defendant's math errors continued, and were always in Defendant's favor.  For example from 6/1/21 to 3/17/22, Defendant garnished $4,776.86 from Plaintiff.  Thus, by 3/17/22, Plaintiff had paid Defendant a minimum total of $8,064.52.  Plaintiff's HR records, which she is producing herewith, show that Plaintiff actually paid $8,147.66.  If this is the true amount Plaintiff paid, Defendant's misstatements of the debt are even more egregious.  If the maximum possible balance on 5/21/21 was $7,504.13, then the maximum interest that could have accrued by 4/19/22, the date of Defendant's next garnishment application, was $616.47 and the maximum debt balance could be $8,120.60 without any

payments. Once again, assuming all payments were made on 4/19/2022, the $4,776.86 in payments would result in a maximum balance owed, after $10.85 in service fees and the $10 garnishment surcharge, of $3,364.59. On the 4/19/22 garnishment form, Defendant falsely and fraudulently inflated this balance by thousands of dollars, claiming that Plaintiff owed $6,372.48. On this same garnishment form, Defendant added $18.40 in "post judgment costs" that were false and illusory. Defendant never filed a bill of costs for any amount, and the circuit clerk never taxed any such costs in Defendant's favor. Undeterred by the rules, the law, or the rules of professional conduct, Defendant simply added this $18.40 to Plaintiff's balance due because he thought nobody was watching. Subsequently, Defendant garnished Plaintiff for another $1,667.84 according to case.net records. Because costs, then interest, and then principal are paid down (in that order), Plaintiff paid Defendant for the illicit $18.40 in "post judgment costs" in

addition to post-judgment interest that Plaintiff did not owe. Plaintiff was forced to hire the undersigned counsel to try and quash the garnishment in 19PR-AC00283. Fortunately, counsel was able to stop the garnishment. For counsel's work in the state court case, Plaintiff is indebted to counsel for 2.7 hours of time at $450 per hour, totaling $1,215.

Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9.

Connie's decision to seek counsel in response to the mistaken garnishments is further supported by Attorney Richard Voytas' Declaration. Exhibit 14, Richard Voytas Declaration.

18.    Plaintiff does not have any evidence that Defendant knowingly, willfully, or intentionally intended to harm her. (See Exhibit A, p. 45).

**RESPONSE ("R-SUMF 18"): Plaintiff controverts and disputes SUMF 18 pursuant to FRCP 56(c)(1)(A).   Connie denies SUMF 18. Defendant bases this fact on a single**

**question in which Connie answered "I don't know" and Defendant's counsel asked no follow up questions.**

Do you have any evidence that my client knowingly, willingly, or intentionally -- strike that.

Do you have any evidence that my client knowingly, willfully, or intentionally intended to harm you with respect to this debt?

A    I don't know.

**In responding to Defendant's interrogatories, when answering a question about Defendant's "knowing, willful, and intentional" actions, Connie answered as follows once again pointing to the numerous blatant miscalculations and how they affected her:**

24.    PUNITIVE DAMAGES

Regarding your contention that Defendant's garnishment related actions were "knowing, willful, and intentional justifying the imposition of punitive damages," please provide any and all information/facts:

    a.  supporting your claim that Defendants alleged wrongful garnishment was done intentionally;

    b.  supporting your claim that Defendant was aware Plaintiff did not owe the amount being sought in the garnishments;

    c.  supporting your claim that Defendant intended to cause injury to Plaintiff by garnishing her;

    d.  supporting your claim that Defendant's purpose in filing the garnishment applications was to harass and oppress her;

**Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 24.**

**In Connie's response, Connie highlights the exact ways in which Defendant's calculations could not possibly be correct, which forced her to hire counsel in order to stop Defendant's improper garnishments:**

ANSWER: On 9/12/19, Defendant obtained judgment in the amount of $9351.14 against Plaintiff.   The judgment bore 9% interest.   There were no taxed costs.   With no payment whatsoever from Plaintiff, the maximum interest accrual to 7/30/20 was $742.84.   Plaintiff did pay at least $1016.61 according to Defendant's own garnishment application dated 7/30/20.   On that form, Defendant's inability to perform basic math manifested for the first time, resulting in significant errors in Defendant's favor.   On 7/30/20, via the garnishment form, Defendant reported to the court and Plaintiff that interest in the amount of $750.11.   In reality, Plaintiff's payments would have significantly paid down the principal amount of the judgment from 9/12/19 to 7/30/20.   Even if the entire $1,016.61 had been paid on 7/30/20, the very day of the garnishment application, accrued interest in the amount of $742.84 would be paid in its entirety and the principal amount of the judgment would be reduced by $273.77 to $9,077.37.   When the $8.35 service fee and $10 garnishment clerk fee surcharge are added to this amount, the maximum balance that could be due was $9,095.72.   As the bulk of the $1,016.61 would have been received far earlier than 7/30/20, more principal would have been paid off and the true balance is likely far lower than the maximum possible balance of $9,095.72.   Defendant Huelskamp, a debt collector regulated by the strict liability FDCPA, errantly reported the balance due as $9,102.99.   This is an error of at least $7.27 in

Defendant's favor, and constitutes an amount that Plaintiff could not possibly have owed. Between 8/4/20 and 5/10/21, Plaintiff paid, according to case.net records, a total of $2,271.05 to Defendant. Because the maximum possible balance owed on 7/30/20 was $9,095.72, the maximum possible interest that could have accrued (even without any interim payments, which of course Defendant received) by 5/21/21 was $661.06. Assuming that all of Plaintiff's $2,271.05 in payments were made on the latest possible day, 5/21/21, the date of Defendant's next garnishment application, the entirety of the $661.06 in accrued interest would have been paid in addition to $1,609.99 in principal repayments. The maximum balance due was $7,485.73 plus $8.40 for service fees and $10 for the garnishment fee surcharge, for a grand total maximum possible balance of $7,504.13 as of 5/21/21. Defendant's difficulty with math persisted through the garnishment application dated 5/21/21, where he credited only $2,050.47 in total payments despite the fact that Plaintiff had made at least $1,016.61 + $2,271.05 = $3,287.66 in payments. Once again, Defendant made an egregious error in calculating the total balance due on the 5/21/21 garnishment form, wrongly reporting that Plaintiff still owed a total of $7,953.80, at least $449.27 more than Plaintiff could possibly have owed. The effect of these errors was that Plaintiff was paying hundreds

of dollars in interest that she did not owe. Defendant's math errors continued, and were always in Defendant's favor. For example from 6/1/21 to 3/17/22, Defendant garnished $4,776.86 from Plaintiff. Thus, by 3/17/22, Plaintiff had paid Defendant a minimum total of $8,064.52. Plaintiff's HR records, which she is producing herewith, show that Plaintiff actually paid $8,147.66. If this is the true amount Plaintiff paid, Defendant's misstatements of the debt are even more egregious. If the maximum possible balance on 5/21/21 was $7,504.13, then the maximum interest that could have accrued by 4/19/22, the date of Defendant's next garnishment application, was $616.47 and the maximum debt balance could be $8,120.60 without any payments. Once again, assuming all payments were made on

4/19/2022, the $4,776.86 in payments would result in a maximum balance owed, after $10.85 in service fees and the $10 garnishment surcharge, of $3,364.59. On the 4/19/22 garnishment form, Defendant falsely and fraudulently inflated this balance by thousands of dollars, claiming that Plaintiff owed $6,372.48. On this same garnishment form, Defendant added $18.40 in "post judgment costs" that were false and illusory. Defendant never filed a bill of costs for any amount, and the circuit clerk never taxed any such costs in Defendant's favor. Undeterred by the rules, the law, or the rules of professional conduct, Defendant simply added this $18.40 to Plaintiff's balance due because he thought nobody was watching. Subsequently, Defendant garnished Plaintiff for another $1,667.84 according to case.net records. Because costs, then interest, and then principal are paid down (in that order), Plaintiff paid Defendant for the illicit $18.40 in "post judgment costs" in addition to post-judgment interest that Plaintiff did not owe. Plaintiff was forced to hire the undersigned counsel to try and quash the garnishment in 19PR-AC00283. Fortunately, counsel was able to stop the garnishment. For counsel's work in the state court case, Plaintiff is indebted to counsel for 2.7 hours of time at $450 per hour, totaling $1,215.

**Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 24.**

19.     Defendant was authorized by RSMo. 408.040 to assess a statutory interest rate of nine (9) percent per annum on Plaintiff's judgment. (See Exhibit B, ¶15).

**RESPONSE ("R-SUMF 19"): Plaintiff controverts and disputes SUMF 19 pursuant to FRCP 56(c)(1)(A).  Connie denies SUMF 19. Whether Defendant was authorized to assess a statutory interest rate of nine percent per annum on Connie's judgment is based on the statute and not Defendant's own statement and legal conclusion provided in an affidavit. The statute does provide a nine percent interest rate under certain circumstances, and Defendant has not cited evidence to support this. Additionally, the statute states that "Postjudgment payments or credits shall be applied first to postjudgment costs, then to postjudgment interest, and then to the judgment balance." *See* Mo. Rev. Stat. § 408.040.**

20.     Plaintiff's last payment occurred on October 11, 2022. (See Exhibit B, ¶13, Exhibit C).

**RESPONSE ("R-SUMF 20"): Plaintiff admits SUMF 20.**

21.     Taking into consideration payments made, post-judgment costs, and post-judgment interest, Plaintiff had a remaining judgment balance of $2,321.46 as of her last payment on October 11, 2022. (See Exhibit B, ¶16).

**RESPONSE ("R-SUMF 21"): Plaintiff controverts and disputes SUMF 21 pursuant to FRCP 56(c)(1)(A). Connie denies SUMF 21. Defendant provides no mathematical support for his assertion regarding the judgment balance, supported solely by an**

uncorroborated affidavit. **Defendant's Exhibit B.** This figure is not supported by interrogatories, depositions, exhibits, or produced documents.

Connie objects to SUMF 21, according to Federal Rule of Civil Procedure 56(b)(2), that the material cited cannot be presented in a form that would be admissible into evidence. Defendant Huelskamp lacks the personal knowledge required to establish foundation in accordance with Federal Rule of Evidence 602. Huelskamp has repeatedly demonstrated his lack of personal knowledge when it comes to even simple calculations related to Connie's debt. In his deposition, Huelskamp could not explain a single calculation on the garnishment forms. See **Exhibit 10** excerpts below.

Robert Huelskamp, owner of Defendant Huelskamp Law, LLC, signed and filed the First Garnishment without understanding from whence the numbers reported on the face of the garnishment came:

```
        So now I will turn to the documents that I
have labeled as Plaintiff's Exhibit Number 3, which
should be the three garnishments in this case.  I'll
begin with the garnishment that the front page is
Defendant's 0004 that has the date of 7/30/2020 on
it.
        You previously identified, Mr. Huelskamp,
that that is your signature in the signature block
of this garnishment.  Is that correct?
    A    Yes.
```

**Exhibit 10**, Robert Huelskamp Deposition, p. 84.

Q    The next number that is reported, it says less credits, and it states $1,016.61.  Is that correct?

A    That's what it says.

Q    And how would that number be calculated and input into the form?

A    I don't know.

Q    Is that a number that exists somewhere in the accounting system?  Is that -- is that a number that is kept in a separate document in your office?  How -- how would I know the credits on an account?

A    I don't know where that number came from.

Q    And at the bottom it says total due $9,102.99.  Is that correct?

A    That's what it says.

Q    And do you know where that number comes from?

A    I didn't do the math, so at this moment -- so I assume it's calculated based on those numbers above it.

**Exhibit 10**, Robert Huelskamp Deposition, pp.86–87.

Robert Huelskamp, owner of Defendant Huelskamp Law, LLC, signed and filed the Second Garnishment without understanding from whence the numbers reported on the face of the garnishment came:

Q    Okay.  I'm going to move now to it's 8, Defendant's 0008, which should be the May 21st, 2021 garnishment application.

And I believe, Mr. Huelskamp, that you previously stated that the signature that appears on this May 21, 2021 dated garnishment is yours.  Is that correct?

A    It is.

Q    And we're going to, unfortunately, go through the side numbers once again.  So as far as the judgment balance, that states $9,351.14.

Where did that number come from?

A    **It appears to be the judgment amount from the September 2019 judgment.**

Q    And the next item is post-judgment interest, and it is reported as $634.73.

Do you know where that number comes from?

A    **It's just -- no.**

Q     And for the service fee for this writ it states $8.40.

Based on your previous answer, is that the cost of mailing this by certified mail?

A     I would imagine.

Q     The next reported number on here is less credits of $2,000 -- excuse me -- $2,050.47.  Is that correct?

A     That's what it says.

Q     And where does this number come from?

A     I don't know.

Q     And under total due it states $7,953.80. Is that correct?

A     That's what it says.

Q     And what does that number come from?

A     I don't know.

**Exhibit 10**, Robert Huelskamp Deposition, pp.87–88.

Robert Huelskamp, owner of Defendant Huelskamp Law, LLC, signed and filed the Third Garnishment without understanding from whence the numbers reported on the face of the garnishment came:

Q   I'll, then, turn to Defendant's 0012, which is the April 18th, 2022 dated garnishment application.

And, Mr. Huelskamp, I believe, yet again, and for the last time, that you stated that the signature that appears on this garnishment application is yours.  Is that correct?

**A    It is my signature, yes.**

Q   On this document there are some

computer-entered numbers and some handwritten numbers.

Does that seem like a fair characterization?

A    Yes.

Q    Are -- is that your handwriting that wrote the numbers in that column?

A    It is not.

Q    Yet again, we will start with the judgment balance which reads $9,351.14.  Is that correct?

A    That's what it says.

Q    And where did that number come from?

A    It would be the judgment entered on September 12th, 2019.

Q    And for post-judgment interest it reports $1,758.95.  Is that correct?

A    That's what it says.

Q    And where does that number come from?

A    I don't know.

Q    For post-judgment costs it states $18.40. Where does that number come from?

A    I don't know.

Q    It next states service fee for this writ and it states $10.85.

Where does that number come from?

A    I would imagine that was the certified letter.

Q    And under less credits it states $4,776.86. Is that correct?

A    That's what it says.

Q    And where did that number come from?

A    I -- I didn't do it, so I don't know.

Q    And under total due it states $6,372 -- excuse me -- and 48 cents. Is that correct?

A    It does say that.

Q    And where does that number come from?

A    Again, I didn't calculate it, so I don't know.

**Exhibit 10**, Robert Huelskamp Deposition, pp.88–90.

**Furthermore, the $2,321.46 "judgment balance" alleged as fact by Defendant cannot be correct. Mo. Rev. Stat. § 408.040.1 requires that "Postjudgment payments or credits shall be applied first to postjudgment costs, then to postjudgment interest, and then to the judgment balance." Due to Huelskamp's repeated miscalculations as highlighted in Connie's response to Defendant's Interrogatory No. 9, and the exact date Huelskamp received and applied each garnishment payment from Connie is unknown, it is impossible to calculate the precise amount of interest and principal remaining due and owing.**

**However, it is possible to mathematically prove that Huelskamp did force Connie to pay interest which was never due or owed under the judgment, which further proves the inaccuracy of Defendant's alleged "judgment balance" of $2,321.46:**

**Mathematical Proof**

On September 12, 2019, Perry, represented by Huelskamp, obtained a debt collection judgment against Connie for $9,351.14. **Defendant's Exhibit B(2)**. The record reflects that Huelskamp did not file a bill of costs for the post judgment costs and a clerk did not tax costs in that amount. **Exhibit 6**, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. See publicly available docket of case no. 19PR-AC00283.

Huelskamp submitted the First Garnishment on July 30, 2020. **Exhibit 2**, First Garnishment. With no payment whatsoever from Connie, the maximum interest accrual from the date of the judgment to the July 30, 2020 First Garnishment was $742.84:



*See* **Exhibit 7**, First Interest Calculation.

Huelskamp, rather than reporting $742.84 in interest was due, reported to Connie and the court that interest had accrued in the amount of $750.11. **Exhibit 2**, First Garnishment. This mistake overstated the amount of interest owed and therefore overstated the debt amount. **Exhibit 2**, First Garnishment; **Exhibit 7**, First Interest Calculation. In addition to overstating the interest, Huelskamp also overstated the

principal amount that Connie owed. From September 12, 2019 to June 30, 2020 Connie's payments totaling $1,016.61 would have significantly paid down the principal amount of the judgment.  Exhibit 2, First Garnishment. This is because the maximum accrued interest of $742.84 was hundreds of dollars less than the $1,016.61 Connie paid.  Exhibit 2, First Garnishment; Exhibit 7, First Interest Calculation; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. Even if Connie had paid the entire $1,016.61 on July 30, 2020, the very day of the First Garnishment, accrued interest in the amount of $742.84 would be paid in its entirety and the principal amount of the judgment would be reduced by $273.77 to $9,077.37. Exhibit 2, First Garnishment; Exhibit 7, First Interest Calculation; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. When the $8.35 service fee and $10 garnishment clerk fee surcharge (both from Exhibit 3) are added to this amount, the maximum principal balance that could be due (and that could accrue interest) on July 30, 2020 was $9,095.72, not the $9,102.99 that Huelskamp reported on the First Garnishment. Exhibit 2, First Garnishment; Exhibit 7, First Interest Calculation; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. As the bulk of the $1,016.61 would have been received far earlier than July 30, 2020, more principal would have been paid off and the true balance is likely far lower than the maximum possible balance of $9,095.72. *Id.* Garnishment payments first pay down costs, then interest, and then finally principal.  Mo. Rev. Stat. § 408.040.

The First Garnishment was labeled as 20-GARN-935. See the garnishments tab of case no. 19PR-AC00283 and Exhibit 8, First Garnishment Payments. Between July 30, 2020, and May 24, 2021, Huelskamp garnished Connie's wages in the total amount of $2,271.05. Exhibit 8, First Garnishment Payments; Exhibit 6, Plaintiff's Interrogatory

Responses, at Interrogatory No. 9. Included in this amount Huelskamp collected from Connie were the overstated interest and principal amounts identified above. *Id.*

Huelskamp submitted the Second Garnishment (21-GARN-542) on May 21, 2021. Exhibit 9, Second Garnishment. See the garnishments tab of case no. 19PR-AC00283 and Exhibit 10, Second Garnishment Payments. The Second Garnishment did not include the previously paid $1,016.61 as a credit. Exhibit 9, Second Garnishment. At minimum, the Second Garnishment therefore overstated the total debt amount by $1,016.61. Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. In the Second Garnishment, Huelskamp credited Connie for $2,050.47—money that was garnished from Connie pursuant to the First Garnishment. Exhibit 8, First Garnishment Payments; Exhibit 9, Second Garnishment. In the Second Garnishment, Huelskamp listed the total balance as of May 21, 2021 as $7,953.80. Exhibit 9, Second Garnishment. Because the maximum possible balance owed on July 30, 2020 was $9,095.72 (*supra*), the maximum possible interest that could have accrued (even without any interim payments, which of course Huelskamp received) from July 30, 2020 to May 21, 2021 was $661.06:




*See* Exhibit 11, Second Interest Calculation.

Assuming that all of Connie's $2,271.05 in payments were made on the latest possible day, May 21, 2021, the date of the Second Garnishment, the entirety of the $661.06 in accrued interest would have been paid in addition to $1,609.99 in principal repayments. See the garnishments tab of case no. 19PR-AC00283 and Exhibit 10, Second Garnishment Payments; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. Therefore, the maximum balance due was $7,485.73 plus $8.40 for service fees and $10 for the garnishment fee surcharge, for a grand total maximum possible balance of $7,504.13 as of May 21, 2021. Exhibit 10, Second Garnishment Payments; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. Accordingly, the balance due that Huelskamp reported in the Second Garnishment of $7,953.80 is incorrect and overstates the true amount of the debt. Exhibit 11, Second Interest Calculation; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9.

In between the Second and Third Garnishments, Huelskamp garnished Connie for $4,776.86. Exhibit 3, Third Garnishment; Exhibit 10, Second Garnishment Payments. At least part of this $4776.86 would have gone to pay down the overstated principal amount of the debt, as garnishment payments first pay down costs, then interest, and then finally principal. Mo. Rev. Stat. § 408.040; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. By the conclusion of the Second Garnishment, Connie paid Huelskamp $8,064.52 ($4,776.86 + $2,271.05 + $1,016.61). Exhibit 2, First Garnishment; Exhibit 8, First Garnishment Payments; Exhibit 9, Second Garnishment; Exhibit 3, Third Garnishment; Exhibit 9, Second Garnishment Payments; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9.

Huelskamp submitted the Third Garnishment (22-GARN-533) on April 18, 2022. **Exhibit 3**, Third Garnishment. See the garnishments tab of case no. 19PR-AC00283 and **Exhibit 102**, Third Garnishment Payments. In the Third Garnishment, Huelskamp credited Connie for $4,776.86 in total payments. **Exhibit 3**, Third Garnishment. This misstates the true amount of Connie's payments by thousands of dollars. **Exhibit 2**, First Garnishment; **Exhibit 8**, First Garnishment Payments; **Exhibit 9**, Second Garnishment; **Exhibit 3**, Third Garnishment; **Exhibit 9**, Second Garnishment Payments; **Exhibit 6**, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. Huelskamp identified the post-judgment interest as being $1,758.95 in the Third Garnishment. **Exhibit 3**, Third Garnishment. Huelskamp's interest calculation was wrong by more than $1,000. **Exhibit 13**, Third Interest Calculation.  If the maximum possible balance on May 21, 2021 was $7,504.13, then the maximum interest that could have accrued by April 19, 2022, the date of Huelskamp's next garnishment application, was $616.47, not the $1,758.95 Huelskamp was reporting in the Third Garnishment:



*See* **Exhibit 13**, Third Interest Calculation.

With an interest amount of $616.47, the maximum debt balance would be $8,120.60 without any payments. Exhibit 13, Third Interest Calculation; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. Once again, assuming all of the $4,776.86 Huelskamp garnished from Connie between the Second and Third Garnishments was received on the date of the Third Garnishment, April 19, 2022, the maximum balance owed, after $10.85 in service fees and the $10 garnishment surcharge, would have been $3,364.59. Exhibit 13, Third Interest Calculation. In the Third Garnishment, Huelskamp inflated this balance by thousands of dollars, claiming that Connie owed $6,372.48. Exhibit 3, Third Garnishment. In the Third Garnishment, Huelskamp included $18.40 in post judgment costs. Exhibit 3, Third Garnishment. The record reflects that Huelskamp did not file a bill of costs for the post judgment costs and a clerk did not tax costs in that amount. Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. See publicly available docket of case no. 19PR-AC00283. Between May 23, 2022 and October 11, 2022, Huelskamp garnished Connie for an additional $1,667.84. Exhibit 12, Third Garnishment Payments. Because garnishment payments are first applied to costs and then interest, Connie paid the excessive interest and untaxed cost amounts discussed above. Mo. Rev. Stat. § 408.040; Exhibit 6, Plaintiff's Interrogatory Responses, at Interrogatory No. 9. By the Third Garnishment, Huelskamp was claiming that Connie owed about three thousand dollars more than Connie could have possibly owed.

These calculations mathematically prove that Huelskamp forced Connie to pay interest which was never due or owed under the judgment. It also highlights the impossibility of now calculating exactly how much Connie owed following her last payment. Furthermore, it shows that all these issues are the result of Huelskamp's repeated

**miscalculations and collecting amounts that were not owed and not categorizing or applying them correctly.**

**For Huelskamp to now state that he has an exact number for how much Connie owed following her last payment, with no supporting figures or calculations and which he conveniently seeks to use for the sake of his own legal argument, is nothing short of absurd.**

22.     Plaintiff filed this lawsuit on October 19, 2022. (See Exhibit A, pp 14).

**RESPONSE ("R-SUMF 22"): Plaintiff admits SUMF 22.**

Respectfully submitted,

**VOYTAS LAW, LLC**

By:     /s/ Richard A. Voytas, Jr.
Richard A. Voytas, Jr., #52046
David A. Weber, #70409
Caleb G. Christian, #70830
7321 S. Lindbergh Blvd., Ste. 400
St. Louis, MO  63125
Phone: 314.380.3166
Email: rick@voytaslaw.com
        david@voytaslaw.com
        caleb@voytaslaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically with the United States District Court for the Eastern District of Missouri, this 15th day of December, 2023, with notice of case activity generated and sent electronically to all counsel of record.

/s/ Richard A. Voytas, Jr.